2021 WL 2093692
Only the Westlaw citation is currently available.
United States District Court, D. Hawaiʻi.

Jon K. YAMADA, Plaintiff,
v.
UNITED AIRLINES, INC., John Does 1-5, Jane Does 1-5, Doe Corporations 1-5, Doe Partnerships 1-5, Doe Non-Profit Organizations 1-5, Doe Governmental Agencies 1-5, Defendants.

CIV. NO. 19-00551 LEK-KJM
|
Signed 05/24/2021

**Attorneys and Law Firms**

Charles H. Brower, Michael P. Healy, Honolulu, HI, for Plaintiff.

Eileen C. Zorc, Ronald Tang, Marr Jones & Wang, Honolulu, HI, for Defendant United Airlines, Inc.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Leslie E. Kobayashi, United States District Judge

**\*1** Before the Court is Defendant United Airlines, Inc.'s ("Defendant" or "United") Motion for Summary Judgment ("Motion"), filed on September 16, 2020. [Dkt. no. 29.] Plaintiff Jon K. Yamada ("Plaintiff") filed his memorandum in opposition to the Motion ("Memorandum in Opposition") on November 21, 2020, and Defendant filed its reply on November 27, 2020. [Dkt. nos. 41, 49.] This matter came on for hearing on December 11, 2020. On January 28, 2021, an entering order was issued informing the parties of this Court's ruling on the Motion. [Dkt. no. 56.] This Order supersedes that entering order. Defendant's Motion is hereby granted for the reasons set forth below.

### BACKGROUND

Plaintiff had been employed by United starting in 1989, and since 2013 as a Ground Service Equipment ("GSE") Technician in Honolulu. See Decl. of Jon K. Yamada ("Pltf.'s Decl."), filed 11/21/20 (dkt. no. 43), at ¶ 2. In Honolulu, Plaintiff typically worked with fellow technicians Jeff Magno ("Magno") and Wade Nakabayashi ("Nakabayashi"), and would sometimes act as the lead technician, which required him to plan, direct, coordinate, instruct, and delegate work to other technicians as instructed by his supervisor, Brian Wong ("Wong"). [Def.'s Concise Statement of Facts in Supp. of Motion for Summary Judgment ("CSOF"), filed 9/16/20 (dkt. no. 30), at ¶¶ 2-3; Pltf.'s response to Def.'s CSOF, ("Pltf.'s CSOF"), filed 11/21/20 (dkt. no. 42), at ¶¶ 2-3 (stating CSOF at ¶¶ 2-3 are undisputed).] The parties have identified three key events in Plaintiff's employment history with United that are particularly relevant to the current litigation.

To begin with, in or around June 2015, Plaintiff witnessed Nakabayashi showing a gun and ammunition to Magno while at work. [Pltf.'s Decl. at ¶ 6.] According to Plaintiff, he saw Nakabayashi holding the gun in its case, and overheard Nakabayashi tell Magno that he got the gun from a friend. [Id.] Although Plaintiff did not report the gun to anyone at that time, he later became aware that Magno told an individual named Brian Sugi about the incident, who in turn reported it to the Chief Steward for their union, Moki Kim ("Kim"). See CSOF, Decl. of Eileen C. Zorc ("Zorc Decl."), Exh. K (excerpts of Trans. of Oral and Videotaped Depo. of Jon K. Yamada, dated 7/30/20) at 146-47.[1] The record does not reveal any further action on the gun incident in 2015.

Next, on March 3, 2016, when Nakabayashi drove to a nearby automotive store to buy supplies for a repair project, Plaintiff and Magno followed him in a separate vehicle. [CSOF at ¶ 6; Pltf.'s CSOF at ¶ 6 (disputing CSOF at ¶ 6, but only as to why Plaintiff followed Nakabayashi).] Plaintiff explains that he had been acting as the lead technician that day, Nakabayashi had not told Plaintiff or anyone else why he was leaving, and he did not seek permission before leaving the work area. Therefore, Plaintiff followed him to find out where he was going. Furthermore, Plaintiff states that he was concerned about Nakabayashi because Nakabayashi had been under a lot of stress since his divorce in 2014. [Pltf.'s Decl. at ¶ 8.] The next day, Wong told Plaintiff that Nakabayashi had approached him and expressed that Plaintiff and Magno had followed him to the store, and that Nakabayashi felt threatened. Plaintiff explained to Wong why he had followed Nakabayashi, stating he had left without permission and Plaintiff was concerned about Nakabayashi's behavior and

## APPENDIX 4

stress level. Wong replied that he had spoken to Nakabayashi, and that he thought Nakabayashi seemed fine. [Id. at ¶¶ 9-10.]

**\*2** On March 5, 2016, Plaintiff called United's Human Resources Department with multiple concerns about Nakabayashi, including the June 2015 gun incident. [Id. at ¶¶ 11-12.] Around that time, Plaintiff also sent a letter to United Chief Executive Officer Oscar Munoz, voicing numerous complaints about working conditions, management decisions, Wong, discrimination, and other issues, but not the June 2015 gun incident. [Zorc Decl., Exh. R (letter from Plaintiff to Oscar Munoz, dated 3/8/16).]

While the investigation into the incident of Plaintiff following Nakabayashi was ongoing, Wong reported that Plaintiff and others were giving Nakabayashi the cold shoulder, and his suspicion that one of the GSE technicians had unplugged the computer Nakabayashi normally used. See CSOF, Decl. of Anhvu Ly ("Ly Decl."),[2] Exh. D (email from Wong to Ly and Jim Keating, dated 4/22/16). Wong warned Plaintiff that retaliation against Nakabayashi was prohibited. [Pltf.'s Decl. at ¶ 14.] Plaintiff told Wong that: Plaintiff did not turn off or unplug Nakabayashi's computer; Nakabayashi was distancing himself from the other workers; and Nakabayashi would sit by himself in the tool cage while everyone else worked. [Id. at ¶ 15.] On April 29, 2016, Plaintiff emailed Ly about the investigation, acknowledging that the time he followed Nakabayashi off the property had been viewed by some, including Kim and Ly, as harassment. [Zorc Decl., Exh. T (email from Plaintiff to Ly, dated 4/29/16) at PageID #: 390.] However, he told Ly that he was concerned about Nakabayashi's behavior, and complained about Kim, Wong, and how the conflict had been handled in the workplace. [Id.]

On May 24, 2016, Wong placed Plaintiff on an eighteen-month termination warning for failing to report seeing the gun, and for following Nakabayashi off the property. [Zorc Decl., Exh. S (Termination Warning letter addressed to Plaintiff from Wong, dated 5/24/16).] Magno received an eighteen-month termination warning for the same conduct. [Ly Decl., Exh. E (Termination Warning letter addressed to Magno from Wong, dated 5/24/16).] Nakabayashi received an eighteen-month termination warning for bringing the gun to work. [Id., Exh. F (Termination Warning letter addressed to Nakabayashi from Wong, dated 5/24/16).[3]] Also on May 24, 2016, Ly sent Plaintiff a letter indicating that the investigation had been closed, and reiterating that retaliation was prohibited. [Zorc Decl., Exh. V (letter from Ly to Plaintiff, dated 5/24/16).]

On June 8, 2016, Plaintiff sent an email to Charles Duncan, the Vice President of Maintenance at United at that time, stating that he believed he received the eighteen-month termination warning because of his March 8, 2016 letter to Oscar Munoz. See Zorc Decl., Exh. U (3/13/17 email from Plaintiff to Tin Shing Chao, forwarding an email addressed to Charles Duncan, signed by Plaintiff, dated 6/8/16). The email to Charles Duncan does not mention Plaintiff and Magno following Nakabayashi to the auto parts store. See id. Ly, along with Wong, GSE Maintenance Managing Director Ray Ames, GSE Maintenance Director Gary Dyer, and GSE Maintenance Senior Manager James Keating, flew to Honolulu and met with Plaintiff on August 30, 2016. [Ly Decl. at ¶ 11.] They discussed Plaintiff's history of not communicating or assigning work to Nakabayashi, counseled him that he was required to do so when acting as the lead technician, and reminded him that retaliation against Nakabayashi was prohibited. [Id.]

**\*3** The final event occurred on or around February 18, 2017, when Plaintiff drove a truck Nakabayashi was using from where it was parked at Gate 10 in the Airport Operations Area ("AOA") to the GSE workshop and parked it on the rooftop parking lot above the workshop, requiring Nakabayashi to walk back from the AOA. [Pltf.'s Decl. at ¶¶ 24-25; Ly Decl. at ¶ 14.] On February 25, 2017, Ly returned to Honolulu to investigate the incident. [Ly Decl. at ¶ 13.] Ly determined that the rooftop parking lot was not visible from ground level, the roof was the farthest in distance and took the longest to get to out of all the parking areas around the shop, and vehicles and equipment were usually parked on the side of the shop. [Id.] According to Plaintiff, he parked the truck on the roof because the usual parking area was congested with equipment. [Pltf.'s Decl. at ¶ 27.] However, Ly determined there was ample parking on the side of the shop, and inquired with Wong about whether the work logs indicated an unusually high volume of work on February 18, 2017 that would explain the alleged parking shortage. Wong reported to Ly that there was not an unusually high volume of work that day. Upon personally inspecting the roof, Ly did not find any company vehicles. [Ly Decl. at ¶ 13.]

On February 25, 2017, Ly, along with Wong and shop steward Wes Wakata ("Wakata"), interviewed Plaintiff. [Id. at ¶ 14.] Plaintiff explained that he spotted the truck while driving around the AOA looking for equipment with Magno, exited Magno's vehicle, and drove the truck to the rooftop parking lot above the workshop without stopping. [Id.] During the

interview, Plaintiff also stated that: 1) no one had reported the truck as abandoned or blocking the gate; 2) Plaintiff did not look for other parking before taking the truck to the roof; 3) February 18, 2017 was probably Plaintiff's first time parking a company truck on the roof, and he had not parked another company vehicle on the roof since; 4) Magno followed Plaintiff up to the roof and drove Plaintiff back to the shop, parking his vehicle in or near the shop; 5) Plaintiff thought the truck had been abandoned, and that he needed it because it had a lift gate, but he did not explain why the lift gate was needed; and 6) despite counseling and although they worked together at least once per week, Plaintiff had only assigned work and communicated with Nakabayashi one time since his August 30, 2016 meeting with Ly and GSE management. [Id. at ¶ 15.] Magno similarly reported that he did not park vehicles on the roof, did not know of a situation where a technician would park a vehicle on the roof when there was available street-level parking, and that no other company vehicles were on the roof that day. [Id. at ¶¶ 16-16.b.]

Sometime before March 1, 2017, Ly reviewed the records for the access gate between the shop and Gate 10, which showed that Plaintiff and Magno had used their access cards twice to access the AOA, at 3:30 p.m. and 4:57 p.m. [Id. at ¶ 19.] Ly saw pictures of video surveillance footage that showed the truck was moved from Gate 10 at around 5:05 p.m. [Id.] On March 1, 2017, Ly participated in another interview with Plaintiff, along with Wong, Wakata, and union representatives Justin Muraki and Roger Kanakaole. [Id. at ¶ 20.] Plaintiff restated that he had only taken one trip out from the shop, and he had not stopped at the shop before picking up the truck Nakabayashi had been using and driving it to the roof. [Id.] Plaintiff acknowledges that his answer later changed as to how many times he went into the AOA to retrieve the truck, although he claims it is because he initially misremembered. See Pltf.'s Decl. at ¶ 28. However, Ly determined that Plaintiff had been dishonest during the interview, as evidenced by the access card swipes and the unusual act of parking a company vehicle on the roof. After discussing the situation with Ly, Wong removed Plaintiff from service, pending the outcome of the investigation. [Ly Decl. at ¶ 20.]

On March 2, 2017, Plaintiff sent another letter by mail to Oscar Munoz, complaining that every investigation so far "ha[d] been prejudiced by cronyism, an omission of key facts and evidence, collusion, or conflicts of interests to produce a false narrative." [Zorc Decl., Exh. P (letter addressed to Oscar Munoz from Plaintiff, dated 3/2/17) at PageID #: 382.] Plaintiff concluded the letter by asking Mr. Munoz to meet with Plaintiff and his coworkers personally to resolve their issues. [Id.]

**\*4** On March 9, 2017, Plaintiff sent an email to the State of Hawai'i Department of Labor & Industrial Relations Occupational Safety and Health ("HIOSH") complaining about United and the preceding events. [Pltf.'s errata to Pltf.'s Decl., filed 11/23/20 (dkt. no. 45), Exh. 2 (email from Plaintiff to dlir.hiosh.complaints@hawaii.gov, dated 3/9/17).] In his email, Plaintiff stated that United was retaliating against him for reporting the time Nakabayashi brought the gun to work in 2015. [Id.] On March 13, 2017, Tin Shing Chao, M.P.H., an Occupational Health Branch Manager at HIOSH, responded to Plaintiff's email with a series of questions about the incident. [Def.'s errata to Exhibit Q in its CSOF, filed 11/20/20, (dkt. no. 40) at PageID #: 547-48.] On March 14, 2017, Plaintiff emailed his answers to the questions. [Id. at PageID #: 546-47.]

On March 15, 2017, United issued Plaintiff a Notice of Separation letter, informing Plaintiff that his employment with United was terminated. [Zorc Decl., Exh. N (Notice of Separation letter from United, signed by Wong, to Plaintiff, dated 3/15/17 ("Separation Letter")).] In the Separation Letter, Wong explained that the company's investigation into the February 18, 2017 incident revealed that Plaintiff had not followed United's "Working Together Guidelines" in his interactions with Nakabayashi. [Id.] Specifically, Plaintiff drove the truck Nakabayashi had been using to the roof of the shop for the purpose of concealing the truck from Nakabayashi. Also, the Separation Letter noted that Plaintiff's statement during United's investigation was inconsistent with the evidence, such as the surveillance video and access card records. Finally, the decision was informed in part by the fact that Plaintiff had previously followed Nakabayashi to spy on him and refused to assign him work or communicate with him when acting as the lead technician. United determined that Plaintiff's behavior was motivated by personal animus against Nakabayashi. [Id.] According to the Separation Letter, because Plaintiff had already received a termination warning on May 24, 2016 and had since continued to violate United's rules and policies, United terminated Plaintiff's employment. [Id. at PageID #: 372]

Plaintiff initiated the instant case on March 13, 2019, and Defendant removed the case pursuant to diversity jurisdiction. [Notice of Removal, filed 10/11/19 (dkt. no. 1), at ¶ 6; id., Decl. of Dorota Karpierz, Exh. A (Complaint).]

Plaintiff alleges a single claim: termination in retaliation for whistleblowing regarding unsafe and hostile workplace conditions, in violation of the Hawai'i Whistleblowers' Protection Act ("HWPA"), Haw. Rev. Stat. § 378-62. In the Motion, Defendant asserts that Plaintiff cannot establish a prima facie case under the HWPA, that Defendant had legitimate, nondiscriminatory reasons for terminating Plaintiff, and that Plaintiff failed to mitigate his damages.

**STANDARD**

The HWPA provides, in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) The employee ... reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
>
> (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States[,]
>
> ....
>
> unless the employee knows that the report is false[.]

Section 378-62(1)(A).

"In Crosby v. State Department of Budget & Finance, 76 Hawai'i 332, 342, 876 P.2d 1300, 1310 (1994), the Hawaii Supreme Court essentially adopted the familiar McDonnell Douglas burden-shifting framework for claims under Hawaii's Whistleblowers' Protection Act."[4] Chan v. Wells Fargo Advisors, LLC, 124 F.Supp. 3d 1045, 1055 (D. Hawai'i 2015). The Ninth Circuit has stated:

> *5 Under th[e McDonnell Douglas burden-shifting] analysis, plaintiffs must first establish a prima facie case of employment discrimination. Noyes v. Kelly Servs., 488 F.3d 1163, 1168 (9th Cir. 2007). If plaintiffs establish a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123–24 (9th Cir. 2000). If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination. Noyes, 488 F.3d at 1168; see also Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000) (plaintiffs must "introduce evidence sufficient to raise a genuine issue of material fact" as to pretext).

Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155-56 (9th Cir. 2010) (some alterations in Hawn).

"To establish a prima facie case for retaliation under the HWPA, the plaintiff must prove that: (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) the protected activity was a 'substantial or motivating factor' in the adverse employment action." Henao v. Hilton Grand Vacations Inc., 772 F. App'x 510, 511 (9th Cir. 2019) (citing Crosby v. State Dep't of Budget & Fin., 76 Hawai'i 332, 876 P.2d 1300, 1310 (1994)).

In analyzing whether the defendant took the challenged action because of the employee's protected activity – i.e. whether there is "a causal connection between the alleged retaliation and the 'whistleblowing' " – the Hawai'i Supreme Court has looked to HWPA's legislative history, which "indicates that the legislature intended that the required burden of proof be similar to that utilized in traditional labor management relations discharge cases." Crosby, 76 Hawai'i at 342, 876 P.2d at 1310. The supreme court noted:

> Under the National Labor Relations Act, as amended, 29 U.S.C. §§ 151-168 (1988), an employee has the burden of showing that his or her protected conduct was a "substantial or motivating factor" in the decision to terminate the employee. See also Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625, 631 (1982) (noting that "the plaintiff alleging a retaliatory discharge bears the burden of proving that the discharge violates a clear mandate of public policy").

In reviewing an initial draft of the HWPA, the House Standing Committee reported:

> the bill imposes the burden of proof on the employee and also establishes a higher standard of proof than normally applied in civil cases. Under existing custom and practice in labor management relations discharge cases, the burden of proof is placed on the employer. Accordingly, your Committee amended the bill to remove subsection (d) of section -3, thereby maintaining

the existing custom and practice of placing the burden of proof on the employer in discharge cases.

Hse. Stand. Comm. Rep. No. 25, in 1987 House Journal, at 1090. We note, however, that an aggrieved employee always retains the ultimate burden of proof in a retaliatory discharge case. Sonicraft, Inc. v. NLRB, 905 F.2d 146, 150 (7th Cir. 1990), *cert. denied*, 498 U.S. 1024, 111 S. Ct. 671, 112 L. Ed. 2d 664 (1991). The legislature must have been referring to the corresponding rule that "the burden of negating causation is on the employer." Id. Once the employee shows that the employer's disapproval of his [protected activity] played a role in the employer's action against him or her, "[t]he employer can defend affirmatively by showing that the termination would have occurred regardless of the protected activity." NLRB v. Howard Elec. Co., 873 F.2d 1287, 1290 (9th Cir. 1989) (citing NLRB v. Transportation Management Corp., 462 U.S. 393, 401-03, 103 S. Ct. 2469, 2474, 76 L. Ed. 2d 667 (1983)).[5] "In other words, the employer has an affirmative defense (no causation), as to which of course he bears the burden of persuasion, but so far as the main case is concerned the burden of persuasion never shifts." Sonicraft, 905 F.2d at 150....

**\*6** Id. (some alterations in Crosby) (footnote omitted).

**DISCUSSION**

**I. Plaintiff's Prima Facie Case**
For purposes of this Motion, it is undisputed that Plaintiff engaged in protected activity in March of 2016 when he reported to United's Human Resources Department that Nakabayashi brought the gun to work in June of 2015, and later in 2016 and 2017 when he sent letters and emails to United's management personnel and outside parties. It is also undisputed that Plaintiff experienced an adverse employment event when he was terminated on March 15, 2017.[6] Therefore, the only remaining element of Plaintiff's prima facie case is the causal link between his protected activity and his termination. Plaintiff does not address how his protected activity and termination are causally related. See Mem. in Opp. at 15-16. Still, Plaintiff's burden of proof at the prima facie stage of the case is minimal. See Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 659 (9th Cir. 2002). To make a prima facie showing of a causal connection, *i.e.* that the plaintiff's protected activity was a substantial or motivating factor in the adverse employment action,

"a plaintiff can introduce evidence regarding the 'proximity in time between the protected action and the allegedly retaliatory employment decision,' from which a 'jury logically could infer' [the connection]." Griffin [v. JTSI, Inc.], 654 F. Supp. 2d [1122,] 1132 [(D. Hawai'i 2008)] (quoting Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003)). That is, "[although] an employee may always present direct evidence of motive, proximity in time is one type of circumstantial evidence that is sufficient on its own to meet the plaintiff's burden." Id. (citation omitted).

Tagupa v. VIPdesk, Inc., 125 F. Supp. 3d 1108, 1120 (D. Hawai'i 2015) (some alterations in Tagupa).

Plaintiff has presented no evidence of a causal connection between his protected activity and his termination. On a motion for summary judgment, the record must be viewed in the light most favorable to Plaintiff as the non-moving party, and all inferences must be drawn in Plaintiff's favor. See S.R. Nehad v. Browder, 929 F.3d 1125, 1132 (9th Cir. 2019); see also Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Even in the light most favorable to Plaintiff, there are no facts in the record, or argued in the Memorandum in Opposition, to directly connect any statement Plaintiff made in his emails, letters, phone calls, or otherwise, to his eventual termination. The Court therefore turns to circumstantial evidence.

**\*7** With respect to whether proximity in time could be evidence of causation, the record does not suggest that anyone at United knew about Plaintiff's emails to Tin Shing Chao. Therefore, Plaintiff has not made a prima facie showing of a causal connection between those emails and Plaintiff's termination. On the other hand, Plaintiff's March 2, 2017 letter to Oscar Munoz preceded Plaintiff's termination by just thirteen days. Given the minimal degree of evidence required at the prima facie stage, it must be addressed.

In Clark County School District v. Breeden, the United States Supreme Court noted that the requisite temporal proximity "must be very close" if temporal proximity is the only evidence of causation. 532 U.S. 268, 273 (2001) (per curiam) (citations and internal quotation marks omitted). However, the Ninth Circuit also "cautioned that courts should not engage in a mechanical inquiry into the amount of time between the [protected activity] and alleged retaliatory action." Anthoine v. N. Cent. Cntys. Consortium, 605 F.3d 740, 751 (9th Cir. 2010) (citation omitted). "There is no

'bright line' rule providing that any particular period is always too long or always short enough to support an inference." You v. Longs Drugs Stores Cal., LLC, 937 F. Supp. 2d 1237, 1258 (D. Hawai'i 2013) (citing Coszalter v. City of Salem, 320 F.3d 968, 977–78 (9th Cir. 2003)), aff'd, 594 F. App'x 438 (9th Cir. 2015). Therefore, "whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." Anthoine, 605 F.3d at 751 (brackets, citation, and quotation marks omitted).

There is no evidence in the record to suggest that Plaintiff's March 2, 2017 letter to Oscar Munoz was part of United's decision to terminate Plaintiff's employment. Importantly, by the time Plaintiff wrote the letter, the disciplinary process was nearly complete. Plaintiff's offending conduct as described by United in Plaintiff's Separation Letter had already occurred, see Zorc Decl., Exh. N (Separation Letter), Ly's investigation into Plaintiff's conduct was underway, if not complete, see, e.g., Ly' Decl. at ¶¶ 13-14, 19-21, and Plaintiff had been suspended in light of his conduct, id. at ¶ 20. Given the surrounding circumstances, although Plaintiff's March 2, 2017 letter is reasonably close in time to his termination, Plaintiff has presented no evidence that it was causally related to his termination.

With respect to Plaintiff's earlier protected activity, such as his March 2016 phone call to United's Human Resources Department, or his June 2016 email to Charles Duncan, those events are too remote in time, and there are too many intervening events, including the incident of February 18, 2017, to indicate a causal connection between those communications and his March 2017 termination. See Anthoine, 605 F.3d at 751.

Plaintiff has established a causal connection between his protected activity and his termination to even the minimal degree necessary to make his prima facie case for whistleblower retaliation. On that basis alone the Motion is granted. However, because Plaintiff invokes the concept of pretext in his Memorandum in Opposition, and it is the only argument raised by Plaintiff in his Memorandum in Opposition, the Court will also address the second part of the McDonnell Douglas burden-shifting analysis.

**II. Plaintiff's Allegations of Pretext**
If a plaintiff establishes his prima facie case, the burden would then shift to the defendant to articulate a legitimate, nondiscriminatory reason for his termination. See Chuang, 225 F.3d at 1123-24; see also Tagupa, 125 F. Supp. 3d at 1120 ("[E]mployers are 'entitled to summary judgment if they can demonstrate that they would have reached the same adverse employment decision even in the absence of the employee's protected conduct.' " (some citations and internal quotation marks omitted) (quoting Anthoine v. N. Cent. Counties Consortium, 605 F.3d 740, 752 (9th Cir. 2010))). Even if Plaintiff had made his prima facie case, Defendant met its burden by providing evidence that Plaintiff was terminated for his behavior other than his protected activity, including but not limited to the events of February 18, 2017. See Zorc Decl., Exh. N (Separation Letter). The burden would then shift back to Plaintiff to raise a triable issue of fact as to whether Defendant's stated reason for Plaintiff's termination was a mere pretext for retaliation. See Noyes, 488 F.3d at 1168.

 *8  Plaintiff asserts that Defendant's proffered reason for his termination is pretextual. However, even viewed in the light most favorable to Plaintiff, the evidence, including the investigation conducted by Ly, Plaintiff's conduct in admittedly moving the truck to the roof, his inconsistent statements during the investigation as to the number of trips he took to the AOA, the time he followed Nakabayashi off the property, and his refusal to communicate with or assign Nakabayashi work when acting as a lead, all support Defendant's stated reasons for Plaintiff's termination. Plaintiff's conclusory argument is that Defendant's true reason for terminating Plaintiff was for him reporting a hostile work environment when he called Human Resources about the gun incident in March of 2016. Therefore, Plaintiff argues, Defendant's proffered reason must be pretextual because it was reasonable and not improper for Plaintiff to move the truck to the roof. Plaintiff's argument is a purely speculative allegation as to Defendant's true motives, see Mem. in Opp. at 14-15, is not supported by the record, and does not constitute evidence sufficient to show that a triable issue of fact remains in dispute. See Knowles v. Hawai'i Pac. Univ., Civ. No. 16-00678 ACK-KSC, 2018 WL 3370520, at *9 (D. Hawai'i July 10, 2018) (explaining that speculative allegations are insufficient to "create a factual dispute for purposes of summary judgment") (citing Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1081–82 (9th Cir. 1996)). In light of the evidence in the record, Plaintiff failed to raise a triable issue of fact as to pretext.

In sum, Plaintiff failed to demonstrate a causal connection between his protected activity and his termination at the prima facie stage of the analysis. Furthermore, even if he had made

such a prima facie showing, he did not rebut Defendant's legitimate reasons proffered for his termination by raising a triable issue of fact as to pretext. On that basis, Defendant has carried its burden on its motion for summary judgment by showing that there are no genuine issues of material fact in dispute. Therefore, the Motion is granted. Because summary judgment is granted, the Court does not reach Defendant's arguments regarding mitigation of damages.

For the foregoing reasons, Defendants Motion for Summary Judgment, filed September 16, 2020, is HEREBY GRANTED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 2093692

## CONCLUSION

Footnotes

1   On September 17, 2020, Defendant filed its Errata to Exhibit K. [Dkt. no. 32.]
2   Anhvu Ly ("Ly") is a Human Resources Manager for United. [Ly Decl. at ¶ 1.]
3   Nothing in the record other than Plaintiff's statements suggests that Nakabayashi violated official policies or unofficial customs when he left work to pick up supplies at the auto parts store. Notably, the incident is not mentioned in Nakabayashi's termination warning letter, but Plaintiff following Nakabayashi was cited in Plaintiff's termination warning letter as a reason for the discipline. Compare Zorc Decl., Exh. S (Plaintiff's Termination Warning letter) with Ly Decl., Exh. F (Nakabayashi's Termination Warning letter).
4   The "McDonnell Douglas burden-shifting framework" refers to the analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 782 (1973).
5   Transportation Management Corp. was abrogated on other grounds by Director, Office of Workers' Compensation Programs, Department of Labor v. Greenwich Collieries, 512 U.S. 267 (1994).
6   It is also undisputed that Plaintiff's May 4, 2016 termination warning is outside the two-year statute of limitations. See Haw. Rev. Stat. § 378-63. Therefore, the only relevant adverse employment action is Plaintiff's March 15, 2017 termination.

---

**End of Document**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.