1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF HAWAII

3   PRESTON LEE,              | CIVIL NO. 1:20-CV-00489 LEK-KJM
                              | (Other Civil Action)
4         Plaintiff,          |
                              |
5         v.                  |
                              |
6   L3HARRIS TECHNOLOGIES,    |
    INC.; JOHN DOES 1-10; JANE |
7   DOES 1-10; DOE CORPORATIONS|
    1-10; DOE PARTNERSHIPS    |
8   1-10; DOE UNINCORPORATED  |
    ORGANIZATIONS 1-10; and   |
9   DOE GOVERNMENTAL AGENCIES |
    1-10.                     |
10                            |
          Defendants.         |
11  _____|

12

13

14

15        VIDEOTAPED DEPOSITION OF PRESTON LEE

16  Taken on behalf of Defendant L3Harris Technologies, Inc. at

17  the law offices of Cades Schutte LLP, 1000 Bishop Street,

18  Suite 1200, Honolulu, Hawaii on Friday, June 25, 2021

19  commencing at 9:21 a.m. pursuant to Notice.

20

21

22

23

24  Reported by:
    Priscilla Gonzaga, CSR #127
25  State of Hawaii

# EXHIBIT B

2

1    APPEARANCES:

2    For Plaintiff:

3            JOSEPH ROSENBAUM, ESQ.
             Fujiwara and Rosenbaum, LLLC
4            1100 Alakea Street, 20th Floor, Suite B
             Honolulu, Hawaii 96816
5

6

7    For Defendant L3Harris Technologies, Inc.:

8            AMANDA JONES, ESQ.
             Cades Schutte LLP
9            1000 Bishop Street, Suite 1200
             Honolulu, Hawaii 96813
10

11

12   Also Present:

13           Alan Nielsen, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    I N D E X

2    EXAMINATION BY:                          PAGE

3        MS. JONES                              5

4

5    EXHIBITS FOR IDENTIFICATION:

6        EXHIBIT 1                             45
             Letter to Rodney Martin From
7            Preston Lee

8        EXHIBIT 264                           64
             Disciplinary Warning
9
         EXHIBIT 3                             70
10           Medical Excuse Form

11       EXHIBIT 4                             77
             Workers' Comp Claim
12
         EXHIBIT 5                             78
13           Medical Excuse Forms

14       EXHIBIT 6                             81
             Request for Leave
15
         EXHIBIT 7                            106
16           Employee Counseling Record

17       EXHIBIT 8                            124
             Department of Veterans Affairs
18           Document

19       EXHIBIT 9                            129
             Department of Veterans Affairs
20           Disability Benefits

21       EXHIBIT 10                           130
             Application for Disability
22           Compensation

23       EXHIBIT 11                           133
             Statement in Support of Claim
24
         EXHIBIT 12                           138
25           Statement in Support of Claim

4

1    EXHIBIT 13                                          156
          PTSD Disability Benefits
2         Questionnaire

3    EXHIBIT 14                                          182
          Charge of Discrimination
4
     EXHIBIT 15                                          189
5         Pre-Complaint Questionnaire

6    EXHIBIT 16                                          206
          Records from Department of
7         Veterans Affairs

8    EXHIBIT 17                                          214
          VA Progress Notes
9
     EXHIBIT 18                                          237
10        VA Document

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          (Reporter's disclosure is available.)

2          VIDEOGRAPHER: This is the deposition of

3 Preston Lee in the matter of Preston Lee vs. L3Harris

4 Technologies, Inc., et al.

5          We're located at Cades Schutte, 1000 Bishop

6 Street, Suite 1200, Honolulu, Hawaii.

7          My name is Alan Nielsen, video specialist

8 for Certified Legal Video Services.

9          Will the counsel please state your names.

10          MR. ROSENBAUM: Joseph Rosenbaum here on

11 behalf of plaintiff Preston Lee.

12          MS. JONES: And Amanda Jones for L3Harris

13 Technologies.

14          VIDEOGRAPHER: Thank you.

15          Today is June 25th, 2021. We're on the

16 record at 9:21 a.m.

17          Will the court reporter please swear in our

18 deponent.

19                    PRESTON LEE,

20 called as a witness, having been first duly sworn,

21 was examined and testified as follows:

22                    EXAMINATION

23 BY MS. JONES:

24    Q    Good morning, Mr. Lee. My name is Amanda

25 Jones. I represent L3Harris Technologies.

6

1       Will you please state your full name for the

2   record.

3       A    Preston Lee.

4       Q    And today, I'm going to refer to L3Harris

5   Technologies, Inc., the defendant in the lawsuit as

6   L3Harris.  Will that make sense to you?

7       A    Yes, ma'am.

8       Q    And are you under the influence of any

9   drugs, alcohol or medications that would impair your

10  ability to understand questions and answer truthfully

11  today?

12      A    No, ma'am.

13      Q    Is there any other reason that you may have

14  difficulty understanding questions or answering

15  truthfully today?

16      A    No, ma'am.

17      Q    Although this is a somewhat informal setting

18  here in a conference room in a law office and there's

19  no judge present, the deposition testimony that

20  you're giving today will be subject to the same oath

21  and penalties of perjury that would apply if you were

22  giving testimony in court in front of a judge.  Do

23  you understand that?

24      A    Yes, ma'am.

25      Q    Have you ever had your deposition taken

7

1    before?

2         A    No.

3         Q    So I'm going to go through a few rules for

4    today's deposition.

5              First, if at any time you do not understand

6    my question, please let me know and I will rephrase

7    the question to try to make it clearer.  Will you do

8    that?

9         A    Yes.

10        Q    If at any time during the deposition you

11   realize that you've answered something incorrectly or

12   incompletely, please let me know and we can revisit

13   that question.  Okay?

14        A    Yes.

15        Q    If you choose, you have the right to review

16   the transcript from today's deposition and make

17   corrections to that deposition transcript.  Is that

18   something you'd like to do?

19             MR. ROSENBAUM:  Yes.  We'd like -- sorry.

20   We'd like to do that through my office please.

21        Q    (By Ms. Jones) Okay.  So Mr. Lee, I do want

22   to let you know that if you do make changes to your

23   deposition testimony after the deposition is

24   completed, we have a right to comment about the fact

25   to the judge or to the jury that you changed your

8

1    deposition testimony later on.  Do you understand

2    that?

3         A    Yes, ma'am.

4         Q    Okay.  So that leads me back to my prior

5    point which is during the deposition today, if at any

6    point you realize that something was incorrect,

7    please let me know so we can understand your

8    testimony.  Okay?

9         A    Yes.

10        Q    If I ask you a question and you do not know

11   the answer, please tell me you don't know.  Do not

12   guess at something that you don't know.  Okay?

13        A    Yes.

14        Q    We will be taking breaks periodically during

15   today's deposition.  If you need a break at another

16   time, please let me know and we can take a break.  I

17   would just ask that you answer whatever question is

18   pending before we go on a break.  Okay?

19        A    Yes.

20        Q    Now, the court reporter here is taking down

21   everything that I'm saying and everything that you're

22   saying.  And so for that reason, it's important that

23   we try not to talk over each other.  You're doing a

24   pretty good job of waiting until I'm finished asking

25   my question before you start.  But just please

16

1    A    Yes.  Pressure washing, scrubbing, chipping,

2    treating the metal.

3    Q    And did you, as a painter, typically work

4    with a partner, another painter?

5    A    Yes, ma'am.

6    Q    And who was your supervisor in 2019?

7    A    Rodney Martin.

8    Q    How long was Rodney Martin your

9    supervisor --

10   A    Fourteen years.

11   Q    Okay.  I'm just going to ask you to wait

12   till I'm finished with my question before you start.

13   I know you're figuring out where I'm going.  But just

14   to help out the court reporter, yeah?

15        Okay.  So Mr. Martin was your supervisor for

16   about 14 years?

17   A    Yes.  Sorry.

18   Q    And did you ever have any problems with Mr.

19   Martin?

20   A    Definitely.

21        MR. ROSENBAUM:  Objection, form of the

22   question.  Go ahead.

23        THE WITNESS:  He treated me unfairly from

24   the day I started.

25   Q    (By Ms. Jones) How so?

1    A    Every time a situation came up, he

2    automatically blamed me.  And then after he does his

3    so-called I'm gonna do an investigation on you, after

4    he does an investigation and come to find out that my

5    leadman is lying, he doesn't do nothing about it.

6    And then I ask my supervisor to write up my leadman

7    because he's turning me on this false allegations and

8    you telling me I'm gonna get fired, after he do the

9    investigation, nothing happens.  And then when I

10   explain to him to write up my leadman for lying,

11   nothing happens.  We notify HR.  Nothing happens.

12   And that's been going on for 14 years.

13        Q    So from the time you started at the paint

14   shop?

15        A    From the time I started in 2006, day one.

16        Q    Now prior to that, you were working out

17   there but in a different department, is that --

18        A    I was working on helicopters.  I sorry,

19   yeah.  I have to wait.  I getting all kind of da kine

20   already but.

21             MR. ROSENBAUM:  Take your time.

22        Q    (By Ms. Jones) Now earlier, you referred to

23   a leadman.  Who is that?

24        A    Sean Igne.

25        Q    And how long did you work with Sean Igne?

23

1   Gilbert came back, he said oh, you know what Rod, I

2   like Gilbert.  Give David back to Preston.  And then

3   Rod said no, we already did the paperwork, you taking

4   David.  I taking Gilbert.  Again, now, he's pissed

5   off already.  You know what I mean?  Every little

6   thing I do, he gets all pissed off and he try and

7   screw me over.

8       Q    Okay.  So at some point, Gilbert became your

9   partner, is that right?

10      A    Yes.

11      Q    Now, do you agree that handling

12  disagreements or disputes with your co-workers in a

13  calm manner was a requirement for your job?

14      A    Of course.

15      Q    Do you recall having attended training on

16  respect in the workplace?

17      A    I can imagine but I don't recall.  I can't

18  tell you if I did or didn't.

19      Q    Was it -- do you recall it ever being

20  conveyed to you during your employment that employees

21  must be respectful towards their co-workers?

22      A    Well, at the time when Sean and me got into

23  the argument when he told me to -- how did it go?

24  How do you say 'em?  I not going to say --

25           MR. ROSENBAUM:  No, you can say it.  Say

24

1  exactly what he told you.

2          THE WITNESS:  Okay.  This last incident that

3  came up when he -- when he told -- when he was

4  yelling at me -- I was power washing and he came up

5  behind me and I was standing right next to the power

6  washer.  And he -- and he told me -- he was yelling

7  at me to put on my pants.  So when I -- when he told

8  me to put on my pants, I turned around.  Gilbert was

9  coming already with my pants.  So he gave me my

10  pants.  It's just a rubber.  I slipped it on.  I

11  picked up the power washer.  I started power washing

12  again.  And then Sean left.  So I told Gilbert when

13  we went back to the shop, that I'm going to fix this

14  guy 'cause I've had it already.

15          We went back to the shop.  I did my

16  timesheet.  Sean was in the shop -- on the computer.

17  And I knocked on the door nicely and I said Sean, if

18  I gotta wear my PPE, you gotta wear your PPE.  I said

19  come Monday, you better -- you better have steel toe

20  shoes and long pants.  Because when he told me put on

21  my pants, he standing there with tennis shoes and

22  shorts.  So I told Gilbert how can he be standing

23  there and everybody knows he work with tennis shoes,

24  not steel toe shoes.  He wear tennis shoes and

25  shorts.

25

1          The only reason why I was wearing shorts is

2    'cause I was soaking wet and I was power washing one

3    building.  This guy works with shorts and tennis

4    shoes the whole day.

5          Q    Okay.

6          A    Every job.  So when I went over, I told him

7    he need to wear long pants and steel toe shoes.  And

8    then he said why, you going turn me in?  I said you

9    damn right I going turn you in.  I -- and then he

10   said you know what, F you.  Then I said eh, F you

11   too.  Then he said F you.  Then I said F you too

12   then.  I went catch myself and I said -- I stay

13   getting fed up already.  And if I don't walk away is

14   gonna get blown out of proportion.  So I turned

15   around and walked away.

16         And then I waited for the time for us to go

17   home.  When I went to the car to go home, I notice

18   nobody was leaving.  And that's when I knew they went

19   write one letter and everybody went agree to say that

20   I was swearing at Sean.  But yet, he was the one that

21   started the swearing.

22         Q    Okay.  So Mr. Lee, I'm going to ask you some

23   more questions about that.  But my specific question

24   to you was whether or not it had ever been conveyed

25   to you while you were employed there that employees

27

1      Q      Okay, let me --

2      A      Or if somebody come up to me and tell me

3    specifically hey, Preston, you cannot be -- no.

4      Q      Let me be more specific on my question then.

5    Okay.

6           So you don't -- you may have but you don't

7    recall if you attended training that discussed

8    respect in the work place, is that correct --

9      A      Yes, yes.

10     Q      Did anyone like a manager or human

11   resources, prior to the incident with Sean Igne, ever

12   have a conversation with you about the need to be

13   respectful to co-workers in the workplace?

14     A      I can't recall.

15     Q      Do you agree that it would violate company

16   policies to swear at a co-worker?

17     A      Well, I know for a fact it's against the

18   code of conduct.

19     Q      What about do you agree that it's against

20   company policy to threaten a co-worker?

21     A      Of course.

22     Q      And in your position as a painter, you are

23   also a member of the union, is that right?

24     A      Yes, ma'am.

25     Q      Which one is that?

30

1   that?

2       A      Never.

3       Q      Did you know who she was prior to that?

4       A      Have no clue.

5       Q      So I want to go back and ask you about the

6   pressure washing incident that you spoke a little bit

7   about earlier when -- when Sean told you to put on

8   your pants.  Okay.  So you were doing pressure

9   washing work at the time, right?

10      A      Yes.

11      Q      And you were wearing shorts while you were

12  doing that pressure washing, is that correct?

13      A      I was wearing a T-shirt with a rain jacket

14  with shorts and steel toe boots.

15      Q      And you -- Mr. Igne told you to put on rain

16  pants, is that correct?

17      A      Yes, ma'am.

18      Q      Now, in the days leading up to --

19      A      Wait, let me -- can I go back?  I'm sorry.

20  He didn't tell me to put on my pants.  He was yelling

21  at me to put on my pants.

22      Q      Okay.  And was the pressure washing machine

23  was going at the time?

24      A      I was standing right next to it.

25      Q      Okay.  And is that like a gasoline powered

31

1    machine --

2         A    Yes, ma'am.

3         Q    So is it pretty loud?

4         A    Very.

5         Q    Okay.  So in the days leading up to this

6    incident where Sean yelled for you to put the pants

7    on, were you aware that a navy safety officer had

8    spoken with Gilbert Castro about workplace safety

9    issues?

10        A    Yes, ma'am.

11        Q    How were you aware of that?

12        A    Because when we went back to the shop,

13   Gilbert told me that during -- while we was working,

14   he got caught on top of the roof without his PPE.

15   And I told him why did he go -- you know, the whole

16   trip and everything.  And he said he just went there

17   roof ask for just to rinse 'em off and the lady

18   went -- right there went bust him.  And then he had

19   to sign papers with our safety.  And then she wrote

20   him up.  And they -- our safety came and got

21   involved, had to read him one lecture.  He had to

22   sign.  And I was like when all this when happen?  He

23   was like oh, I was on this side, you was on that

24   side.  And that's why I didn't know 'cause he was on

25   side of the building, I was on the other side of the

32

1   building.

2        Q    And was there also a discussion at lunchtime

3   about the fact that this safety officer had talked to

4   Gilbert?

5        A    I -- Gilbert told me that he told Sean that

6   he got written up after everything was done, was said

7   and done, after Sean came and yelled at me and

8   everything.  I didn't know Gilbert got written up

9   till the end of the day.

10       Q    Okay.  But so you don't recall a

11  lunchtime --

12       A    No.

13       Q    -- conversation about the safety officer

14  having a conversation with Gilbert?

15       A    No.  And I didn't get written up.  The lady

16  never write me up.  I never talk to no -- I never

17  talk to no lady.  I never know about no lady.  I

18  don't know nothing until the end of the day.

19       Q    Okay.  So prior to Sean telling you to put

20  on pants, you don't -- you're not aware of

21  conversation about the safety officer, you know,

22  watching you guys and looking what --

23       A    That's --

24            MR. ROSENBAUM:  Objection, form of the

25  question.  Go ahead.

35

1        And Gilbert Costales was right there
2    watching Rodney Martin read the letter to me.  And
3    all that investigation, all lies.  I never get
4    written up.  Safety never make me sign any papers.
5    And they went ask Gilbert.  Gilbert told them he got
6    written up.  So why Sean went lie, I have no idea.
7        David Hesapene is Sean Igne's partner.
8    David Hesapene said -- he said that Sean was yelling
9    at me to put on my pants.  He never tell me nicely.
10   So I get two witnesses right there.
11       Q    Okay.  I'm going to move on.
12            Do you believe that it was appropriate to
13   wear shorts while working?
14       A    Yes.
15       Q    And did you wear shorts while working on
16   other occasions?
17       A    Yes.
18       Q    Do you believe it was appropriate to wear
19   shorts while pressure washing?
20       A    Yes.
21       Q    And prior to this incident where Sean yelled
22   at you to put on the pants, had anyone ever told you
23   that rain pants need to be worn while pressure
24   washing?
25       A    Did anyone -- did anyone come to me and tell

1   meeting or in a discussion.

2        A    I can't remember that but I guarantee you my

3   supervisor, Rodney Martin, knows that we was wearing

4   shorts while we pressure washing and he was -- it

5   was -- it was -- it was all right.

6        Q    So at the end of the workday on the day when

7   Sean yelled for you to put on your pants, okay --

8        A    No, it wasn't at the end of the day.  This

9   is during the -- this is like right after lunch.

10       Q    I'm not -- I'm not finished with my question

11  yet.  So just wait till I'm finished, okay?

12            So the day when -- let's go back to the day

13  when Sean yells for you to put on your pants, okay?

14  At the end of the workday that day, you went to the

15  office where Sean was working on his timesheet, is

16  that right?

17       A    Yes.

18       Q    Okay.

19       A    It's our office.  I got to go -- I have to

20  go there.

21       Q    Okay.  And when you went to the office and

22  you encountered Sean, you were mad at him because he

23  had told you to put on pants, is that correct?

24       A    Actually, I wasn't mad.  Actually, I wanted

25  to just put him in his place.  So -- so -- so that's

38

1   why when I went over there -- 'cause I got no problem

2   wearing pants every day, wearing steel toe every day.

3   So it doesn't bother me.  I have to wear pants every

4   day and steel toe every day.

5              Sean comes in every day with shorts and

6   tennis shoes.  So it's okay for him to wear shorts

7   and tennis shoes.  And then when I put on my shorts

8   because -- and I'm power washing, that's the only

9   time I put on shorts 'cause we gonna get soaking wet.

10  And then I'm the one working.  He's sitting down

11  watching me and he telling me to put on pants when

12  he's wearing shorts and tennis shoes.  That's when I

13  went in there and I told him if I gotta wear my PPE,

14  you gotta wear your PPE.  And that's when he lost it

15  because he don't want to wear his PPE.  I got no

16  problems wearing it so I wear mine every day.

17       Q    So did you yell at Mr. Igne?

18       A    Negative.

19       Q    You didn't yell at him at any time?

20       A    Negative.

21            MR. ROSENBAUM:  Objection.  You mean when

22  he's in the office at that moment or any time in the

23  whole course of his employment?

24       Q    (By Ms. Jones) Right now I'm asking about

25  the incident when you went to the office on the day

39

1    that Mr. Igne told you to put on the pants, okay --

2        A    Okay.

3        Q    When you went to the office that day and you

4    had a discussion with Sean, did you yell at him at

5    any point during that --

6        A    No.

7        Q    Wait till I'm finished please.  Okay?

8             During that discussion at the office, did

9    you yell at Sean Igne at any point?

10       A    No.

11       Q    Did you swear at Mr. Igne at any point

12   during that discussion?

13       A    When I told him that he has -- if I got to

14   wear my PPE, you gotta wear your PPE.  He asked me if

15   I would turn him in.  I said if you don't wear it,

16   I'm going to turn you in.  And then I was talking to

17   him like I talking to you.  But, you know, some guys

18   say I get one deep voice, a loud voice.  I just told

19   him like how I talking to you.  If I gotta wear my

20   PPE, you gotta wear your PPE.  And then he said why?

21   If I gotta wear my PPE, you gotta wear your PPE.  So

22   come Monday, you better have all your stuff together.

23   And I said it just how I'm talking to you.  And he

24   said why, you going turn me in?  I said you damn

25   right I going turn you in.  And that's when -- you

40

1   know what, fuck you.  And then I say you know,

2   fuck you.  I was -- then I did it twice, maybe three

3   times and then I caught myself and I was the one that

4   walked away.  Even though he the one that started it,

5   I the one that walked away.

6       Q    So the day after that incident, you --

7   did Mr. Martin tell you that he needed to talk to you

8   about what had happened?

9       A    No.

10      Q    Did you talk to Mr. Martin the next day

11  about what -- the interaction between you and Sean?

12      A    I don't think so.  I don't know if it was --

13  I don't think it was the next day because Sean called

14  in sick the next day.  And he wrote one letter and he

15  sent the letter to HR and sent the letter to Rodney

16  Martin.

17          After Rodney got the letter, then he called

18  me to his office.  I don't know if that was the next

19  day or what but Rodney talked to me like prior to me

20  going home.  It was at the end of the workday.  So as

21  I recall -- and that's when he called me in the

22  office and he had the letter.  He had the letter

23  like -- like if this is the letter to be -- to be

24  like a -- an A that he is, he had the letter written

25  upside down and he put the letter right next to me

41

1   like this.  Like I could -- instead -- instead of

2   have the letter -- you know what I mean, like a

3   normal person, here, read what Sean wrote, he put the

4   letter all the way next to me.  And Rodney is sitting

5   right here.  Right?  I can see the letter right here.

6   Then he's like oh, you see the letter?  Yes.  Oh,

7   Rodney went write this about you.  I said so what --

8           MR. ROSENBAUM:  Rodney or Sean?

9           THE WITNESS:  Rodney wrote -- Sean wrote the

10  letter about me.

11      Q    (By Ms. Jones) Okay.  So Rodney told you

12  that Sean had written something?

13      A    Right.

14      Q    About the interaction that you and Sean had,

15  is that right?

16      A    Right.

17      Q    Okay.  And did Rodney ask you what happened?

18      A    Yes.

19      Q    And did you describe for him what happened?

20      A    And as soon as I did, Rodney lost it.

21      Q    What do you mean he lost it?

22      A    He was all pissed off because everything

23  Sean wrote was all lies.

24      Q    So --

25      A    Rodney -- Rodney Martin, even like -- he's

44

1   Why would I go over there and start swearing at him?

2   And Rod couldn't say nothing.  I said exactly.  And I

3   said what about all this letters right here?  It's

4   all lies.  I said you know what, Rodney, do your

5   investigation.  But I tell you what, I like write up

6   Sean for lying 'cause I never get written up.  I

7   never get -- sign any -- any statements with the base

8   safety.  I never do nothing.  And now you telling me

9   I going get fired.  I want a -- if -- after you do

10  your so-called investigation, I want you to write up

11  Sean.

12       Q    Okay.

13       A    Right after that, nothing.  They do their

14  investigation, nothing.

15       Q    So did Mr. Martin have you prepare a

16  statement regarding the interaction between you and

17  Sean?

18       A    I never have to write one statement because

19  it was all lies and Rod knows it.

20       Q    And on the day that Sean told you to put on

21  pants, do you know what tasks Sean was performing

22  that day?

23       A    I have no clue and I no care.

24       Q    Do you know if he was doing any pressure

25  washing that day?

45

1        A      I know he wasn't.

2        Q      Okay.

3        A      Because -- let me finish.   I know he wasn't

4   because we have the power washers so he cannot be

5   power washing nothing.

6        Q      Okay.   Mr. Lee, the court reporter has

7   handed you what's been marked Exhibit 1 to your

8   deposition.   You can also --

9        A      Oh, can I ask one question too?

10              COURT REPORTER:   Wait, wait, wait, wait.

11              MR. ROSENBAUM:   She got to mark it --

12              MS. JONES:   You can mark --

13              COURT REPORTER:   This is 1 or this is 1?

14              MS. JONES:   Oh, it's just a copy for Mr.

15   Rosenbaum.   It's the same thing.

16              MR. ROSENBAUM:   This one is mine?

17              MS. JONES:   No.

18              COURT REPORTER:   No, that one is his.   This

19   one's yours.

20              MR. ROSENBAUM:   Thank you.

21        Q      (By Ms. Jones) Mr. Lee, the court reporter

22   has handed you what's been marked Exhibit 1 to your

23   deposition.   Let me know when you're finished

24   reviewing the document.

25        A      Yeah.

RALPH ROSENBERG COURT REPORTERS, INC.

46

1    Q    Do you recognize this document?

2    A    I don't recognize -- I mean I don't know --

3 this is what happened but.

4    Q    Okay.  So is that your signature at the

5 bottom?

6    A    Yes.

7    Q    Okay.  And did Rodney have you -- provide

8 this document to you to review and sign?

9    A    I guess.

10    Q    What do you mean you guess?  You don't

11 remember?

12    A    No, I don't remember but this is what

13 happened.

14    Q    Okay.  But that is your signature at the

15 bottom?

16    A    Yes, ma'am.

17    Q    Okay.  And you're saying that this document

18 that's Exhibit 1 describes what happened between you

19 and Sean?

20    A    Yeah, pretty much.  That's why I like know

21 the letter that he wrote because he put down that he

22 wasn't yelling at me.  He told me nicely to put on my

23 pants.  He couldn't have did that 'cause I was

24 standing next to the power washer.  Gilbert and David

25 is witness to that.

47

1      Q     Okay, I understand.

2      A     And then everything from -- his lying from

3   when he told me to put on my pants.  He lied about me

4   getting written up by the safety lady.  All of this

5   all lies.

6      Q     You can put that on the side now.  She needs

7   to collect that at the end so.

8          MR. ROSENBAUM:  This one's mine.  I can keep

9   it.  Just that one, one copy they got to keep for the

10   court reporter.

11      Q     (By Ms. Jones) So the letter that Sean

12   wrote, did you ever actually read it?

13      A     No.  I wanted to but they told me oh, I'm

14   sorry, it's confidential information.

15      Q     So Rodney conveyed to you parts of what were

16   in the letter?

17      A     Yes.

18      Q     Okay.  But you didn't actually read it

19   yourself?

20      A     No.  I even asked HR for the copy of the

21   letter, confidential information.  But I tell you

22   it's all lies though.

23      Q     Okay.  And when you spoke with Mr. Martin

24   about the incident with Sean, were you honest with

25   him?

48

1       A    One hundred ten percent.

2       Q    Did you tell any of your co-workers that you
3  were upset with Sean Igne about this incident with
4  him telling you to put on pants?

5       A    I tell everybody about the way I feel about
6  Sean on a daily basis.

7       Q    But at -- in November 2019 after this
8  incident with Sean, did you tell your co-workers that
9  you were upset with Sean for telling you to put on
10  pants?

11      A    Yes.

12      Q    Did you tell co-workers that you were upset
13  because Sean had written a letter about you?

14      A    Yes.

15      Q    Now, earlier you talked about David
16  Hesapene?

17      A    Wait, wait.  I like -- can I say something
18  about what you just asked me?

19      Q    Yeah.

20      A    Okay.  Not only I went ask them -- I was
21  upset about him writing the letter.  I was upset
22  because he lied about the letter and everybody knows
23  that he lied about the letter.  But when I asked to
24  see the letter, is all confidential.  And then when I
25  ask to say how can he lie and turn me in and do all

RALPH ROSENBERG COURT REPORTERS, INC.

49

1  of this and nothing happens?  And then that's where

2  everything starts.  Just do your job.

3      Q    Okay.  So I want to ask you about David

4  Hesapene.  You mentioned him earlier, one of your

5  co-workers, right?  Did you have any problems with

6  David while you were working there?

7      A    No.

8      Q    So did you tell David -- after this argument

9  that you had with Sean in the office, did you tell

10  David that you didn't care if you lost your job, you

11  were going to punch Sean through his face?

12      A    I don't recall saying that but I didn't.  I

13  never did.  I never threaten him.  I never did touch

14  him.  I never say anything.  I never do anything to

15  harm anybody.

16      Q    Is it possible that you told David that you

17  were going to punch Sean through his face?

18      A    Let me put it this way.  Wait, how did you

19  say that again?  You said that I told David that I

20  was going punch Sean in his face?

21      Q    Right.

22      A    No, that's not what I said.  I said -- I

23  might have said I like punch him in his face but

24  that's just speaking out loud.  You know what I mean?

25  When I get mad at him when we talking that's like

RALPH ROSENBERG COURT REPORTERS, INC.

50

1    ooh, I love give him one but I just -- that's just

2    the way I talk.  That don't mean I'm going to hit

3    him.  And it shows that.  I work there 27 years.  I

4    never -- I never touch nobody.  I never threaten

5    nobody.  I never hit nobody.  In 27 years.  I might

6    have said -- I might have said a lot of things to a

7    lot of people.  There's a lot of guys I don't like

8    and I speak my mind.  But that don't mean I'm going

9    to go over there and do something.  And I never did.

10   But like I said, I hate that guy.  I hate this guy.

11   You know what I mean?  But I don't go over there talk

12   to 'em because I don't like the guy.  I just stay

13   away.  But I'm not afraid to say I hate -- that guy

14   right there, hey, I hate that fucker.  You know what

15   I mean?  That's how I speak.

16        Q    Okay.  Did you also tell David, nobody can

17   touch me, not Rod, not Sean, not HR?

18        A    I'm not sure but I might have.

19        Q    Do you recall words to that effect that you

20   used with David?

21        A    I might have said that because I never did

22   nothing wrong.

23        Q    Okay.

24        A    How they gonna touch me when I never do

25   nothing wrong?

RALPH ROSENBERG COURT REPORTERS, INC.

53

1    life.  You know what I mean?  I just -- sometimes I

2    get so pissed off that I gotta go straight home and

3    just -- I scream sometimes.  I yell, I cry because of

4    the stuff that they do to me.

5        Q    Okay.  I want to move on now and talk about

6    November 18, 2019.  That was the day you had a

7    meeting at the HR office.  You recall that?

8        A    Yeah.

9        Q    Okay.  So on November 18th, were you told by

10   Rodney Martin that you needed to meet with him and

11   HR?

12       A    Yes.

13       Q    And that meeting, was that held at the HR

14   office?

15       A    Yes.

16       Q    Who was present during that meeting --

17       A    Julie --

18       Q    Hold on.  You just got to wait until I'm

19   finished.  The court reporter has to be able to have

20   time to take it down.  Okay?

21            So who was present during the meeting on

22   November 18th at the HR office?

23       A    Julie Broyles and Rodney Martin.

24       Q    And you?

25       A    Me.

Sean and you the one that -- and then Gilbert was like eh, no, no, no, no, no blame me. I never tell Sean nothing. And that's when Gilbert came and told me hey, Rod -- Rod went call me this and that and I told him Sean went lie everything. I said that's not my fault. That's his -- that's his kuleana he went lie. I no care.

Q So when you went to the meeting at HR, did you think you were going to be fired during the meeting?

A Of course not.

Q Okay. Now --

A Wait, let me go back. Why was I -- why would I get fired for not doing nothing?

Q Preston, I'm not suggesting anything. I'm just asking what you thought when you were going into the meeting. So you didn't have any indication that you were going to get fired when you walked in, is that right?

A No.

Q Okay. Earlier on during that meeting, you made an accusation about Sean Igne stealing gas from the base, is that right?

A Yes.

Q Okay. And why did you bring that up?

58

1    I said investigate Sean Igne stealing gas.  He been

2    doing it for years.  And we get witnesses for that.

3        Q    Okay.  So during the meeting on November 18,

4    2019, did Rodney Martin discuss the respect in the

5    workplace training that you'd had previously?

6        A    I have no clue.

7             MR. ROSENBAUM:  Do you remember?

8             THE WITNESS:  No.

9        Q    (By Ms. Jones) You don't remember?  Okay.

10            Do you recall anything that Rodney Martin

11   conveyed to you during that November 18th meeting?

12       A    He might have said that you gotta work

13   together.  You gotta -- well, he gotta respect you.

14   I gotta respect him and that -- but it was going in

15   one ear and coming out the other because they go out

16   of their way to screw me over for 14 years and

17   nothing happens.  We can go through this.  You can

18   ask me different ways.  You can do whatever.  We

19   going round and round in circles here.  It's the same

20   question.  He mistreated me the whole time I was

21   there.

22       Q    Are you talking about Sean?

23       A    Yes, Sean and Rod.

24       Q    Okay.  Did Rodney Martin say anything to you

25   during the November 18th meeting that was upsetting

64

```
 1        A     I don't recall.

 2        Q     Okay.  The court reporter has handed you

 3   what's been marked Exhibit 2 to your deposition.

 4   Please take a look at that and let me know when

 5   you're ready.

 6        A     Okay.

 7        Q     Do you recognize Exhibit 2?

 8        A     Yeah.

 9        Q     And is that your signature on the lower

10   left --

11        A     Yes.

12        Q     Hold on.  Mr. Lee, if you can just please

13   wait till I'm finished.

14              Is that your signature on the lower left

15   corner of the first page of Exhibit 2?

16        A     Yes.

17        Q     And did you sign this during the meeting

18   with Mr. Martin and Ms. Broyles on November 18, 2019?

19        A     Yes.

20        Q     And did you understand that a written

21   warning was being issued to you during this meeting

22   on November 18th?

23        A     Yes.

24        Q     And you were not suspended as a result of

25   this disciplinary action, correct?
```

RALPH ROSENBERG COURT REPORTERS, INC.

65

1       A       Correct.

2       Q       And you were not terminated, correct?

3       A       Correct.

4       Q       And when -- so when they finished discussing

5    this with you, you were free to go back to work, is

6    that right?

7       A       I couldn't.

8       Q       Well, the company wasn't prohibiting you

9    from going back to work, is that correct?

10      A       Correct.

11      Q       Now, you, at the conclusion of the meeting,

12   ended up leaving work, is that right?

13      A       Yes.

14      Q       And did you say that you needed to leave and

15   go to the doctor?

16      A       Yes.

17      Q       And did you say that you were going to be

18   finding a lawyer?

19      A       Yes.

20      Q       And is that because you were contemplating

21   filing or initiating some kind of legal action?

22      A       Yes.

23      Q       Why?

24      A       Because I'm being discriminated against.

25      Q       Because of the disciplinary warning?

67

1   reasons why.  I can go on and on.  You ain't got

2   enough time.

3       Q     Okay.  And so did you leave work as soon as

4   the meeting was finished?

5       A     I told you, yes.

6       Q     So you didn't finish your shift that day, is

7   that correct?

8       A     Yes, ma'am.

9       Q     Okay.  And did you ever go back to work at

10  L3Harris again after that?

11      A     Well, I don't know how you -- I don't know

12  how to say this but they made me -- they told me to

13  fill out my timesheet and just stay home and they

14  going pay me.

15      Q     That was in April, right?

16      A     Right.

17      Q     But you never went back?  You were never in

18  the workplace again after that?

19            MR. ROSENBAUM:  Did you ever physically go

20  back to work after that day --

21            THE WITNESS:  No, never.  That's why I

22  cannot understand how did I instigate one fight when

23  I wasn't even there.

24      Q     (By Ms. Jones) Okay.  Now, did you go to see

25  Dr. Williamson on November 18th after the meeting at

77

1   you what's been marked as Exhibit 4 to your

2   deposition.  You recognize this document, Mr. Lee?

3      A   Yes.

4      Q   Is this a claim you filed, a workers' comp

5   claim you filed?

6      A   Yes.

7      Q   And is this your handwriting on this

8   document?

9      A   Yes.

10     Q   And do you see on the -- there's a box that

11  says "describe how accident occurred" towards the

12  bottom.

13     A   Okay.

14     Q   And did you write in that box "I got written

15  up for code of conduct"?

16     A   Yes.

17     Q   That's your handwriting?

18     A   Yes.

19     Q   And is that what the basis for your workers'

20  comp claim was?

21         MR. ROSENBAUM:  Objection, calls for a legal

22  opinion or legal conclusion.

23         THE WITNESS:  No.  My workers' comp

24  complaint was that Sean wrote me -- I wrote that

25  because I never like write one whole -- one whole

83

1          MR. ROSENBAUM:  Okay.

2          MS. JONES:  Okay.  Let's go off the record.

3          VIDEOGRAPHER:  Okay.  We're going off the

4    record at 10:59 a.m.

5          (Recess taken.)

6          VIDEOGRAPHER:  Back on the record at

7    11:10 a.m.

8     Q    (By Ms. Jones) Mr. Lee, earlier we talked

9    about the -- at the November 18 meeting, that you had

10   made an accusation about Sean Igne stealing gasoline.

11   Had you made any allegations about Sean stealing gas

12   prior to the November 18, 2019 meeting?

13    A    No.

14    Q    After making that allegation during that

15   meeting on November 18th, did you also call a navy

16   hotline and report that Sean Igne was stealing gas?

17    A    No.

18    Q    Did you make a report to anybody else about

19   Sean Igne stealing gas?

20    A    I told Rod.  I told Julie.  And I told -- I

21   called the -- I called the captain of the base.

22    Q    Who's that?

23    A    I don't know his name.  The CO, whatever his

24   name.

25    Q    And what did you say when you called the

RALPH ROSENBERG COURT REPORTERS, INC.

84

1    captain of the base?

2        A    That I have witnessed him stealing gas from

3    the base.

4        Q    Witnessed Sean?

5        A    Yes.  I didn't hear -- I didn't hear it.  I

6    didn't -- somebody didn't tell me.  I seen him

7    physically take a gas can, fill it up at the gas

8    station, put it in our truck, drive to his truck,

9    take the gas can out of the -- the work truck, put it

10   in his personal truck and then at the end of the day,

11   drive his truck home with the gas in his truck.

12       Q    And --

13       A    And he do this when I'm in the vehicle.  And

14   he do this every Tuesday and Thursday.  Why?  I don't

15   know.  But every Tuesday and Thursday  -- Tuesdays

16   and Thursdays for years.

17       Q    That was when you and Sean were partnered

18   together?

19       A    No.  That was when like sometimes my van is

20   in the shop or I have to ride with them.  And he

21   still does it.

22       Q    And is that what you told the captain of the

23   base when you called him?

24       A    Yes.  I told that to Rod.  I told the exact

25   same thing I told you to Julie.  And I told that to

93

1    A    No.  I mean I work -- he knows I work with

2  Sean.  I mean what you mean describe how when -- we

3  work together.  He knows that.

4    Q    Did you tell Mr. Taylor that you hated Mr.

5  Igne?

6    A    I have no clue.

7    Q    You don't remember?

8    A    What does that have to do with anything

9  though?  I told everybody I hate -- everybody knows I

10  hate him for what he's doing to me.

11    Q    Did you tell Mr. Taylor that you had

12  observed Mr. Igne putting gas into his personal gas

13  can every Tuesday and Thursday during the periods

14  from 2007 to 2010?

15    A    Didn't I just say that?

16          MR. ROSENBAUM:  Just focus on those --

17          THE WITNESS:  Yes.

18          MR. ROSENBAUM:  --  2007 to 2010.

19          THE WITNESS:  Yes.

20    Q    (By Ms. Jones) And do you recall that Mr.

21  Taylor asked you why are you now -- just now

22  reporting this in 2019?

23    A    Yes.

24    Q    And did you say because he just turned me in

25  so I will turn him in?

94

1    A    No.

2    Q    You didn't say that?

3    A    No.

4    Q    Did you say anything -- words to that

5    effect?

6    A    No.

7    Q    What did you say when he asked you --

8    A    I told him --

9    Q    Hold on.  What did you say when Mr. Taylor

10   asked you why you're just now reporting this in 2019?

11   A    Because he's been doing it for over how many

12   years and nobody does nothing about it.  Everybody

13   knows he's being stealing gas.  The other painters

14   see him stealing gas, not only me.

15   Q    Then why bring it up in 2019?

16   A    Because I'm fed up already.  Every -- he

17   turned me in for every little -- we went through this

18   already.  He turned me in from the day I got there to

19   2021.  He turned me in, he lied.  He turned me in, he

20   lied.  He turned me in, he lied.  He turned me in, he

21   lied.  Nothing happens.  The paper the one that says

22   oh, go to your -- your superior, go see your leadman.

23   You cannot see your leadman, go to your supervisor.

24   Cannot go to your super -- go to the -- go to HR.

25   They all know all about this.  They all know how they

RALPH ROSENBERG COURT REPORTERS, INC.

95

1    was treating me.  They all know about him turning me

2    in and not doing nothing.  Who else I going turn to?

3    I already talk -- my leadman is the one that is -- is

4    instigating this trouble by turning me in and writing

5    me up.  The supervisor does his so-called

6    investigation even though he's not one investigator.

7    I even told him to his face, you do -- you do so much

8    investigating, you should've been one cop.  Why you

9    one supervisor over here?  He investigate all of this

10   stuffs, every single time, comes out to be all lies.

11   I want to write up Sean.  Nothing happens.  I go back

12   and I tell HR the same thing what I just told you.

13   Nothing happens.  Where else can I turn?

14       Q    So did you report this in 2019 'cause you're

15   pissed off that Sean had made a complaint about you?

16       A    I was pissed off with Sean in 2006.

17       Q    Okay.  But you weren't reporting this in

18   2006 --

19       A    Exactly.  I just let it -- I just -- because

20   you know why?  I was brought up, do your job, shut

21   your mouth.  I no care what that lady doing.  I no

22   care what that guy doing.  It's none of your

23   business.  Just do your job.  That's how I was

24   raised.

25       Q    But in 2019, you make a report that Sean is

96

1   stealing gas.  And my question is did you decide to

2   make that allegation about Sean because you were

3   pissed off that he had complained about you?

4       A    I was pissed off from 2006.  I went turn him

5   in 2019 because I just had it already.  But let it be

6   known I was pissed off from 2006.

7       Q    Did you have any further discussions with

8   the captain of the base about this allegation?

9       A    No.

10      Q    You never tried to call him back or

11  anything?

12      A    No.

13      Q    Now, in your -- the complaint that you filed

14  in this lawsuit, you allege that in December of 2019,

15  Ross West called you and requested your CAC card and

16  secret clearance card.  You recall that allegation?

17      A    He called for -- what day was that?

18      Q    Your complaint says it was in December of

19  2019.

20      A    Okay.  That's right.  And he asked me for

21  any CAC card and my -- my secret clearance ID.

22      Q    So the -- the C-A-C is -- you call that the

23  CAC card?

24      A    CAC card, yeah -- yes.

25      Q    And is the secret clearance card, is that

RALPH ROSENBERG COURT REPORTERS, INC.

97

1    also sometimes referred to as the blue badge?

2        A    Yes, ma'am.

3        Q    And who did you understand Ross West to be?

4        A    My project manager.

5        Q    And so you knew Ross West already?

6        A    Yes.

7        Q    You knew he was the project manager out

8    there?

9        A    Yes.

10        Q    Did you have any problems with Ross West

11    prior to this?

12        A    I have a problem with what he did.

13        Q    But my question is prior to him calling you

14    in December of 2019 about the badge, did you have any

15    problems with Ross West?

16        A    No, ma'am.

17        Q    And the conversation with Ross West about

18    the CAC card and the badge, that was a phone

19    conversation?

20        A    Yes, ma'am.

21        Q    And that was while you were out on leave?

22        A    Yes, ma'am.

23        Q    The CAC card and the blue badge were needed

24    to access areas of the base that are for employees

25    only, is that correct?

98

1    A    That's -- that's for access with people with
2    secret clearance.  You can work on the base but you
3    might not have a clearance.  So you cannot get into
4    the facilities.
5    Q    Okay.  So . . .
6    A    Not everybody has a CAC -- has a security
7    clearance ID.
8    Q    Right.  So but after you turned those in,
9    you were still able to get on base with your military
10   ID, is that right?
11   A    Yes.  But my question is why did Ross West
12   take my CAC card and my blue badge when I was on --
13   when I was on -- when I was on leave when there was
14   other individuals that was on leave?  He never took
15   their CAC card.  That's why I feel that he's
16   discriminating against me and only me.  Why did he
17   only take my CAC card?
18   Q    Okay.  So when -- when he collected the CAC
19   card, that just prevented you from accessing areas
20   that you need to access to work, is that right?
21   A    Let me rephrase that.  He didn't -- how did
22   she answer the question?  Ross West didn't -- didn't
23   take my CAC card.  He wasn't there.  So I gave it to
24   his secretary which that was illegal right there.
25   Because we have training like I said.  You sign this

99

1  things every time and we have training.  And there's

2  legal ways of doing this.  You cannot give your CAC

3  card to anybody.  That's against navy policy and we

4  have training on that.  If -- if Ross West would walk

5  up to a computer and a CAC card is in the computer,

6  he going take the CAC card and then when the person

7  comes back, he gotta go see Ross West to get your CAC

8  card back because you're not supposed to leave that

9  CAC card in anybody's possession.

10       And on top of that, when he told me to bring

11  the CAC card, he said if I'm not there, just give it

12  to my secretary.  How I know my secretary not using

13  my CAC card when I'm not there?

14       Q    Okay.  So while you're not working, do you

15  need the CAC card for anything?

16       A    Yes.

17       Q    What?

18       A    I need to come in every two weeks to log on

19  the computer.  Because if you don't, the computer

20  will gonna -- since your CAC card is being activated,

21  it's going to shut you down.  Then you cannot do your

22  timesheet from a military computer.

23       Q    Were you doing a timesheet during the entire

24  time that you're on leave?

25       A    Yes.

1    Q    You were coming on base while you were on

2    leave?

3    A    Yes.

4    Q    So after you turned in your card, how were

5    you doing that?

6    A    I had to do it from home.

7    Q    And so you -- so you just logged on from

8    home to do your timesheet?

9    A    Yes.  But the reason why I was doing it on

10   the -- on the base because if I don't do it -- if I

11   don't -- I don't use my CAC card, it's gonna -- after

12   30 days or two weeks or whatever, it's gonna shut

13   off.  And then to reboot the CAC card, the

14   supervisor, Rodney Martin, is gonna have to go and do

15   all kind stuffs which is gonna totally piss him off.

16   So that's why I just keep going on the base and doing

17   this so my CAC card don't get turned off for not

18   being in use.

19   Q    Okay.  So when Ross West called you about --

20   he told you that you -- he needed to collect your CAC

21   card, is that right?

22   A    Yes.

23   Q    Did he saying anything else?

24   A    I asked him why and he said that's my job

25   that's why.

101

1   Q   Did he say anything else?

2   A   And I said fine.

3   Q   Did you -- okay.  So you didn't -- did you

4   say anything else to Ross?

5   A   He called me up.  He said Preston, I need

6   your CAC card.  I said why?  He said it's my job.  I

7   said fine.  I said it's 3:30.  It's too late for me

8   to come in and give you the CAC card.  He said can

9   you come in Monday?  This was a Friday.  I said no

10  problem.  I said I'll see you bright and early -- I

11  see you bright and early Monday morning.  He goes

12  well, if I'm not there, just give it to Lovely --

13  Lovey.  I said you let me give my CAC card to your

14  secretary?  He said yes.  I said fine, knowing that

15  it's illegal to give my CAC card to anybody.

16  Q   Did you tell him that?

17  A   No.

18  Q   You didn't tell Ross that?

19  A   Nope.  It's not -- why I gonna tell my

20  project manager how for do his job?

21  Q   I'm just asking --

22  A   So -- no, and I'm just saying --

23  Q   I'm not arguing --

24  A   I'm not argue -- and I just saying

25  there's -- there's -- there's -- there's the right

1   way how to do it.  And he should have told me take my

2   CAC card and go to security and turn it in, not give

3   to one other -- one secretary.

4        Q    I understand.  I'm just asking you what

5   was --

6        A    I'm just telling you that's -- that's how

7   you supposed to do it but he didn't want me to do it

8   that way.  So I did it the way he wanted 'cause he's

9   the project manager.

10       Q    Understood.  Okay.  And you -- Lovey is Mr.

11  West's secretary?

12       A    Yes.

13       Q    You knew that already from before?

14       A    Yes.

15       Q    Okay.  And you knew who she was so you'd

16  recognize her?

17       A    Yes.

18       Q    So did you go in on the Monday and deliver

19  the badges that he asked?

20       A    Yes.

21       Q    And so did you see Mr. West at the time?

22       A    I gave it to her 'cause he wasn't there.

23  That's -- he -- I supposed to go in and give it to

24  Mr. West.  I went in there.  He wasn't there.  So he

25  instructed me if I'm not there, give it to my

119

1    you?

2         A    Mr. Lee, your position has been terminated.

3         Q    Is that all?

4         A    That's it.  And I said okay, why?  And she

5    said oh, you know why.  I said no, I don't know why.

6    She goes oh, well, because of -- because of the stuff

7    that happened at work.  I said okay, fine.  I said

8    thank you for -- thank you for letting me work for

9    this company for all these years but I going tell you

10   right now, you guys are firing me wrongfully and I'm

11   gonna seek legal assistance.  And that was brought up

12   at the hearing at the unemployment.

13        Q    And was there any other discussion during

14   the phone call with Ms. Stewart?

15        A    No.

16        Q    Did she -- did Danielle say anything about

17   PTSD during that phone call?

18        A    Nope.

19        Q    Has anyone told you that you were fired

20   because you had PTSD?

21        A    Nope.

22        Q    Did you talk to the union about filing a

23   grievance regarding your termination?

24        A    Nope.

25        Q    During your employment and while you're

RALPH ROSENBERG COURT REPORTERS, INC.

135

1      VIDEOGRAPHER:  Okay.  We're going off the

2   record at 12:18 p.m.

3      (Recess taken.)

4      VIDEOGRAPHER:  Okay.  We're going back on

5   the record at 12:48 p.m.

6   Q    (By Ms. Jones) Mr. Lee, before we get to the

7   next exhibit, I don't think I asked you before but

8   Gilbert Castro who, I guess, was your partner at

9   least for a short period of time, did you have any

10  problems with him?

11  A    Yeah.  We friends but I had problems with

12  him.  I had to tell him -- set him straight a couple

13  times.

14  Q    About what?

15  A    About work.

16  Q    Well, like how to do things or --

17  A    Well, like I said in 2006, when I first got

18  there, him and Sean was partners.  Okay.  And then

19  before they split up -- no -- yeah.  What happened

20  was -- no, no.  What happened was when I first got --

21  when I first got there, I bumped Gilbert.  Okay?  So

22  that's why Sean and Rodney didn't accept me because I

23  took away the friend, right?  And it's a Filipino

24  thing.  Everybody in there is Filipino except for me.

25  No -- and Rodney -- Rodney too.  He's not Filipino

180

1          THE WITNESS:   No.

2          Q     (By Ms. Jones) And there was no disciplinary

3     action imposed on you during that meeting in

4     March 2019, correct?

5          A     Yes.

6          Q     Yes there was or there was -- sorry, my

7     question was probably bad.   Let me restate it.

8                Was any disciplinary action imposed upon you

9     as -- during or as a result of the meeting in

10    March 2019?

11               MR. ROSENBAUM:   Objection, calls for a legal

12    opinion.   But go ahead.

13               MS. JONES:   No, it doesn't.

14               THE WITNESS:   The answer is no because I

15    didn't do nothing wrong.   But they was trying to see

16    if I did -- was going -- why would you ask me if I

17    like -- like fight my co-worker just out of the

18    blues?   I mean what -- what basis do they have that

19    to ask me?

20         Q     (By Ms. Jones) And did they tell you during

21    that meeting that a co-worker had come to HR to raise

22    a concern?

23         A     No.   I asked that question.

24         Q     You asked why they were calling you in?

25         A     I said because of Sean Igne telling you guys

182

1   Q   And what about Julie, did you have any

2   meetings with her between March 2019 and

3   November 2019?

4   A   Not that I recall.  But they was there when

5   I got in the car accident though.

6   Q   For the disciplinary meeting when --

7   A   When I -- when I banged the bumper on my

8   van.

9   Q   Yeah.  So that was 2015, right?

10   A   Okay.  Well -- I don't know but they was

11   there for that so.

12   Q   Yeah.  I was just asking about the period

13   between March 2019 and November 2019.

14   A   Okay.

15   Q   And you don't recall any meetings during

16   that period --

17   A   No, ma'am.

18   Q   Okay.  So the court reporter has handed you

19   what's been marked Exhibit 14 to your deposition.

20   A   Yeah.

21   Q   Do you recognize this document?

22   A   Yes.

23   Q   Is this a charge of discrimination that you

24   filed with the EEOC?

25   A   Definitely.

183

1    Q    And is that your signature at the bottom?

2    A    Yes, ma'am.

3    Q    On both pages 1 and 2?

4    A    Yep.  Yes, ma'am.

5    Q    Did you have a lawyer when you submitted

6  this charge?

7    A    No, ma'am.  I did this -- I did all this.

8  Get this one and the human -- the -- the human -- not

9  human rights -- human rights?  No, it's Hawaii Civil

10  Rights, huh?  What the name?

11         MR. ROSENBAUM:  That's this one.

12         THE WITNESS:  Human rights?  No, this is

13  different.  This is the EOC.

14         MR. ROSENBAUM:  Yes, Hawaii Civil Rights

15  Commission.

16         THE WITNESS:  Okay.  Yeah, I did all this

17  before -- before I found him.  I did all this on my

18  own.

19    Q    (By Ms. Jones) When did you hire Joe?

20    A    After this I think.  Because these guys the

21  one told me to -- this is what happens.  I went -- I

22  went contact these guys.  They made me fill out all

23  these paperwork.  And -- and I submitted it to them.

24  They did their investigation.  And they was the one

25  told me that I was discriminated against and I need

184

1   to get legal -- seek one lawyer and sue the company

2   because they cannot do what they did to me.  And

3   that's where we stay today.

4       Q    Okay.  So in the -- looking at Exhibit 14.

5       A    Sorry.  14?

6       Q    Yeah.  At the -- there's four paragraphs --

7   no, first page.  There's four paragraphs --

8       A    Okay.

9       Q    -- under the particulars are.  See that?

10      A    Uh-hum, yes, ma'am.

11      Q    And then in the third paragraph, it says

12  "Since my diagnosis in February 2019, I've been

13  subjected to repeated harassment and discipline by

14  Respondent.  For example, Sean" -- I think it should

15  be Igne.

16      A    Yes, ma'am.

17      Q    "Has informed the company that he is afraid

18  to work with me because of my condition.  Mr. Igne

19  has also asked me why I just do not retire."  You see

20  that?

21      A    Yep, that's true.

22      Q    So when did those things occur?

23      A    In February.

24      Q    So in February of 2019?  So those things

25  happened in between the time that you got the award

185

1    from the VA and in between the time that you had the

2    meeting with Jasmine and Julie?

3         A    Say that, what you just said.

4         Q    Did -- so these things occurred in between

5    the time you got the disability determination from

6    the VA and the time you had the meeting with Jasmine

7    and Julie in March 2019?

8              MR. ROSENBAUM:  Objection, form of the

9    question --

10             THE WITNESS:  No.  No.  What happened was I

11   got the decision in February.  Sean found out that I

12   had PTSD.  He told me why don't I retire.  And then

13   since I told him I not gonna retire, oh, if I did

14   this, if I had this -- eh, you never have 'em.  So

15   don't worry about it.

16             Then after he found out that I wasn't gonna

17   retire, still to try and get me out, he went upstairs

18   and told them he was afraid to work with me because

19   I'm a PTSD.

20        Q    (By Ms. Jones) So that's what I'm saying is

21   these things that you're talking about that Sean did,

22   that was all happening in the February 2019 time

23   period?

24        A    Yes, ma'am.  Yes, ma'am.

25        Q    Okay.

186

1    A    And see look, I even forgot but it says

2    right here.  He told me for -- ask me how come I

3    don't retire.  Remember I said that?  I remembered

4    that.

5    Q    Okay.  And then the next paragraph says

6    "Additionally, Rigging Shop Lead Mark Vegas has gone

7    to the Union and told them that I should not be

8    working there because I have PTSD."

9    A    Yep.

10   Q    "Mr. Vegas has helped Mr. Igne to write

11   letters against me which have been turned in to

12   Respondent."  You see that?

13   A    Yep.

14   Q    When did that happen?

15   A    That happened right after they found out I

16   had PTSD.  That same month February, the third week,

17   Wednesday, they went to the union meeting.  And they

18   start the union meeting with old business.  Okay.  We

19   have any new business?  Yes, Mark, you have anything

20   to say?  Well, how can Preston work when he get PTSD?

21   Q    So this was a union meeting in February

22   2019?

23   A    Yep.  And that's how the whole company found

24   out that I get PTSD from Mark Vegas.

25        MR. ROSENBAUM:  Tell her the full story.

1           MS. JONES:  Okay, no, no, no.  Hold on, Joe.
2    Let me ask the questions please.
3        Q    (By Ms. Jones) Were you at the meeting?
4        A    No.
5        Q    Somebody told -- did somebody tell you about
6    the meeting?
7        A    Okay.  Like Joe said, this is what happened.
8    Mark Vegas went to the meeting.  They asked any
9    business, old business, no.  New business, yes Mark?
10   Oh, how can Preston work when he get PTSD?  And then
11   Tony Pereira came in.  That -- another steward said
12   what?  Oh, Preston get PTSD, how can he be working?
13   Oh, you know what, we gotta turn him, in, brah
14   because he's liable.  If he snap at work, the
15   company's liable.  They going get sued.  So we gotta
16   go to the company and tell them that they gotta let
17   Preston go because eh, he's a liability.
18           Then right there, ring.  Hello?  Eh,
19   Preston, where you stay?  I said I stay home.  Why?
20   Brah, you need to come to the union meeting.  I said
21   for what?  Oh, the union meeting about you.  I go
22   what you mean about me?  They said eh, the whole
23   union meeting is about you.  Huh?  Mark Vegas said
24   this, Tony Pereira said this.  What?  Eh, they
25   trying -- they gonna try get you fired.  This, this

188

1    and this.  How do I know?  I get more than one friend

2    there.

3         Q    Okay.  So who --

4         A    So multiple -- you like know their names?

5         Q    Who called you during the meeting to tell

6    you what was happening?

7         A    Dywle Lee and Galen Alvarez.  And they still

8    employed by the company.

9         Q    Okay.

10        A    And they gonna testify on my behalf.

11        Q    And -- and this -- again, this whole meeting

12   that you're talking about was in February 19, this

13   whole discussion?

14        A    Yes.  I pretty sure, yes.

15        Q    And did you -- when you went to the meeting

16   after that with Jasmine and Julie, did you talk to

17   them about what happened at the union meeting?

18        A    No.

19        Q    Did you talk to them about what Sean had

20   said about retiring?

21        A    I don't know if I asked them about me

22   retiring.  But I asked them if Sean was the one that

23   went turn me in.  I like hear 'em from them.  And

24   they said they cannot tell me that.  But I know it

25   was Sean that turned me in.

189

1    Q    Yeah.  No, I'm just saying did you say to

2    them what Sean said?

3    A    No.  You know what, to tell you the truth,

4    I'm not sure.  I might have but I'm over it already.

5    You know what I mean?

6         MS. JONES:  Okay.  Let's -- I want to give

7    the court reporter a chance to rest her fingers for a

8    minute.  So we're going to take a five-minute break,

9    okay?

10        MR. ROSENBAUM:  Sounds good.

11        MS. JONES:  Let's go off the record.

12        VIDEOGRAPHER:  Okay.  We're going off the

13   record at 1:53 p.m.

14        (Recess taken).

15        VIDEOGRAPHER:  Back on the record at

16   2:06 p.m.

17   Q    (By Ms. Jones) Mr. Lee, the court reporter

18   has just handed you what's been marked Exhibit 15 to

19   your deposition.  Do you recognize this document?

20   A    Not really but, yeah, go ahead.

21   Q    Do you recognize this being your

22   handwriting?

23   A    This is my handwriting, yes.

24   Q    And is that your signature on the bottom of

25   page 4?

190

1          MR. ROSENBAUM:  The last one.

2          THE WITNESS:  Yes.

3     Q    (By Ms. Jones) Can you turn to page 3

4  please.

5     A    Yes.

6     Q    So you see there's -- is this your

7  handwriting on page 3?

8     A    I don't think so.

9     Q    You don't think so?

10    A    No.

11    Q    Did somebody help you with this charge or

12 this questionnaire?

13    A    What does it say?  I don't know what this

14 thing says.  I like my chance -- charge of

15 discrimination for something discrimination and after

16 or stress leave related to . . . I don't know who

17 wrote this.  It's not me.

18    Q    So if -- let me reference on the front page

19 the date up at the top.  It says November 17, 2020.

20 You see that?

21    A    Yes, ma'am.

22    Q    Okay.  So this was after your employment was

23 terminated?  Do --

24    A    I was terminated already.

25    Q    Yeah.  Your employment was terminated

196

1    Q    Right.  So they paid you for an extra day?

2    A    How do you know that?

3    Q    Well, that's what you're telling me.

4    A    No, that's what they telling me.  I want to

5  see the pay stub.  How did they pay me to the 23rd

6  when I didn't submit a -- when I didn't submit a time

7  card?

8    Q    Okay.  So --

9    A    I'm asking you.  You asking me and I'm

10  asking you.

11    Q    Okay.  Mr. Lee, I'm sorry but I'm not going

12  to answer questions today.  This is your deposition,

13  not mine.  Okay?  So let's move on.  I don't think

14  that's critical anyway about if they paid you for an

15  extra day or not.

16         Going back to -- you talked earlier about

17  the union -- this union meeting in February of 2019

18  that some of the guys called you to tell you about.

19  Did you ever file a complaint with the union about

20  what was being discussed at the meeting?

21    A    Nope.

22    Q    Did you file a complaint with anybody else

23  about what was being discussed during this union

24  meeting?

25    A    Because of what was discussed at that union

RALPH ROSENBERG COURT REPORTERS, INC.

197

1    meeting, I never went to any more union meetings.

2        Q    But did you file a complaint with anybody

3    else about --

4        A    I answered that, no.

5        Q    So in this lawsuit, the complaint that you

6    filed in this lawsuit, you . . . there's an

7    allegation in your complaint that you were retaliated

8    against for "reporting illegal practices at

9    L3Harris".  What illegal practices did you report?

10       A    Sean stealing gas.

11       Q    Anything else?

12       A    Him going home.

13       Q    What do you mean him going home?

14       A    He would leave three times a week.

15       Q    Okay.  Any other illegal practices that you

16   reported?

17       A    No.  I don't know.

18       Q    When -- when did you report that Sean was

19   leaving work?

20       A    The same time he was stealing gas.

21       Q    You said that during the meeting with Julie

22   and Rodney?

23       A    (Moves head up and down.)

24       Q    Is that a yes?

25       A    Yes, I'm sorry.

198

1    Q    So -- and so what exactly did you say to

2   Julie and Rodney during the meeting about Sean

3   leaving?

4    A    He steal gas every Tuesdays and Thursdays,

5   okay.  And three time a week, he brings his personal

6   vehicle to the job site.  And between 12 and

7   2 o'clock, he gets in his truck and he goes home.

8   And he logs eight hours.  And I guarantee you Gilbert

9   go witness to that too.  And how do I know he goes

10  home and logs eight hours?  I check his timesheet.

11  And I'm willing to take a lie detector test for that

12  too.

13       Q    Are you currently employed anywhere?

14       A    No, ma'am.

15       Q    Since your employment with L3Harris was

16  terminated in June of 2020, have you submitted an

17  application for any job?

18       A    I call.

19       Q    But did you actually submit an application

20  to anybody --

21       A    No.  I call to see if there's employment.

22       Q    In your interrogatory responses, you said

23  that you called three painting companies.  Is that

24  what you're referring to?

25       A    Yes, ma'am.

230

1    would leave.

2         Q    Okay.  So --

3         A    If he has the gall to come up and tell

4    everybody that when this is all over and I win, that

5    I'm gonna walk up to him and shake his hand and tell

6    him thank you for everything he done for me which is

7    he never do shit for me.  But I'm not that dumb.

8         Q    The -- I want to go back and ask you

9    about -- I know we talked about this a little bit but

10   I just want to make sure that I have an understanding

11   of -- totality of what you're claiming in terms of

12   harassment.  Remember we talked -- we talked about

13   the fact that I was asking about people harassing you

14   for a disability.  So you told me about Sean Igne

15   making some comments about when are you going to

16   retire that I understand was in February of 2019.

17   And you also said that Mark Vegas made some comments

18   during the union meeting, right?

19        A    Yes, ma'am.

20        Q    Other than Sean Igne asking about when

21   you're going to retire, did anyone else say anything

22   to you, any of your co-workers say anything to you

23   about having PTSD or, you know, harassing you in any

24   way?

25        A    Of course.

231

1      Q      Who?

2      A      Steven Duarte.  He told me in a long

3  conversation, to make it short.  If he could retire,

4  he would because that's his goal too, have enough

5  money to retire and no work.  And he feels that since

6  I get hundred percent PTSD, that I should retire and

7  walk away and this bullshit and him.  Who else?

8      Q      So let me ask you about Steven.  When --

9  when did Steven make that comment?

10     A      Right after everybody find out I had PTSD.

11     Q      So this is in February of 2019?

12     A      I don't know if it's in February.  Might

13  have been -- could have been in March after the union

14  meeting 'cause after the union meeting, everybody

15  knew about it.

16     Q      So this was either in February or March that

17  Steven made this comment?

18     A      Say that again.

19     Q      So when Steven made this comment to you,

20  that was either in February or March of 2019?

21     A      Yes, yes.

22     Q      And did you feel that Steven's comment to

23  you about retirement was harassing you?

24     A      Of course.

25     Q      Why?

232

1    A    Why is he telling me I should retire because
2   I get PTSD?  It's none of his F-ing business.
3    Q    Did you tell him that?
4    A    You want -- you want me -- you want to know
5   what I told him?
6    Q    Yes.
7    A    I told him -- I told him like this.  I said
8   Steven, you so worried about what I getting.  I said
9   you can get 'em too.  And he said huh?  I said you
10  can get -- you can get 'em too.  He goes how I can
11  get 'em?  I told him grow some fucking balls, go down
12  to the VA office, raise your right hand and join the
13  military.  And you would -- you too could get
14  disability.  But you one big pussy.  That's why you
15  not gonna get shit.  Get the fuck out of my van is
16  what I told him.
17    Q    Did he ever talk to you about -- say
18  anything to you about it after that?
19    A    No.
20    Q    Did you ever make any complaints about what
21  Steven said to you?
22    A    Yes.
23    Q    To whom?
24    A    To my wife when I come home and I'm pissed
25  and I like -- I like scream and yell and let it out

236

1   came and turned me in.  That's regardless.  But he

2   telling me why don't I retire and I said it's not --

3   it's not his damn business, brah, what I do.

4        Q    Did you make any complaints to L3Harris

5   about comments by Mark Vegas?

6        A    No.

7        Q    Between the time -- so in March of 2019, you

8   had this meeting with Jasmine and Julie.  Between

9   that meeting up until the meeting in November when

10  you issued the written warning, was there any

11  disciplinary action imposed on you?

12       A    On me?

13       Q    Yes.

14       A    Additional -- additional --

15       Q    Were you disciplined for anything?

16       A    No.

17       Q    So you weren't written up or anything like

18  that?

19       A    For?

20       Q    Anything.

21       A    From what time period you talking?

22       Q    From March of 2019 when you had the meeting

23  with Jasmine and Julie.

24       A    Yeah.

25       Q    Up until the written warning that was issued

249

C E R T I F I C A T E

STATE OF HAWAII                    )
                                   ) SS:
CITY AND COUNTY OF HONOLULU        )


        I, PRISCILLA GONZAGA, Certified Shorthand
Reporter, do hereby certify:

        That on June 25, 2021, appeared before me
PRESTON LEE, the witness whose deposition is
contained herein; that prior to being examined he was
by me duly sworn:

        That the deposition was taken down by me in
machine shorthand and was thereafter reduced to
typewriting; that the foregoing represents, to the
best of my ability, a true and correct transcript of
the proceedings had in the foregoing matter.

        That pursuant to Rule 30(e) of the Hawaii
Rules of Civil Procedure, a request for an
opportunity to review and make changes to this
transcript:

    __x__   Was made by the deponent or a party (and/or
            their attorney) prior to the completion of
            the deposition.

    _____   Was **not** made by the deponent or a party
            and/or their attorney) prior to the
            completion of the deposition.

    _____   Was waived.

        I further certify that I am not an attorney
for any of the parties hereto, nor in any way
concerned with the cause.


        Dated: This _//_ day of July 2021 in
Honolulu, Hawaii.




        _____
        Priscilla Gonzaga, CSR # 127


RALPH ROSENBERG COURT REPORTERS, INC.

## WITNESS CORRECTION SHEET

**CASE: LEE VS. L3HARRIS TECHNOLOGIES, INC.; CIVIL NO. 1:20-CV-00489 LEK-KJM**

**DEPOSITION OF PRESTON LEE (VIDEOTAPED), TAKEN ON 6-25-21.**

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |
|      |      |            |        |

(If additional space is needed, attach a blank sheet)

Signature of Deponent: _____ Date: _____
================================================================

## CERTIFICATE

☐ Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

☒ Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

☐ Please be advised that signature and/or corrections were received and are **not being filed** with the transcript because:

    ☐ the deponent failed to sign and/or make corrections within 30 days after notification that the transcript was available for review.

    ☐ a request for an opportunity to review the transcript was **not** made by the deponent or a party before completion of the deposition.

☐ Please be advised that the above-named case is going to trial and/or hearing and the deponent has **not** had 30 days to read and sign the deposition before the filing of this transcript with the Court.

DATED:        8-30-21, HONOLULU, HAWAII.

CSR NO. 29

*Ralph Rosenberg* by d.y.
**Ralph Rosenberg Court Reporters, Inc.**
*1001 Bishop Street, Suite 2460, Honolulu, HI 96813*
*Phone: (808) 524-2090   Fax: (808) 524-2596*