```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3   _____)
                                    )
     PRESTON LEE,                   )   Civil No.
 4                                  )   20-00489 LEK-KJM
                 Plaintiff,         )   (Other Civil Action)
 5                                  )
            vs.                     )
 6                                  )
     L3HARRIS TECHNOLOGIES, INC.;   )
 7   JOHN DOES 1-10; JANE DOES      )
     1-10; DOE CORPORATIONS 1-10;   )
 8   DOE PARTNERSHIPS 1-10; DOE     )
     UNINCORPORATED ORGANIZATIONS   )
 9   1-10; and DOE GOVERNMENTAL     )
     AGENCIES 1-10,                 )
10                                  )   (Pages 1 - 74)
                 Defendants.        )
11   _____)

12

13

14              DEPOSITION OF GILBERT CASTRO

15     taken on behalf of Defendants, commencing at

16   8:59 a.m., Wednesday, September 22, 2021, pursuant to

17   Notice.

18

19

20

21

22

23

24   Reported by:    JESSICA AKITA, RPR
                     Certified Shorthand Reporter
25                   Hawaii License No. 461
```

# EXHIBIT BB

```
 1   APPEARANCES:

 2
       FOR THE PLAINTIFF, PRESTON LEE:
 3
             Fujiwara and Rosenbaum, LLLC
 4           BY:  JOSEPH T. ROSENBAUM, ESQ.
             Alakea Corporate Tower
 5           1100 Alakea Street, Floor 20, Suite B
             Honolulu, Hawaii  96813
 6           808-203-5436
             jtr@frlawhi.com
 7

 8
       FOR THE DEFENDANT, L3HARRIS TECHNOLOGIES, INC.:
 9
             Cades Schutte LLP
10           BY:  AMANDA M. JONES, ESQ.
             Cades Schutte Building
11           1000 Bishop Street, Floor 12
             Honolulu, Hawaii  96813
12           808-521-9232
             ajones@cades.com
13

14
     Also Present:
15
             PRESTON LEE
16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   DEPOSITION OF:                                  Page

 3   GILBERT CASTRO

 4      EXAMINATION BY MS. JONES:                       4

 5      EXAMINATION BY MR. ROSENBAUM:                  59

 6

 7                  E X H I B I T S

 8   Marked       Description                        Page

 9    Exhibit 1   Subpoena To Testify At A              9
                  Deposition in a Civil Action
10                (3 pages)

11    Exhibit 2   Incident Concerning Preston Lee     16
                  and Sean Igne (2 pages)
12
      Exhibit 3   Statement of Gilbert Castro         33
13                (2 pages)

14    Exhibit 4   Statement of Gilbert Castro         40
                  (1 page)
15
      Exhibit 5   Declaration of Gilbert Castro       42
16                (3 pages)

17

18              INFORMATION REQUESTED

19                    (None.)

20

21        QUESTIONS INSTRUCTED NOT TO ANSWER

22                    (None.)

23

24

25
```

```
 1                        LIHUE, HAWAII;

 2           WEDNESDAY, SEPTEMBER 22, 2021; 8:59 A.M.

 3                        *  *  *  *  *

 4                        GILBERT CASTRO,

 5           having been first duly sworn, was examined

 6                     and testified as follows:

 7                          EXAMINATION

 8  BY MS. JONES:

 9       Q.    Good morning.

10       A.    Good morning.

11       Q.    My name is Amanda Jones.  I represent

12  L3Harris Technologies.

13             Can you please state your full name?

14       A.    Gilbert P. Castro.

15       Q.    Okay.  And where are you currently employed?

16       A.    Right now it's Kupono.  It's an umbrella

17  company with Amentum.  It's called Koa Lani.

18       Q.    And previously, were you employed by Ke'aki

19  Technologies?

20       A.    Yes.  Yes.

21       Q.    Just a couple of things.

22       A.    Uh-huh.

23       Q.    So the court reporter today is taking down

24  all of my questions and then everything that you say.

25       A.    Okay.
```

1  put?

2                    COURT REPORTER:  Exhibit 1.

3                    MS. JONES:  Oh.  Numbers are fine.

4                    (Exhibit 2 was marked.)

5  BY MS. JONES:

6       **Q.    Mr. Castro, the court reporter has handed you**

7  **what's been marked Exhibit 2 to your deposition, and if**

8  **you can take a look at this document.  It's two pages.**

9  **Just review it and let me know when you're finished**

10 **reviewing it; okay?**

11      A.    Some stuffs is correct.  Some stuffs is kind

12 of -- it's not how it happened.

13      **Q.    Okay.  Let me ask you some questions about**

14 **this.  So you --**

15      A.    Yeah.

16      **Q.    -- you reviewed Exhibit 2?**

17      A.    Yes.

18      **Q.    Okay.  Do you recognize this document?**

19      A.    This document is a whole incident that

20 happened.  That's how everything got started right here.

21      **Q.    Okay.  But just taking this piece by piece.**

22 **First, I just want to know if you recognize the document**

23 **itself?**

24      A.    Yes.

25      **Q.    Okay.  And is -- if you look at the second**

1    page of the document, is that your signature there?

2         A.    Yes.

3         Q.    Okay.   And did you also handwrite in the date

4    next to your signature?

5         A.    Yes.

6         Q.    Okay.   And is this a statement that you gave

7    to Rodney Martin?

8         A.    Yes.

9         Q.    So, after you signed this document, you

10   handed it in to Mr. Martin?

11        A.    Yes.

12        Q.    And who is Rodney Martin?

13        A.    He was our former supervisor.

14        Q.    Okay.

15        A.    The super.

16        Q.    So he was the supervisor for both you and

17   Preston Lee?

18        A.    Yes.

19        Q.    He was in charge of the paint shop?

20        A.    Yes.

21        Q.    Okay.   And was he also in charge of other

22   areas, if you know?

23        A.    Oh.   Yeah.

24        Q.    Is that a "yes"?

25        A.    Yes.

1     Q.    Okay.  And prior to doing the statement which

2  is Exhibit 2, did Mr. Martin ask you some questions

3  about what had happened the previous day?

4     A.    Concerning this incident?

5     Q.    Yeah.  Did -- did Mr. Martin ask you some

6  questions about the incident that had happened the

7  previous afternoon between Preston Lee and Sean Igne?

8     A.    He asked me but was more for what was said.

9     Q.    Mr. Martin was asking you what was said

10 between Mr. Lee and Mr. Igne?

11    A.    Yes.

12    Q.    Okay.

13    A.    As a witness.

14    Q.    Right.

15          So Mr. Martin wanted -- was asking you what

16 happened between the two of them?

17    A.    Mr. Martin had bring me in to accommodate

18 what else had happened after this incident.  Yes.  But

19 not before.  I don't know why he brought me in before.

20    Q.    No, no, no.  I'm not asking before.

21          There's an incident between Sean Igne and

22 Preston Lee that you talk about in your statement,

23 Exhibit 2.

24    A.    Okay.

25    Q.    Is that right?

1        A.    Yes.

2        Q.    Okay.  After that incident, Mr. Martin called

3   you in to ask you questions about what happened --

4        A.    Yes.

5        Q.    -- is that correct?

6        A.    Yes.

7        Q.    And after asking you questions, the statement

8   that is Exhibit 2 was prepared?

9        A.    Uh-huh.

10       Q.    Is that a "yes"?

11       A.    Yes.

12       Q.    Sorry.  You just have to say "yes" or "no"

13   instead of uh-huh --

14       A.    Oh.  Okay.

15       Q.    -- or huh-uh.

16       A.    Right.

17       Q.    It's hard to take down.

18       A.    Okay.

19       Q.    And when Mr. Martin was questioning you about

20   what happened between Sean Igne and Preston Lee, were

21   you truthful with Mr. Martin?

22       A.    Yes.

23       Q.    So in the second and third paragraphs of

24   Exhibit 2, you reference a Safety Inspector named

25   Kathleen Lambrix; do you see that?

1      A.    Yes.

2      **Q.    You see it, the second and third paragraphs?**

3      A.    Yeah.  Right here.

4      **Q.    Okay.  So I just want to ask you some**

5  **questions about Ms. Lambrix; okay?**

6      A.    Uh-huh.  Yes.

7      **Q.    So, as I understand it, Kathleen Lambrix was**

8  **-- was the Safety Inspector for the Navy; is that right?**

9      A.    Yes.  I didn't even know her until she came

10  introduce herself.

11      **Q.    Okay.  And it looks like, according to your**

12  **statement, that you talked to her on November 5th, 2019;**

13  **does that seem right to you?**

14      A.    Yes.

15      **Q.    And is it correct that she came up to you**

16  **after seeing you on a roof not wearing fall protection?**

17      A.    Yes.  I was -- I was on a lean-to.

18      **Q.    On a what?**

19      A.    Lean-to, you know, like a roof.

20      **Q.    Okay.**

21      A.    A small little roof.  I walked up on top of

22  there but didn't have my fall protection, thinking that

23  I would do things fast, you know, just pressure wash

24  things fast, then I can come down.  But before I could

25  do it, she kind of caught me -- driving by.

1      Q.     And so she came up to you and -- and talked

2   to you about not wearing fall protection?

3      A.     Yeah.  She told me to get down and -- and she

4   introduced herself and told me, "You know you're in the

5   wrong?"

6             I go, "Yes.  I'm wrong."

7             So they kind of explained, then the safety

8   guy, this guy was a -- what is -- this -- our safety --

9   he's not a manager.  He's an assistant -- assistant

10  safety member.  He came over, but they all came and kind

11  of conducted a -- a whole safety issue over here.  And,

12  yes, I was wrong about not wearing safety equipment and

13  pressure washing without -- I had my rain gear, but I

14  didn't have my safety harness and ropes to hold me up.

15     Q.     Okay.  So they had a discussion with you

16  about, "Hey, you've got to wear appropriate protective

17  equipment while you're working"?

18     A.     Yes.

19     Q.     And did Ms. Lambrix also ask you about

20  Preston Lee?

21     A.     No.  The whole -- the whole incident at that

22  point was just -- focuses on me --

23     Q.     Okay.

24     A.     -- not wearing safety.

25     Q.     Can you look at the third paragraph of

1  **Exhibit 2, please?**

2       A.    Uh-huh.

3       **Q.    It begins with, "She asked me to come down."**

4       **You see that paragraph?**

5       A.    "She asked me if the guy pressure washing,"

6  yeah.  Yes.

7       **Q.    Okay.  So it says here in the middle of this**

8  **paragraph, "She asked me if the guy pressure washing the**

9  **walls in shorts," in parentheses, "(Preston) worked with**

10 **me and I said yes."**

11      **Do you see that?**

12      A.    Okay.  Yeah.

13      **Q.    You see that sentence?**

14      A.    Yes.

15      **Q.    Okay.  In looking back at that sentence --**

16      A.    Uh-huh.

17      **Q.    -- does it refresh your recollection that**

18 **Ms. Lambrix asked you about Preston?**

19      A.    She asked me, "Who else is working here?"

20            And I told, "My -- my friend Preston."  Yes.

21      **Q.    Okay.  And was Preston wearing shorts at the**

22 **time?**

23      A.    He was wearing shorts, but he didn't ask

24 me -- she didn't ask me why -- why is he wearing shorts.

25 Wasn't one -- one issue.

1      Q.    And do I understand that Ms. Lambrix also

2    said to you, "I'm going to be watching you," during this

3    conversation?

4      A.    Well, she said that after the whole incident.

5    When she walked away, she said, "I'll be watching you

6    guys."

7           Safety.  Yeah.

8      Q.    Okay.  And you kind of made a gesture where

9    she -- with your -- with your two fingers from her eyes

10   out towards you; is that right?

11     A.    Yes.

12     Q.    Okay.  Did you tell Preston about the

13   conversation that you had with Ms. Lambrix?

14     A.    Yes.

15     Q.    And did anyone issue any written disciplinary

16   action to you regarding what Ms. Lambrix observed and

17   talked to you about?

18     A.    No written notice to where we was doing

19   wrong, just -- we had personal conversation to take care

20   this safety issue.

21     Q.    And did you inform anybody else, any of your,

22   you know, supervisors or lead man about the conversation

23   that Ms. Lambrix had with you?

24     A.    Yes.  I -- I had to talk to Sean after work

25   -- not after.  Before we -- you know, before work --

1    work was done and explained to him what had happened.

2        **Q.    And you told him that Ms. Lambrix had**

3    **observed you not wearing fall protection and talked to**

4    **you about it?**

5        A.    Yes.

6        **Q.    And did you tell Sean Igne that Ms. Lambrix**

7    **has indicated that she'd be watching you guys?**

8        A.    Yes.

9        **Q.    And what did Sean Igne say, if you recall?**

10       A.    Well, he kind of told me, "You have to wear

11   your safety gear."

12             It's our judgment, yeah?  It's our call.  And

13   the call wasn't right when I didn't use my safety gear,

14   of course.

15       **Q.    So the day after the conversation that you**

16   **had with Ms. Lambrix, you and Preston Lee were pressure**

17   **washing; is that correct?**

18       A.    Yes.

19       **Q.    And when you were pressure washing that day,**

20   **were you wearing rain gear?**

21       A.    Yes.

22       **Q.    And was -- does that include long pants?**

23       A.    Yes.

24       **Q.    And was Preston Lee wearing shorts while**

25   **pressure washing that day?**

1    A.   That -- the following day?

2    **Q.   Yes.**

3    A.   He was wearing shorts, but he just got

4  started to start up, put gas, and start up the machine

5  to warm things up.  Yes.  He -- he wasn't wearing rain

6  gear at that time in the morning.  Yeah.

7    **Q.   Okay.  And as I understand it, Sean Igne**

8  **arrived on the scene while you and Preston were pressure**

9  **washing; is that correct?**

10   A.   Yes.

11   **Q.   And Mr. Igne was trying to get Preston's**

12 **attention over the sound of the pressure washer?**

13   A.   Yes.

14   **Q.   Is the pressure washer pretty loud?**

15   A.   It's real loud.

16   **Q.   Okay.  It's like a gasoline power piece of**

17 **equipment?**

18   A.   Yes.

19   **Q.   And did you understand that Sean Igne was**

20 **trying to signal to Mr. Lee to put on pants?**

21   A.   He was trying to yell at him prior to him

22 getting his attention where he could have just shut the

23 thing off and kind of like wave him in, you know?  But

24 he kept yelling.

25   **Q.   And he was yelling --**

1        A.    Over --

2        Q.    -- to put on pants?

3        A.    Yes.  Well, he wasn't yelling to put on

4   pants.  He was just getting his attention.

5        Q.    He was yelling his name?

6        A.    Yes.

7        Q.    And was he signaling to indicate what he was

8   trying to get his attention for like to -- motioning to

9   put on his pants?

10        A.    He was just yelling.

11             By the time Preston looked back, then he saw

12   him kind of waving his hands and telling -- kept telling

13   him to -- it's hard to talk when the machine is so loud,

14   yeah?  So turn off the machine, you know, so.  Yeah.  He

15   was -- he was yelling for his attention.

16        Q.    Okay.  And then at that point did you go to

17   the truck and get the rain pants?

18        A.    I -- I -- I knew already, so I had the rain

19   gear for -- when -- as Preston was walking up, then Sean

20   kind of explained to him, you know, you got to wear your

21   safety gear.  He's the lead man, yeah.  But you don't

22   have to yell at your team members when you -- you

23   yourself as the lead man can just shut the machine down

24   and talk to him, you know?  I knew already, so I just

25   walked over to the van and handed Mr. Lee his rain gear.

1  "Hey, put this on.  Please put this on so we can keep

2  pressure washing."

3          But Sean was kind of upset, but I would get

4  upset too.  I would get upset because I would be yelling

5  -- he was yelling at me, yeah -- yelling at Mr. Lee, not

6  getting his attention so fast.

7      **Q.    Did you think it was inappropriate for Sean**

8  **Igne to tell Mr. Lee to put on pants?**

9      A.    It's not a -- it wasn't appropriate -- I

10  mean, it was appropriate to him to put on the pants, but

11  not kind of like making a big whole incident where

12  everybody's just walking around you.  He could have just

13  make -- turn off that machine and kind of cool

14  everything down and kind of -- how he pursues things is

15  differently, you know?

16      **Q.    So, if I understand correctly, you think it**

17  **was appropriate for Sean Igne to tell Preston to wear**

18  **pants, but you didn't think that the way he went about**

19  **doing it was the best way; is that right?**

20      A.    Yes.  Yes.  Yes.

21      **Q.    Now, at the end of the workday, that same**

22  **workday --**

23      A.    Uh-huh.

24      **Q.    -- I understand there was a incident in the**

25  **office; is that correct, between Preston and Sean?**

1      A.    Yes.

2      Q.    And in Exhibit 2, in the last paragraph on

3  the first page, the third line says, "I heard Preston

4  yelling at Sean in an angry tone about why he had to

5  wear long pants while Sean was working in short pants.

6  And if he, Preston, was going to have to wear long

7  pants, then Sean better be wearing long pants the next

8  day."

9           You see that?

10     A.    Yes.

11     Q.    Does that sentence accurately reflect what

12  you heard in the office that day?

13     A.    Exactly.

14     Q.    Now, the statement also says that you heard

15  Preston swearing at Sean.

16           Is it correct that Preston was swearing at

17  Sean that afternoon?

18     A.    He said some words of swearing.  Yes.

19     Q.    Like what, the "F" word?

20     A.    "F" word and, you know, he was just very

21  upset.

22     Q.    Was -- did you think that Preston's conduct

23  towards Sean in the office was appropriate?

24     A.    Well, two guys was going at it.  So if one

25  swear, the other one going swear.  So two guys was just

 1  going off at each other.

 2      Q.   Okay.

 3      A.   Had start with, you know, just the build up,

 4  yeah, during the day of him coming to him that morning

 5  kind of, you know, winding him up for the finale at the

 6  end like this --

 7      Q.   Okay.

 8      A.   -- so.

 9      Q.   So in your statement that's Exhibit 2, you

10  don't say anything about Sean swearing at Preston.   I

11  don't see that anywhere in this statement.

12           Do you see that anywhere?

13      A.   No.  But two guys was swearing at each other

14  in -- because I was on the other side listening because

15  I was doing my time card.  Yeah.  So two guys

16  automatically going -- was swearing at each other.

17      Q.   And why is it that you didn't say anything in

18  your statement about Sean swearing during this incident?

19      A.   They never ask me to put if Sean was

20  swearing.

21      Q.   Who never asked you?

22      A.   Rod Martin when they asked me to give a

23  statement.

24      Q.   Okay.  Why did you not put something in here

25  about that before you signed it if that was what

happened?

A.   I just told you what I heard, you know, and I cannot give all the details, you know?  I'm not one police officer, so I don't know.  I just listened.  I heard him swearing.  I heard Sean swearing and that's it.  I mean, if I missed them, I missed them.  I didn't -- I didn't put it in.  But they didn't ask me to ask if Sean was swearing.  I just heard Preston.

Q.   **Did -- did Mr. Martin ask you what happened that afternoon?**

A.   Yeah.

Q.   **Okay.  And did you give him a full accounting of what happened?**

A.   Yeah.  A rough -- rough thing, what had happened.

Q.   **Did you ever amend this statement that you gave to Mr. Martin?**

A.   No.  I never amend anything.  I go back and check it or rephrase things.

Q.   **Did you ever tell him, oh, hey, I missed something in my statement that wasn't included?**

A.   I never really thought about telling in detail what had happened because having one argument is normal, you know?  We -- we get arguments all the time.  And he swore.  I swore.  What you expect?  Everybody's

1  so -- so hyped up already, and I cannot catch every

2  detail what that person said, what that person said.  So

3  I'm -- I'm not -- I'm not perfect in telling who was

4  innocent in the whole thing, you know?

5       Q.    **This incident on November 6, 2019, was that**

6  **the first time you heard Preston yell at somebody at**

7  **work?**

8       A.    He yells at me.  I yell back, but it was just

9  to make the day as -- as comfortable as possible for me,

10 yeah?  But it's all work-related.  But for other people,

11 not really.  I don't -- if -- if he probably yells at

12 people, it's not around me, you know, just to, you know,

13 say "Hi, bye," you know, but that's it.  Not violently,

14 yeah, with anybody.

15      Q.    **Okay.  Earlier, I think you said that**

16 **Exhibit 2 was not exactly what happened?**

17      A.    Uh-huh.

18      Q.    **When you first read Exhibit 2, you said,**

19 **"Some of this was correct and some of this is not what**

20 **happened"; is that -- is that correct?**

21      A.    Yes.

22      Q.    **Okay.  So what -- what is it that is not**

23 **correct about this statement?**

24      A.    (Reading) That guy Jose Felix -- Felix Jose

25 wasn't in the picture over here.  Only -- only Kathleen

1  Lambrix that was in the whole -- whole, you know, kind

2  of -- having one personal explanation for -- for what I

3  was getting in trouble for.  We didn't have Felix Jose

4  in -- in this paragraph, or just only Kathleen Lambrix.

5      Q.   Okay.  I'm sorry.  I don't see where it says

6  Felix Jose here.

7      A.   Yeah.  That's why when I -- I read it, you

8  know, they only had Kathleen's name.

9           MR. ROSENBAUM:  He's saying that that was

10  left out and --

11           THE DEPONENT:  Yeah.  They left out Felix

12  Jose, the safety -- one of our safety members in -- in

13  our supply.

14  BY MS. JONES:

15      Q.   Okay.  So you're saying in paragraph 2 --

16      A.   Uh-huh.

17      Q.   -- of Exhibit 2 --

18      A.   Yes.

19      Q.   -- you just didn't include that this guy

20  Felix Jose was also present during this discussion?

21      A.   Yes.

22      Q.   Is there anything else that is not accurate

23  about Exhibit 2?

24      A.   No.  Everything is pretty -- pretty updated.

25  Just wasn't right where I didn't see Felix's name inside

1    that included the whole conversation.

2        Q.    Okay.  Now, I understand that you were later

3    interviewed by a man named Scott Taylor --

4        A.    Uh-huh.

5        Q.    -- for an investigation that he was doing to

6    an allegation that Sean Igne was stealing gasoline.

7        A.    Uh-huh.

8        Q.    Do you recall that interview?

9        A.    Yes.

10       Q.    Did you know Mr. Taylor prior to that

11   interview?

12       A.    Not really.  He's around, but I don't know

13   him personally.

14       Q.    Okay.  You knew who he was?

15       A.    Yes.

16       Q.    And did you respond truthfully to

17   Mr. Taylor's questions?

18       A.    Yes.

19                  (Exhibit 3 was marked.)

20   BY MS. JONES:

21       Q.    The court reporter has handed you what's been

22   marked as Exhibit 3 to your deposition.  If you can take

23   a look at that document, two pages, and let me know when

24   you're ready.

25       A.    Yes.

```
 1                    (Exhibit 4 was marked.)

 2    BY MS. JONES:

 3         Q.    The court reporter has just handed you what's

 4    been marked as Exhibit 4 --

 5         A.    Uh-huh.

 6         Q.    -- to your deposition.  Please take a look at

 7    this document and let me know when you're ready.

 8         A.    Okay.  I'm ready.

 9         Q.    Okay.  Do you recognize this document?

10         A.    This came from --

11         Q.    It's just a yes or no question --

12         A.    Yes.

13         Q.    -- do you recognize it?

14         A.    Yes.  I recognize it.

15         Q.    Okay.  And is that your signature at the

16    bottom?

17         A.    Yes.

18         Q.    Okay.  And is that your handwriting right

19    above it with the date?

20         A.    Yes.

21         Q.    And what about the handwriting up at the top

22    in paragraphs one, two, and three; is that yours?

23         A.    Yes.

24         Q.    And L3Harris received this document from the

25    union.
```

1      A.    Okay.

2      Q.    And you've got a shirt on today that says,

3   "IBEW1260."

4      A.    Right.

5      Q.    Is that the union that you belong to?

6      A.    Yes.

7      Q.    Okay.   How long have you been a union member?

8      A.    Since '95.

9      Q.    Since you started out at the base?

10      A.    Yes.

11      Q.    And is this a document that the union typed

12   up for you?

13      A.    They typed it up.   Yes.

14      Q.    Yeah.   You didn't type this document; right?

15      A.    No.   I haven't -- yeah.   I wouldn't type this

16   thing out.

17      Q.    Yeah.   So who at the union typed this out, if

18   you know?

19      A.    I don't know anybody from the union that --

20   that actually typed this thing up.

21      Q.    You don't remember who -- who typed this up?

22      A.    No.

23      Q.    Do you -- do you remember who gave it to you?

24      A.    No.   No.

25      Q.    Did you review this document before you

```
 1   signed it?
 2        A.    I signed it.   Yeah.   I reviewed them.   I
 3   signed it.
 4        Q.    And did you agree with the statement in this
 5   document at the time that you signed it?
 6        A.    I agreed it -- or I agreed with it and this
 7   is just one -- like a aggression, yeah, towards Sean,
 8   yeah, about how Preston was treating Sean or anybody
 9   else.  So I just signed it.  I mean, they tell me sign
10   them, I sign them.  I mean, I signed it.
11        Q.    Did the union tell you what they were going
12   to do with this document?
13        A.    They was going to -- I don't know, just hold
14   them, I guess, evidence.  Yeah.  Towards the -- I guess
15   the whole incident -- so this -- this was 11/16/20.
16                   MR. ROSENBAUM:  January 16, '20.
17                   THE DEPONENT:  Oh.  January.
18             Yeah.  This -- I think this -- with the whole
19   incident that was coming up and whatnot, they gave me
20   this to sign, and I signed.
21                   (Exhibit 5 was marked.)
22   BY MS. JONES:
23        Q.    Okay.  Okay.  The court reporter just handed
24   you what's been marked Exhibit 5 to your deposition.
25        A.    Yes.
```

```
1                    C E R T I F I C A T E

2   STATE OF HAWAII                    )
                                       )   SS.
3   CITY AND COUNTY OF KAUAI           )
    _____)

4

5          I, JESSICA AKITA, Certified Shorthand Reporter
    No. 461, RPR, do hereby certify:

6          That on Wednesday, September 22, 2021,
    at 8:59 a.m., appeared before me GILBERT CASTRO, the
7   deponent whose testimony is contained herein; that prior
    to being examined, the deponent was by me duly sworn or
8   affirmed; that the proceedings were taken in machine
    shorthand by me and was thereafter reduced to
9   typewriting under my supervision; that the foregoing
    represents, to the best of my ability, a correct
10  transcript of the proceedings had at that time;
           That pursuant to Rule 30(e) of the Hawai'i Rules
11  of Civil Procedure, a request for an opportunity to
    review and make changes to the transcript:

12

13  ___    Was made by the deponent or a party (and/or
           their attorney) prior to the completion of
14         the deposition.

15  ___    Was not made by the deponent or a party
           (and/or their attorney) prior to the
16         completion of the deposition.

17  _X_    Was waived.

18         I further certify that I am not of counsel or
    attorney for any of the parties to this case, nor in any
19  way interested in the outcome hereof, and that I am not
    related to any of the parties hereto.

20

21         Dated this 28th day of September, 2021.

22                                _____
23                                JESSICA AKITA, RPR
                                  Certified Shorthand Reporter
                                  in and for the State of Hawai'i
24                                License No. 461

25
```

To:    Rodney Martin

Date:    11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

I'm going to give you some background information that had a play in what happened between Preston
Lee and Sean Igne at approximately 1545 hours on Wednesday, 11/6/19.

On 11/5/19, I was pressure washing the roof of BS 358 and Preston was pressure washing the walls
when a NAVFAC Safety Inspector, Kathleen Lambrix, who is in charge of overseeing the safety of the
NOVA project at Makaha Ridge was walking by BS 358 and saw me on the roof without fall protection
gear on.

She asked me to come down and told me that even though the roof was flat I still need to have life lines
strung across the roof and my fall protection gear on. I apologized and told her that I would comply. We
talked in general about PPE and how important it was to wear it. She asked me if the guy pressure
washing the walls in shorts (Preston) worked with me and I said yes. The only other thing she said to me
before leaving was with her two fingers pointing at my eyes, "I'm going to be watching you".

At the end of the day I told my Lead, Sean Igne who was working on another job site that day, what had
happened to me and what the Safety Inspector talked to me about and that I was sorry.

The next day, 11/6/19, Preston and I returned to BS 358 to continue pressure washing the walls  of the
building. Preston was on washing the north wall on the building and I had I was at our work van getting
some gear out of it when I heard a horn blowing. Sean Igne and David Hesapene had arrived on site at
approximately 1215 – 1230 hours to start working on painting the roof. He was trying to get Preston's
attention but because the gas powered pressure washer was so loud he had walked to within 5' or so of
Preston and yelled over the noise of the pressure washer "put on your pants" meaning put on your rain
gear. Sean was motioning with his hands from his waist down to his ankles while he was trying to convey
the message to Preston over the loud noise of the pressure washer. Preston looked at Sean and I,
knowing that Sean wanted Preston to wear his rain gear because of the PPE discussion I had with the
Safety inspector, even though she didn't actually day anything about it, wanted to be proactive, so I
grabbed Preston's rain gear out of the van and walked over and gave it to him. Preston but his rain gear
on and went back to pressure washing without incident. Sean and David grabbed all of the fall
protection gear, set it up on the roof and started working on painting the roof without incident.

At the end of the day when we got back to the shop and were working on entering our timecard
information into the Kiosk computer in the Antenna Riggers office which is on the other side of the
partition wall from the our Paint shop office in the same building, I heard Preston yelling at Sean in an
angry tone about why he had to wear long pants while Sean was working in short pants and if he,
Preston was going to have to wear long pants then Sean better be wearing long pants the next day. I
heard Preston swearing and Sean and Sean say something like "why you going to turn me in" but could



EXHIBIT

2

L3HARRIS-000471

not hear all the details that were being said because I was in another room and the office door was closed. I could tell that Preston was very angry and was very loud.


Gilbert Castro

11 - 7-19

NOV 8 2019

L3HARRIS-000472

EXHIBIT F pg 8

## STATEMENT OF GILBERT CASTRO ON 10 DEC 19

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Castro

Q: Do you agree to the statement above?

A: Yes.

Q: What is your job?

A: Painter.

Q: What was your job during 2007-2010?

A: Painter.

Q: Do you know Sean Igne?

A: Yes.

Q: What is your relationship with Sean Igne?

A: He is my Lead, and he's my friend.

Q: Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A: Yes, many times over the years into the Manu Kai vehicle and the Manu Kai 5-gallon gas cans, one for straight gas (pressure washer) and one for mixed gas (blower). The cans go in a locked locker once a job is finished.

Q: During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A: No, just the red Manu Kai metal gas cans.

Q: Has anyone ever approached you about this issue before today?

A: Rod Martin after his meeting with Preston, and I told him the same thing.

Q: Why would anyone say that you have personal knowledge about Sean misusing the gas?

A: I do not know why — maybe because I have been here for a long time.

Q: Has Preston Lee ever shared knowledge about this misuse with you?

A: Yes, about five times recently. During 2007-2010, he mainly complained about other things.



EXHIBIT
3
9-22-21

CASTRO

L3HARRIS-000503

EXHIBIT F pg 8A

Q: How much gas might you use in a week for each type?

A: Probably never more than two cans of straight gas and no more than one can for the mixed gas.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: I think that leadership must better define Preston's role when he comes back to work.

END OF STATEMENT

GILBERT CASTRO
10 DEC 19

**Statement of Gilbert Castro**

1. My name is Gilbert Castro, and I have been a (Harris/Keaki/Kupono) employee at PMRF as a Sr. Painter since *1995*. *June*

2. I know and have worked with Sean Igne since *June 1965*

3. I know and have worked with Preston Lee since *June 2006*

4. I have read Sean's statement dated November 6, 2019 (attached) and witnessed and agree that Preston's aggressive and hostile behavior is unprofessional, threatening, and adversely affects my ability work with and around Preston.

5. Preston's aggressive and hostile behavior at work creates a hostile work environment for me, Sean and others who work with Preston.

6. I am very uncomfortable working with Preston, and, at times have been concerned about my personal safety at work. I am also concerned about the safety of others, including Sean and Rodney Martin, our supervisor.

7. I believe that Preston's aggressive and hostile behavior creates an unsafe, hostile work environment.

8. The Company is responsible for investigating this unsafe, hostile work environment, and, is also responsible for addressing and correcting the gaps and issues that exist, including:

   a. Evaluate Preston for workplace violence and harassment in an independent medical exam
   b. Evaluate the risk of harm to me and my co-workers
   c. Address the risk of harm, if such exists.

Dated: *1/16/20*

Gilbert Castro



L3HARRIS-000510