```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3   _____
                                   )
 4   PRESTON LEE,                  )  Civil No.
                                   )  20-00489 LEK-KJM
 5            Plaintiff,           )  (Other Civil Action)
                                   )
 6        vs.                      )
                                   )
 7   L3HARRIS TECHNOLOGIES, INC.;  )
     JOHN DOES 1-10; JANE DOES     )
 8   1-10; DOE CORPORATIONS 1-10;  )
     DOE PARTNERSHIPS 1-10; DOE    )
 9   UNINCORPORATED ORGANIZATIONS  )
     1-10; and DOE GOVERNMENTAL    )
10   AGENCIES 1-10,                )
                                   )  (Pages 1 - 48)
11            Defendants.          )
     _____)

12

13

14             DEPOSITION OF DAVID HESAPENE

15     taken on behalf of Defendants, taken at the Law

16  Office of Cades & Schutte, 3135 Akahi Street, Suite A,

17  Lihue, Hawaii 96766, commencing at 10:53 a.m.,

18  Wednesday, September 22, 2021, pursuant to Notice.

19

20

21

22

23

24  Reported by:     JESSICA AKITA, RPR
                     Certified Shorthand Reporter
25                   Hawaii License No. 461
```

**EXHIBIT CC**

```
 1  APPEARANCES:

 2
    FOR THE PLAINTIFF, PRESTON LEE:
 3
            Fujiwara & Rosenbaum, LLLC
 4          BY:  JOSEPH T. ROSENBAUM, ESQ.
            Alakea Corporate Tower
 5          1100 Alakea Street, Fl. 20, Suite B
            Honolulu, Hawaii  96813
 6          808-203-5436
            jtr@frlawhi.com
 7

 8
    FOR THE DEFENDANTS, L3HARRIS TECHNOLOGIES, INC.:
 9
            Cades Schutte LLP
10          BY:  AMANDA M. JONES, ESQ.
            Cades Schutte Building
11          1000 Bishop Street, Floor 12
            Honolulu, Hawaii  96813
12          808-521-9232
            ajones@cades.com
13

14
    Also Present:
15
            PRESTON LEE
16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   DEPOSITION OF:                                    Page

 3   DAVID HESAPENE

 4      EXAMINATION BY MS. JONES:                         4

 5      EXAMINATION BY MR. ROSENBAUM:                    37

 6      EXAMINATION BY MS. JONES:                        45

 7

 8                     E X H I B I T S

 9   Marked        Description                         Page

10    Exhibit 1    Subpoena To Testify At A              8
                   Deposition In A Civil Action
11                 (3 pages)

12    Exhibit 2    Declaration of David Hesapene        10
                   (3 pages)
13

      Exhibit 3    Incident Concerning Preston Lee      26
14                 and Sean Igne (1 page)

15    Exhibit 4    Statement of David Hesapene on 10    31
                   DEC 19 (2 pages)
16

      Exhibit 5    Statement of David Hesapene          33
17                 (1 page)

18

19                  INFORMATION REQUESTED

20                         (None.)

21

22

23              QUESTIONS INSTRUCTED NOT TO ANSWER

24                         (None.)

25
```

```
 1                        LIHUE, HAWAII;
 2          WEDNESDAY, SEPTEMBER 22, 2021; 10:53 A.M.
 3                         * * * * *
 4                        DAVID HESAPENE,
 5        having been first duly sworn, was examined
 6                  and testified as follows:
 7                         EXAMINATION
 8   BY MS. JONES:
 9        Q.   Okay.  Good morning.
10        A.   Good morning.
11        Q.   My name is Amanda Jones, and I represent
12   L3Harris Technologies.
13             Can you please state your full name?
14        A.   David G. Hesapene.
15        Q.   Can you spell your last name for us?
16        A.   H-e-s-a-p-e-n-e.
17        Q.   P-a-n-e?
18        A.   P-e-n-e.
19        Q.   And you understand that this is a federal
20   court proceeding that we're involved with right now, so
21   the testimony that you're giving is under oath and
22   penalty of perjury; do you understand that?
23        A.   Yes.
24        Q.   Is there -- are you under the influence of
25   any drugs, alcohol, medication that would impair your
```

```
 1  already upset because he stay yelling at me.  And, you
 2  know, I said, "Maybe you should talk to him."
 3              Told Rodney that he should talk to him
 4  because we just came back to the job site the next day.
 5       Q.   Okay.  So you talked to Rodney Martin?
 6       A.   Yes.
 7       Q.   And did Rodney Martin ask you what happened
 8  the day before?
 9       A.   No.  I just told him -- I just told him that
10  what had happened that day and was about Preston
11  pressure washing.  That's about it.  I didn't go give
12  him details, you know, because he was asking what had
13  happened.  I said, "Preston was pressure washing without
14  pants and he -- the next day is when he was venting to
15  me."
16       Q.   And you told that to Rodney Martin?
17       A.   Yes.
18              (Exhibit 3 was marked.)
19  BY MS. JONES:
20       Q.   Okay.  The court reporter has handed you
21  what's been marked Exhibit 3 to your deposition.  Take a
22  look at this document and let me know when you're ready.
23       A.   Okay.
24       Q.   Do you recognize Exhibit 3?
25       A.   Yes.
```

```
 1      Q.    Okay.  Is that your signature at the bottom?
 2      A.    Yes.
 3      Q.    And did you handwrite the date under your
 4   name?
 5      A.    The date?  Yeah.
 6      Q.    Okay.
 7      A.    I think my supervisor had -- Rodney Martin
 8   made the statement.  We just have to give -- we just
 9   tell him what had happened and he typed it up.
10      Q.    Okay.  So you talked to Mr. Martin about what
11   happened.  He typed up Exhibit 3, and then you reviewed
12   and signed it?
13      A.    Yes.
14      Q.    And then did -- after you signed it, did you
15   give this document to Mr. Martin?
16      A.    Give it back to him.  Yeah.
17      Q.    Okay.  And who is Mr. Martin?
18      A.    My supervisor.
19      Q.    He was in charge of the paint shop?
20      A.    Yes.
21      Q.    And when you talked to Mr. Martin about what
22   happened, were you honest with him?
23      A.    Yeah.
24      Q.    You told him truthfully what happened?
25      A.    Yes.
```

```
 1      Q.    And did you -- were you truthful in this
 2  statement that is contained in Exhibit 3?
 3      A.    Yes.  Whatever I remembered what was going on
 4  pretty much the day of this pressure washing thing and
 5  then the next day.  It's pretty much whatever I gave, I
 6  was trying to give him a report.
 7      Q.    You think your -- your memory of what
 8  occurred was better when you signed the statement that's
 9  Exhibit 3 than it is today?
10      A.    Yes.  I get too much things in my head.
11      Q.    Yeah.  I hear you.  It was almost two years
12  ago.
13            So in the last paragraph of Exhibit 3, the
14  second sentence states, "Preston just walked up to me
15  and started ranting, 'I don't care if I going to lose my
16  job.  I'm just going to punch Sean through his face.'"
17            Do you see that?
18      A.    Yes.
19      Q.    Is that what Preston said to you?
20      A.    Yes, because he was angry from the day before
21  already.
22      Q.    And -- sorry.  Go ahead.
23      A.    No, then he apologized to me and just tell me
24  he sorry he had to do that, but he just wanted for vent
25  because, you know, this stuff had happened.
```

1    Q.   It -- it also says at the end of this
2  paragraph, "His face was full of sweat from his anger,
3  and he wiped it away and said, 'F,' space, space, space,
4  'Rod, F,' space, space, space, 'Sean.  Nobody can touch
5  me, not Rod, not Sean or HR.'"
6         Do you see that?
7    A.   Yes.
8    Q.   Okay.  Now, in the statement, we have this "F
9  space, space, space."
10   A.   Okay.
11   Q.   Can you tell me exactly what it is that he
12 said?  You may have been sort of being polite here and
13 not using the word.  But what is it that Preston
14 actually said that day?
15   A.   He had that attitude like fuck everybody.  He
16 just was angry -- angry because all this stuff was just
17 frickin happening.
18   Q.   Okay.  So he said, "Fuck Rod"?
19   A.   Yeah.
20   Q.   And Preston also said, "Fuck Sean"?
21   A.   Yes.
22   Q.   And he said -- did he say "nobody can touch
23 me"?
24   A.   Oh.  I didn't -- I don't remember saying
25 that.

1  Q. You don't remember that part?
2  A. No.
3  Q. So in this statement -- actually, scratch
4  that. That's okay. Move on.
5     Do you remember being interviewed by a man
6  named Scott Taylor concerning an allegation about Sean
7  Igne stealing gasoline?
8  A. Yeah.
9  Q. And when -- did you know who Scott Taylor
10 was?
11 A. He was replacing the general manager at the
12 time. The general manager wasn't here. So I think he
13 was taking his place. That's the way I thought -- I
14 thought -- I seen it.
15 Q. Okay. So by "general manager," are you
16 referring to Ross West?
17 A. Yes.
18 Q. Did -- but did you know Scott Taylor prior to
19 this interview that he did?
20 A. No, because the only -- the only way I knew
21 Scott Taylor because he was the one that gave us the
22 blue badge. He the one do the security clearance.
23 Q. Okay. So you had seen him before about
24 giving you a badge?
25 A. Yeah. He the one used to do our clearance

```
 1  papers.  He was the one who used to help us.
 2       Q.    Okay.  So you knew him but didn't know him
 3  very well?
 4       A.    No, not personally.
 5       Q.    Okay.  And did Mr. Taylor ask you some
 6  questions as part of this investigation he was doing?
 7       A.    I -- I no remember.  I know he was taking one
 8  statement.  I forget details he was asking me.
 9       Q.    Okay.  Let me show you a document, maybe that
10  will help.
11       A.    Okay.
12              (Exhibit 4 was marked.)
13  BY MS. JONES:
14       Q.    Okay.  The court reporter has just handed you
15  what's been marked Exhibit 4.  If you can take a look at
16  the document and let me know when you're ready.
17       A.    Okay.
18       Q.    Okay.  So is your signature on the second
19  page of Exhibit 4?
20       A.    Yes.
21       Q.    And did Mr. Taylor type up this document
22  for -- for you?
23       A.    Yes.
24       Q.    And did you review it before you signed it?
25       A.    Yes.
```

```
 1        Q.    And when Mr. Taylor was asking you these
 2   questions about the allegation about Sean stealing
 3   gasoline --
 4        A.    Uh-huh.
 5        Q.    -- were you truthful with Mr. Taylor?
 6        A.    Yes.
 7        Q.    And did you see anything in this Exhibit 4
 8   that is not accurate?
 9        A.    Well, he -- when Scott Taylor -- he -- he was
10   asking me questions with everyone, yeah?  So whatever I
11   could think what was going on, I answer them.  But the
12   thing is, you know, we -- we -- we don't -- I don't used
13   to put gas -- everybody used to put gas in the cans.
14   And I don't know.  You know, I never did -- we always
15   used to throw them in the truck.  You know, we take them
16   with us, the gas.  So, you know, I the one probably the
17   one filling up the can and I never noticed the thing was
18   gone, but.
19        Q.    Okay.  So you -- at the time Mr. Taylor was
20   questioning you, you answered the question to the best
21   of your ability at that --
22        A.    Yes.
23        Q.    -- time?
24        A.    Yes.
25        Q.    And you were honest as you could with
```

```
 1  Mr. Taylor at the time?
 2       A.    Yes.
 3       Q.    And at the time that Mr. Taylor interviewed
 4  you, did you have any information that Sean was stealing
 5  gasoline?
 6       A.    No.  I never see him personally take the can
 7  and put them -- you know, take them.  You know, we
 8  always had a can in our truck when we got to pressure
 9  wash and all that.
10       Q.    And so did -- at any time did you report to
11  Mr. Taylor that Sean Igne was stealing gasoline?
12       A.    No.
13       Q.    Is that a "no"?
14       A.    No.
15       Q.    And did Mr. Taylor tell you he was taking
16  your statement here for the investigation that he was
17  doing?
18       A.    Yes.
19             (Exhibit 5 was marked.)
20  BY MS. JONES:
21       Q.    The court reporter has just handed you what
22  has been marked as Exhibit 5 to your deposition.  Take a
23  look at that document and let me know when you're ready.
24       A.    Okay.
25       Q.    David, is that your signature on Exhibit 5?
```

1  Q. And did Mr. Lee's wife also make a complaint
2  about you in the past?
3  A. Yeah -- well, had a few of them they turned
4  me in to corporate one time.
5  Q. And Mr. Lee's wife was one of them?
6  A. And two -- three other guys.
7           MS. JONES: I don't have any further
8  questions at this time, but Mr. Rosenbaum may have some
9  questions.
10                    EXAMINATION
11 BY MR. ROSENBAUM:
12 Q. Yeah, just a couple.
13     Can you look at Exhibit 4? Look at the
14 second page. Looks like the last question you were
15 asked -- that's reflected in this document -- "Is there
16 anything else that you would like to add to or delete
17 from this statement?"
18     And it says your answer was, "I have a real
19 concern that Preston will hurt himself or others."
20     Did you ever say that?
21 A. Well, when -- I used to -- I was always
22 working with him. When he get angry, you know, he
23 always -- you know, he's mad.
24 Q. And did you -- did you state this that you
25 thought Preston would hurt himself or others?

```
 1                    C E R T I F I C A T E

 2     STATE OF HAWAII                )
                                      )  SS.
 3     COUNTY OF KAUAI                )
       _____)
 4

 5          I, JESSICA AKITA, Certified Shorthand Reporter
       No. 461, RPR, do hereby certify:
 6          That on Wednesday, September 22, 2021,
       at 10:53 a.m., appeared before me DAVID HESAPENE, the
 7     deponent whose testimony is contained herein; that prior
       to being examined, the deponent was by me duly sworn or
 8     affirmed; that the proceedings were taken in machine
       shorthand by me and was thereafter reduced to
 9     typewriting under my supervision; that the foregoing
       represents, to the best of my ability, a correct
10     transcript of the proceedings had at that time;
            That pursuant to Rule 30(e) of the Hawai'i Rules
11     of Civil Procedure, a request for an opportunity to
       review and make changes to the transcript:
12
              ___  Was made by the deponent or a party (and/or
13                 their attorney) prior to the completion of
                   the deposition.
14
              ___  Was not made by the deponent or a party
15                 (and/or their attorney) prior to the
                   completion of the deposition.
16
              _X_  Was waived.
17

18          I further certify that I am not of counsel or
       attorney for any of the parties to this case, nor in any
19     way interested in the outcome hereof, and that I am not
       related to any of the parties hereto.
20
            Dated this 29th day of September, 2021.
21
                                    _____
22                                  JESSICA AKITA, RPR
23                                  Certified Shorthand Reporter
                                    in and for the State of Hawai'i
24                                  License No. 461

25
```

To:     Rodney Martin

Date:   11/7/19

Subject: Incident Concerning Preston Lee and Sean Igne

On 11/6/19 my Lead, Sean Igne and I returned to BS 1111 to finish the exterior painting of that beach cottage and after lunch we went to BS 358 to join Preston Lee and Gilbert Castro in painting that building. We got there close to 1230 and pulled up along the north side of the building where Preston was pressure washing the wall.

As we pulled up on the lawn, Sean blew his horn a few times to get Preston's attention but he couldn't hear because the pressure washer and the water hitting the wall must have been too loud. Sean and I got out of the truck and he started walking over towards Preston. When he got close enough to not get sprayed with water bouncing back off the wall, he yelled out to Preston "put your pants on" while motioning with his hands from his waist to his legs to show he was talking about covering your legs. Preston turned around and just looked at Sean without saying anything. Gilbert overheard what was going on and since he was at the van that he and Preston work out of, he grabbed Preston's rain gear and brought over to him. Preston put the gear on and went back to pressure washing while Sean and I hauled the fall protection gear up on to the roof and got going with painting the roof.

At the end of the day when we got back to the shop I went into the Riggers office to enter my time into the company computer with Gilbert and Mark. It was around 1545 hours when and we heard Preston going off, yelling at Sean about why he had to wear long pants while Sean was working in short pants and tennis shoes. He told Sean that he better be wearing long pants the next day. Preston was swearing the F word at Sean and Sean yelled back in defense "why you going to turn me in, I just told you to put PPE on". I couldn't hear everything that was being said clearly but will say that Preston was extremely loud and angry and not acting in a civil manner.,

On the morning of 11/7/19 after arriving at BS 358 to continue painting the roof, Gilbert, Preston and I were on the north side of the building where we kept our gear overnight. Preston just walked up to me and started ranting "I don't care if I going to lose my job, I just going to punch Sean through his face". I told him "I thought you guys settled this years ago but I guess not". His face was full of sweat from his anger and he wiped it away and said "F___ Rod , F___ Sean, nobody can touch me, not Rod, not Sean or HR".

David Hesapene

*(signature)*

11/7/19

EXHIBIT 3
9-22-21
HESAPENE

L3HARRIS-000470

## STATEMENT OF DAVID HESAPENE ON 10 DEC 19

I voluntarily provide this statement to Scott Taylor, who is conducting an inquiry into an allegation that Sean Igne systematically stole gas from the MOGAS station for personal use.

Q = Taylor and A = Hesapene

Q: Do you agree to the statement above?

A: Yes.

Q: What is your job?

A: Painter.

Q: What was your job during 2007-2010?

A: I was in Grounds Department on this contract.

Q: Do you know Sean Igne?

A: Yes.

Q: What is your relationship with Sean Igne?

A: He is my Lead, and we were school classmates, and he's my friend.

Q: Have you ever observed Sean Igne pump gas at the MOGAS station since 2007?

A: Yes, he and I have been partners since Jan 19, and he has put gas in the Manu Kai vehicle and the Manu Kai 5-gallon gas cans, one for straight gas (pressure washer) and one for mixed gas (blower). The cans go in a locked locker once a job is finished.

Q: During the times that you observed him pump gas, did you ever see him pump gas into a personal 5-gallon gas can?

A: No, just the red Manu Kai metal gas cans. Plus, I am the one who normally pumps the gas.

Q: Has anyone ever approached you about this issue before today?

A: Rod Martin about two weeks, and I told him the same thing.

Q: Why would anyone say that you have personal knowledge about Sean misusing the gas?

A: I do not know why. I just know Preston and Sean do not get along, and that Preston will not take orders from him.

Q: Has Preston Lee ever shared knowledge about this misuse with you?

A: Yes, a couple of times recently when he got mad at Sean.



L3HARRIS-000501

Q: How much gas might you use in a week for each type?

A: Probably never more than two cans of straight gas and no more than one can for the mixed gas.

Q: Is there anything else that you'd like to add to or delete from this statement?

A: I have a real concern that Preston will hurt himself or others.

END OF STATEMENT

*David Hey* (signature)

DAVID HESAPENE
10 DEC 19

L3HARRIS-000502