FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
PRESTON LEE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. 20-00489 LEK-KJM |
| | ) (Other Civil Action) |
| Plaintiff, | ) |
| | ) **PLAINTIFF'S MEMORANDUM** |
| vs. | ) **IN OPPOSITION TO** |
| | ) **DEFENDANT L3HARRIS** |
| L3HARRIS TECHNOLOGIES, INC.; | ) **TECHNOLOGIES, INC.'S** |
| JOHN DOES 1-10; JANE DOES 1-10; | ) **MOTION FOR SUMMARY** |
| DOE CORPORATIONS 1-10; DOE | ) **JUDGMENT; CERTIFICATE OF** |
| PARTNERSHIPS 1-10; DOE | ) **SERVICE.** |
| UNINCORPORATED | ) |
| ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT
L3HARRIS TECHNOLOGIES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

1

Plaintiff PRESTON LEE ("Plaintiff and/or Mr. Lee) **opposes** and urges this Honorable Court to reject Defendant L3HARRIS TECHNOLOGIES, INC.'s Motion For Summary Judgment ("Defs.'s Motion").

## I. PERTINENT FACTS

Mr. Lee is a fifty-seven (57) year old a combat veteran who served our country in the United States Navy from 1982-1992. *See* Declaration of Preston Lee ("Lee Decl.") at ¶ 4 attached to Mr. Lee's Concise Statement of Facts ("CSF"). Mr. Lee served two tours in the Persian Gulf in the late 1980's/early 1990's and has PTSD as a result since 1991. *Id*. at 5-11. Mr. Lee never knew what PTSD was until he was informed of what it is by his doctor in or about 2016-2017 when he spoke about his PTSD symptoms with his VA doctor. *Id*. at 12. Mr. Lee was formally diagnosed with PTSD by at least one of his doctor in or about 2017 or 2018. *Id*. at 13.

Mr. Lee was hired on or about March 20, 1994 to work on the Flight Line at the time ITT Industries ("ITT") was the main contractor for the United States Navy at Barking Sands on Kaua'i. *Id*. at 14. Mr. Lee worked on the Flight Line as a helicopter inspector. *Id*. at 15. Mr. Lee was promoted during the time he worked for ITT. *Id*. at 16. Mr. Lee had PTSD the whole time he worked at Barking Sands on the Flight Line for ITT and he never once got into any physical altercations in the workplace and never made any threats against anyone in the workplace. *Id*. at

2

17. He never had any performance issues related to his ability to perform his job duties. *Id*. at 18. In November 2006, Mr. Lee became a painter. *Id*. at 19.

L3 Harris Technologies, Inc. ("L3") took over the United States Navy contract Mr. Lee worked under from ITT at Barking Sands in or about 2015. *Id*. at 20. Mr. Lee held the position of painter. *Id*. at 21. The entire time he worked for L3 Mr. Lee had PTSD, he just hadn't been officially diagnosed yet. *Id*. at 22.

Mr. Lee submitted documentation to the VA in 2017 and 2018 requesting disability benefits related to his PTSD diagnosis that occurred around the same time. Part of the documentation to the VA reflected Mr. Lee's private thoughts and feelings related to his PTSD that he conveyed to his physicians. L3 did not have any of this documentation prior to Mr. Lee's termination. *Id*. at 23.

In February 2019, Mr. Lee received 100% VA disability benefits due to his PTSD. *Id*. at 24. At the time the VA approved his 100% disability benefits, the VA knew he was employed at L3 and there is nothing that forbids a military veteran from receiving 100% VA benefits for PTSD and/or other injuries to continue to work in the private sector. *Id*. at 25. L3 became aware of Mr. Lee's PTSD disability via L3 Lead Sean Igne in or about February 2019 after Mr. Lee informed Mr. Igne Mr. Lee received 100% VA benefits based on his PTSD. *Id*. at 26. Mr. Lee worked on a day-to-day basis side-by-side alongside Mr. Igne, Gilbert Castro and David Hesapene at the paint shop for L3. *Id*. at 27. Mr. Lee did not work with

L3 employee Mark Vegas on a day-to-day basis as he was not in the paint shop. He was a rigger not a painter. *Id*. at 28.

Since disclosing his PTSD in the workplace, Mr. Lee was harassed and unfairly disciplined. *Id*. at 29. Sean Igne told L3's human resources that he was afraid to work with Mr. Lee because of Mr. Lee's PTSD. *Id*. at 30. In or about February 2019, Mr. Igne asked Mr. Lee why he didn't just retire because he got his 100% VA benefits for PTSD. *Id*. at 31. Mr. Lee told Mr. Igne it was none of his business. *Id*. at 32.

Mr. Igne wrote a letter to L3 to falsely portray Mr. Lee in a negative light as a violent person in the workplace that was a threat to him and Mr. Lee's coworkers. Mr. Igne knew this was false. Mr. Igne has been proven to be a liar and a thief of government gas and has falsified his timecards at work. He is simply a liar and a cheat. *Id*. at 35 and Ex A at pg. 37 lns 10-14, pg 39 ln 11-25, pg. 49 ln 5-25 to pg 50-51, pg 52 ln 19 to pg 54 ln 17.

Mr. Lee had PTSD since 1991 and worked at Barking Sands since 1994 and for L3 since 2015 and Mr. Lee never did anything violent in the workplace and he never threatened or physically harmed anyone. *Id*. at 36. Although PTSD does result in irritability and other negative emotions, part of having this disability is Mr. Lee learning to deal with it and maintain his mental wellbeing through learning coping mechanisms and to not let situations enflame his PTSD. *Id*. at 37.

4

Through his efforts to keep his PTSD in check, Mr. Lee has always kept it together at work and he has never been violent with anyone at the workplace and he would never. He told L3 the same. *Id*. at 38. Mr. Lee conveyed this to L3's human resources', Julie Broyles, when they asked him about it. Mr. Lee confirmed that he did not want to hurt his coworkers or in any way be violent in the workplace. *Id*. at 39. Mr. Lee has never once been in a physical altercation in the workplace and he has never physically threatened anyone in the workplace. *Id*. at 40.

Working at Barking Sands is and has always been a workplace for blue collar workers and many veterans. It is quite common for the employees to be cursing in the workplace and at each other. *Id*. at 41; Ex A pg 59 ln 5 to pg 60 ln 9. Every day that he worked at L3 Mr. Lee's coworkers were cursing in the workplace. Lee Decl. at 42. Mr. Lee's former manager/supervisor Rod Martin himself would curse in the workplace. Mr. Lee personally heard Mr. Martin curse more than five (5) times. *Id*. at 43. Mr. Igne himself would also curse in the workplace. Mr. Lee has heard Mr. Igne curse at least twice a day when he worked with Mr. Igne. Mr. Lee worked with Mr. Igne for fourteen (14) years. *Id*. at 44. Rod Martin likely heard Mr. Igne curse in the workplace as it was so common. *Id*. at 45. Mr. Lee tried to remain professional in the workplace. *Id*. at 46. Mr. Lee's professional conduct is reflected in that he never had a poor performance review and, in 2019, he received from L3 an award for 25 years of dedicated service. *Id*. at

5

47. Mr. Lee worked at Barking Sands for 26 years and never was he violent. he might have been loud and might have cursed, but this was commonplace in this blue collar and veteran-filled workplace. *Id*. at 49.

In or about March 2019, Mr. Lee was told by his supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m. *Id*. at 50. Mr. Lee did as instructed and met with Julie Broyles head of L3 HR in Hawai'i and Jasmine Apo an L3 HR representative. *Id*. at 51. At the meeting, Ms. Broyles confirmed she was aware of Mr. lee's PTSD. *Id*. at 52. Ms. Boynes began to ask Mr. Lee a series of questions listed below related to his PTSD as Ms. Apo took notes. *Id*. at 53. Ms. Broyles stated because of Mr. Lee's PTSD they had to ask him some questions. *Id*. at 54. Ms. Broyles asked, amongst other questions: Do you want to hurt your coworkers? Mr. Lee answered, "No." Do you want to hurt yourself? Mr. Lee answered, "No." Do you want to kill your coworkers? Mr. Lee answered "No." Do you want to kill yourself? Mr. Lee answered, "No." Do you have an anger problem? Mr. Lee answered, "No." Do you want to kill people when you get angry? Mr. Lee answered, "No." Do you need anger management classes? Mr. Lee answered, "No." Do you need a psychiatrist? Mr. Lee answered, "No." Do you have a drug problem? Mr. Lee answered, "No." Do you have an alcohol problem? Mr. Lee answered, "No." *Id*. at 57. Mr. Lee asked them if they were trying to fire him and Ms. Broyles and Ms. Apo said they were there to help him. *Id*. at 58. Ms.

6

Broyles asked Mr. Lee if he needed any accommodation. *Id*. at 59. Mr. Lee

responded, "No" as he had been functioning in the workplace up to that point for

twenty-five (25) years without accommodation and without any violence or any

other threatening conduct. *Id*. at 60. Mr. Lee had been able to perform his job

duties as a painter for years without anyone calling his ability to do his job

functions into question. Mr. Lee saw no reason for an accommodation. Nothing

had changed. *Id*. at 61.

After he was called in and interviewed by HR, Mr. Lee spoke with L3's Bill

Nordmeier, the operator for grounds department, who informed Mr. Lee that Mr.

Nordmeier also had just received 100% VA disability for his back. *Id*. at 64.

Mr. Nordmeier was still working at L3s although he has 100% VA disability. *Id*. at

65. Due to the way Mr. Lee was questioned by HR after getting his 100% disability

from the federal government, Mr. Nordmeier told Mr. Lee he went to L3 HR to

inform them that he also got his 100% VA disability. *Id*. at 66. Mr. Nordmeier told

Mr. Lee he went to L3 HR and disclosed that he had received 100% disability from

the federal government and wanted to disclose it to L3. *Id*. at 67. Mr. Nordmeier

told Mr. Lee that HR at L3 told Mr. Nordmeier that he doesn't need to disclose it

and that he shouldn't talk about his disability at work as it was personal. *Id*. at 68.

On or about November 15, 2019, Mr. Lee's coworker Gilbert Castro was

verbally warned by the safety lady at Barking Sands for not wearing protective

gear. *Id.* at 70. After lunch on the same date, Mr. Igne yelled at Mr. Lee to put on pants which he immediately complied with. *Id.* at 71. Mr. Lee was power washing at that time and was wearing shorts because he was soaking wet. *Id.* at 72. Mr. Lee was wearing steel toed rubber boots. *Id.* at 73. At that time, Mr. Igne was also wearing shorts and tennis shoes. *Id.* at 74. Mr. Igne wore shorts and tennis shoes every day at work. *Id.* at 75. On the same date, Mr. Lee told Mr. Igne, "Tomorrow if I have to wear long pants, you have to wear long pants. If I have to wear steel toe shoes you have to wear steel toe shoes. What is good for one is good for all. So come tomorrow morning have your PPE or else." *Id.* at 78. Mr. Igne said, "Or else what, you going turn me in?" *Id.* at 79. Mr. Lee respond, "Yeah" *Id.* at 80. Mr. Igne: "Well, fuck you" *Id.* at 81. Mr. Lee responds: "Well, fuck you too." *Id.* at 82. Mr. Igne and Mr. Lee exchanged a couple more "fuck yous" and Mr. Lee realized it was wrong and walked away. *Id.* at 83. Mr. Lee never physically threatened Mr. Igne. *Id.* at 84. Mr. Igne claims that when they spoke Mr. Lee's hands were "fisted and his chest was popped out." This is completely false. Mr. Lee was in no way physically threatening Mr. Igne. *Id.* at 85.

The following workday, Mr. Lee was called into Mr. Martin's office regarding a letter/note that Mr. Igne wrote to human resources/management regarding the previous day's confrontation with Mr. Lee. *Id.* at 86. Mr. Martin asked Mr. Lee a series of questioned that indicated Mr. Igne had given Mr. Martin

false information. *Id*. at 87-95. Mr. Martin said he was going to investigate Mr. Lee and this alleged incident. *Id*. at 97.

Previously in or about October 2017, Mr. Igne lied to Mr. Martin and stated Mr. Lee walked up to Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and falsely alleged Mr. Lee said he was going to kick Mr. Igne's ass after work. *Id*. at 98. This was proven to be a lie by the two witnesses present. *Id*. at 99. In his November 2019 letter to L3 regarding him being afraid of Mr. Lee, Mr. Igne cites to the incident on October 24, 2017. The truth of that incident is that Mr. Igne falsely claimed that Mr. Lee had again clenched his fists and popped out his chest like he wanted to fight. This incident was investigated by L3 and David Hesapene, who was a direct witness told the truth. David Hesapene reported that Mr. Lee never had clenched fist and a popped-out chest and never said he wanted to fight Mr. Igne. Declaration of David Hesapene at ¶ 6. Mr. Igne was again lying. *Id*. The investigation, done by Rodney Martin, came back that Mr. Lee did nothing wrong. Lee Decl. at 100.

On November 18, 2019, Mr. Lee had a meeting with human recourses and Mr. Martin regarding the confrontation with Mr. Igne. *Id*. at 102. Mr. Lee was told he was being written up for breaking the code of conduct for telling Mr. Igne fuck you. *Id*. at 102. During this meteing Mr. Lee reported that Mr. Igne had been stealing gas from the government for his personal truck. The theft of the gasoline

was confirmed by Gilbert Castro. Ex A at pg. 37 lns 10-14, pg 39 ln 11-25, pg. 49

ln 5-25 to pg 50-51.  Mr. Lee then told them he had to immediately take stress

leave and that he could not work under these conditions as he felt he was being

single out now that he was officially diagnosed with PTSD and those at the

workplace knew about his diagnosis. *Id*. at 111.

Mr. Lee went to see his doctor that very day to be placed on stress leave

which was effective November 21, 2019. *Id*. at 112-113.

On December 5, 2019, Ross West, the L3 project manager called Mr. Lee

and requested Mr. Lee's CAC card and secret clearance card. The CAC and secret

clearance cards are national security sensitive. Mr. Lee received security clearance

training every year. L3 employees are supposed to give the CAC card and secret

clearance card to security not to Mr. West. *Id*. at 114. Mr. Lee was directed by Mr.

West to give his CAC card and secret clearance card to Mr. West and if he wasn't

there then give it to his secretary. *Id*. at 115. Mr. Lee objected and said that was not

proper as the CAC card and the secret clearance card were national security related

items that need to be secure at all times. *Id*. at 116. Following Mr. West's directive,

Mr. Lee brought the CAC card and secret clearance card on December 6, 2020 to

Mr. West's office, Mr. West was not there so the card was left with Mr. West's

secretary. *Id*. at 118-119. This was a clear national security violation as Mr. Lee

should have been directed to provide the CAC card and secret clearance card to the

L3 security to safeguard those security sensitive items. *Id*. at 120. There were other L3 employees including Melissa Castillo and William "Bill" Milke, who were on stress leave that did not have their CAC cards and clearance cards removed by L3. They did not have PTSD. *Id*. at 121.

On or about April 1, 2020, Mr. Lee's doctor, Dr. Williamson, released him to return to work. *Id*. at 122. Mr. Lee was told to stay home and he would be paid his full wages. *Id*. at 123. Mr. Lee was never notified by L3 that they felt he was a threat to return to the workplace or was he given a chance to provide his side of the story. Mr. Lee was never called by L3 to determine if he was a threat to return to the workplace. Mr. Lee was never interviewed, his psychologists/psychiatrist were not interviewed, he had no chance to refute any of L3's feelings that he was a threat to return to the workplace. L3 never did any investigation into whether Mr. Lee was a threat to the workplace in 2020 that included Mr. Lee or any doctor's or family on his behalf that would verify he was not a threat to the workplace. Mr. Lee's twenty-six (26) years working at Barking Sands, while he had PTSD, with no violence in the workplace is evidence that he was not a threat to the workplace or his coworkers. *Id*. at 124.

On June 22, 2020, Mr. Lee was issued his termination letter that does not indicate why he was terminated, and he was never told why he was terminated. *Id*. at 125-126.

11

## II. DEFENDANT'S MOTION DOES NOT MEET THE SUMMARY JUDGMENT STANDARD

The Ninth Circuit Court of Appeals is generally reluctant to approve summary judgment in a case in which the motivation or intent of a party is placed at issue, especially in employment rights cases. *See, e.g., Perez v.Curcio,* 841 F.2d 255, 258 (9th Cir. 1988)(emphasis added); *Yartzoff v. Thomas,* 809 F.2d 1371, 1377 (9th Cir. 1987). Consequently, as the requisite discriminatory intent is inherently a factual question, and is usually proven by inference and circumstantial evidence, it is rare to grant summary judgment in favor of a defendant in a discrimination case. *See Lam v. University of Hawaii*, 40 F.3d 1551 (9th Cir.1994) (emphasis added). In employment discrimination cases brought under the *McDonnell Douglas* framework, "[w]e require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a searching inquiry -- one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. University of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994).

## III. ARGUMENT

### A. All Plaintiff's Claims Meet the Legal Standard to Pass Summary Judgment

Discrimination claims under the Americans with Disabilities Act ("ADA") and Section 378-2 of the Hawaii Revised Statutes ("HRS") are analyzed under the

McDonnell Douglas burden-shifting framework. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 49, n.3 (2003); *Schefte v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 425, 32 P.3d 52, 69 (2001).

Plaintiff establishes a prima facie case by showing that "(1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." *Hutton v. Elf Atochem N. Am., Inc.,* 273 F.3d 884, 891 (9th Cir. 2001); *French v. Hawaii Pizza Hut, Inc.,* 105 Hawai'i 462, 467, 99 P.3d 1046, 1051 (2004).

Defs. Motion only argues Mr. Lee can't meet the second and third elements of the prima facie case as to his termination. As a preliminary matter, Mr. Lee objects to the foundation of the declaration of Danielle Stewart and John Kreider and asks they be stricken as to any events that Ms. Stewart and Mr. Kreider did not have personal, firsthand knowledge of, such as what occurred in the workplace and at meetings with HR on Kauai for L3. Ms. Stewart and Mr. Kredier were not present on Kaua'i and do not have personal, firsthand knowledge of what occurred there. It is telling that none of the L3's key percipient witnesses as to what occurred on Kaua'i have submitted declarations such as Mr. Igne, Mr. Lee's coworkers and/or L3's local HR representatives on Kaua'i.

    **i.    Plaintiff Is Without Doubt a Qualified Individual with a Disability**

An individual is a "qualified individual with a disability" if he can perform the essential functions of the position that he holds or desires, with or without reasonable accommodation. 42 U.S.C. § 12111(8); *Kennedy v. Applause,* 90 F.3d 1477, 1481 (9th Cir.1996); *see also Cripe v. City of San Jose,* 261 F.3d 877, 884 (9th Cir.2001). For twenty-six (26) years Mr. Lee performed his job duties at Barking Sands from without any negative performance evaluations. Lee Decl at 18, 47, 60-61, 145. Mr. Lee's ability to perform his essential job functions was never called into question. *Id*. Moreover, Mr. Lee could also handle stress in the workplace even though he had PTSD.  *Id*. at ¶¶ 17, 132, 148, 150. This is confirmed by Mr. Lee's coworkers. Ex. A pg. 62 ln 1 to pg. 63 ln 15, pg. 64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37 ln 24 to pg. 38 ln 4, pg. 38 ln 14 to pg. 41 ln 20; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16.

L3 attempts to sway this Court that Mr. Lee could not perform his essential job functions due to his stress citing to the case *Mayo v. PCC  Structurals, Inc.*, 795 F.3d 941 (9th Cir. 2015) (while an employee can *be qualified despite adverse reactions to stress*, he is not qualified when that stress leads him to threaten to kill his co-workers in chilling detail and on multiple occasions (here, at least five times)). (This vastly disproportionate reaction demonstrated that Mayo could not

perform an "essential function" of his job, and was not a "qualified individual.").

*Mayo*, 795 F.3d at 944; see also id. at 945 ("Mayo's credible, detailed, and unwavering plan to kill his supervisors more than adequately demonstrated that he lacked the ability to appropriately handle stress and interact with others").  ... The *Mayo* court, addressing the narrowness of its holding, expressly wrote that "[w]e emphasize that we only address the extreme facts before us in this case: an employee who makes serious and credible threats of violence toward his co-workers." Id. at 945 n.4. Contrary to Defendant's assertion, absent a credible threat of violence to a coworker or supervisor, facts showing that an employee may have adverse reactions to stress are not enough to conclude, as a matter of law, that the employee cannot perform the essential functions of the job. *See Reaves v. Nexstar Broad., Inc.*, 327 F. Supp. 3d 1352, 1365-1368 (D. Or. 2018) Defs. argument overlooks *Mayo's* limited holding. While *Mayo* noted that an "essential function of almost every job is the ability to appropriately handle stress and interact with others," the court did not hold that every employee who has difficulty handling stress cannot, as a matter of law, establish a prima facie case of disability discrimination. *Id.* at 1368.

The facts of *Mayo* warranted a finding as a matter of law, but were much more extreme and starkly different than the facts in the Instant Matter. Mr. Lee never physically or verbally threatened anyone in the workplace and only got into a

shouting match after his co-worker Mr. Igne told Mr. Lee, "Fuck you", first. Lee Decl. at ¶¶ 17, 48-49, 77, 85, 132, 148, 150; Ex. A pg. 62 ln 1 to pg. 63 ln 15, pg. 64 ln 5-15, pg. 67 ln 4-16, pg. 68 14-25 to pg. 69 ln 2 and ln 6-25; Ex. B pg. 37 ln 24 to pg. 38 ln 4, pg. 38 ln 14 to pg. 41 ln 20; David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11; Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16; Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ 78-85.

L3 then erroneously argues that Mr. Lee is estopped from asserting that he is qualified individual because he filed for VA benefits based on his PTSD symptoms that have nothing to do with his ability to perform his essential job functions. The cases law cited by L3 are easily distinguished and wholly inapplicable to the facts of the Instant Matter. Each of the cases cited had to do with an employee disclosing his/her physical/mental limitations in applying for government disability benefits, or the like, that directly and clearly showed the employees could not physically or mentally perform the essential job functions. There is nothing like those facts in the Instant Matter.

As a preliminary matter, L3 did not have any of Mr. Lee's VA benefits filing documents prior to Mr. Lee's termination and had no idea what was contained therein until discovery. Lee Decl. at ¶ 23. Moreover, Mr. Lee's L3 coworker Mr. Nordmeier also filed and received 100% VA benefits and he was still working at

L3 at the time of Mr. Lee's termination even though L3 new Mr. Nordmeier received 100% VA benefits. *Id*. at ¶¶ 64-68. This comparison shows that a person receiving 100% VA benefits could still work at L3, apparently if they did not have PTSD.

All cases cited as to L3's estoppel argument are distinguished as in each of those cases the employee disclosed symptoms of their disability that directly showed they could not perform their essential job functions. That is not at all present in Mr. Lee's VA benefits filings. Mr. Lee has been able to perform his essential job functions for decades including acting professionally and civilly in the workplace. There is nothing in Mr. Lee's VA benefits filing that show he could not perform the essential job functions of a painter and L3 does not even argue what the essential job functions are for a painter other than acting civilly and professional, as would be true for any job. As part of their argument L3 cites to Mr. Lee's VA benefits documents statement that he gets in fights with his workers. It is undisputed that Mr. Lee never got into any physical altercations with anyone in the workplace and was clearly referencing "fights" such as disagreements/arguments. For these reasons, L3's estoppel argument fails.

L3 argues that Mr. Lee does not dispute that he said he was going to punch Mr Igne. This is untrue. *See* Lee Decl. 148 and the transcript of Mr. Lee's deposition (pgs 49-50) attached to Defs. Motion. L3 argues that Mr. Lee told Dr.

Bianchi that he wanted to instigate a fight or argument. This is inapplicable as it had nothing to do with the workplace. Lee Decl. at ¶¶ 127-132 and *see* Defs. Ex Z.

### ii. Plaintiff Was Terminated Because of His PTSD and L3 Did Not Have Legitimate Reason to Terminate Mr. Lee

One month after L3 became aware Mr. Lee had PTSD they called him into the HR office in March 2019 and questioned him as to if he was threat of violence to his coworkers in the workplace. Lee Decl. at ¶¶ 50-61. This shows that L3 management already felt Mr. Lee was a threat due to his PTSD, within one month of Mr. Lee's disability disclosure, without any basis that Mr. Lee had been violent in the workplace. *See* Lee Decl. in total showing Mr. Lee was never physically or verbally threatening or violent in the workplace.

It is evident that Mr. Lee was terminated because of his disability as Mr. Igne was the one that started the cursing at Mr. Lee and Mr. Igne was not terminated. That is because Mr. Igne does not have PTSD and was not viewed as a threat even though his conduct was identical to Mr. Lee's and worse as Mr. Igne started the cursing before Mr. Lee returned cursing. Lee Decl. at ¶¶ 78-84, 146-147 Ex A. pg 29. Moreover, cursing was commonplace at L3 even from Mr. Igne and Mr. Lee's boss Mr. Rodney Martin. Lee Decl. at ¶¶ 41-45 Ex A at pg. 59 ln 6 to pg. 60 ln 9. Moreover, Mr. Lee was written up for the November 2019 incident with Mr. Igne and was only fired after a witchhunt to gather statements drafted by

the L3 management or the union to falsely claimed Mr. Lee was a threat of

violence based on Mr. Igne's false letter to L3 management. These documents

drafted by the union and employer were refuted at depositions of the same men

that signed them: Gilbert Castro and David Hesapene. *See* Ex A at pgs. 62-64, Ex

B pg 37-45. In sum, both these men stated Mr. Lee was never threatened anyone in

the workplace, including Mr. Igne and did not create a hostile work environment.

The lack of threat of violence by Mr. Lee is corroborated by 5 other coworkers of

Mr. Lee. David Shimogawa Decl. at ¶¶ 2-11; Michael Young Decl. at ¶¶ 3-11;

Jimmy Costales Decl. at ¶¶ 12-13; Guy Fujita at ¶¶ 3-11; Josh Burton at ¶¶ 3-16;

Ex A. pg 28 ln 22 to pg 30 ln 8; Lee Decl. at ¶¶ 78-85. It is important to note that

Mr. Lee's stress reaction due to PTSD cannot be separated from his disability

itself. "Conduct resulting from a disability is considered to be part of the disability,

rather than a separate basis for termination." *Mayo* at 946 citing *Humphrey v.*

*Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001); *see also Gambini v.*

*Total Renal Care, Inc.*, 486 F.3d 1087, 1094-95 (9th Cir. 2007); *Dark v. Curry*

*County*, 451 F.3d 1078, 1084 (9th Cir. 2006). In *Kimbro v. Atlantic Richfield Co.*,

889 F.2d 869 (9th Cir.), *cert. denied*, 498 U.S. 814, 112 L. Ed. 2d 28, 111 S. Ct. 53

(1990), for example, the 9th Circuit found that there was a sufficient causal

connection between the employee's disability and termination where the employee

was discharged for excessive absenteeism caused by migraine-related

absences. *See Kimbro*, 889 F.2d at 875. The *Gambini* court held that the employee's violent outburst was protected if it stemmed from her bipolar disorder after the employee had a temper tantrum when she received a negative review. *See Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007)). As L3 terminated Mr. Lee because of his stress reaction and irritability related to his PTSD, but Mr. Lee was no real threat of violence in the workplace, then L3 terminated Mr. Lee due to his PTSD without a legitimate justification. This is especially true since Mr. Igne was involved in the exact same conduct as Mr. Lee, yet Mr. Igne was not terminated. Mr. Lee never committing any violence in the workplace and these facts create a genuine issue of fact as to whether L3 was legally justified in terminating Mr. Lee based on his alleged conducted related to his PTSD.

In regards to L3 and Keaki's assertion that it could not allow Mr. Lee back in the workplace without an assurance Mr. Lee was not a threat to the workplace, Keaki is L3's partners in the joint venture Manu Kai, they are essentially the same entity trying to use one another to cover their bad acts. Keaki and L3 did nothing to confirm via Mr. Lee or his physician that Mr. Lee could safely return to the workplace. In fact, Dr. Bianchi advised L3 that only Mr. Lee's physician could confirm that Mr. Lee was not a threat to return to the workplace. L3 did not follow Keaki or their own hired physician's advice as to safely returning Mr. Lee to the

workplace. Ignoring what L3 was directed to do by Dr. Bianchi, to get assurances from Mr. Lee's Dr. Williamson that Mr. Lee could return to the workplace. L3 did not reach out to Mr. Lee's physician for confirmation that Mr. Lee could safely return to the workplace. Lee Decl. at ¶¶ 124, 127-142. This is because L3 had no interest in returning Mr. Lee to the workplace as they viewed him as threat because of his PTSD disclosure. This is evidenced by Mr. Lee's March 2019 meeting with HR, Mr. Igne's letter, Mr. John Kreider's Decl at ¶ 5, Ms. Danielle Stewart's Decl. at ¶ 4, the taking of his CAC/secret security clearance card when others on leave did not have it taken (Lee Decl. at ¶ 121), and the fact L3 didn't offer Mr. Lee any accommodation to return to the workplace after his leave in 2020.

*Humphrey* recognized that a "link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability" that results in a discharge for performance problems arising from that disability. *Humphrey*, 239 F.3d at 1140. It is crucial to note in tying Mr. Lees' PTSD into his termination that L3's corporate decisionmaker regarding Mr. Lee's termination, John Kredier, was informed by Ross West on December 11, 2019 that "due to the recent two active shooter events" and Mr. Lees' PTSD they had concerns about Mr. Lee's stability. *See* Ex C. As based on the facts herein, these concerns were untrue, baseless and unfounded. Regarding assertions from Mr. Martin or Mr. Scott Taylor that Mr. Lee was a threat to the workplace, Mr. Lee

completely refutes those statements: Lee Decl. at ¶¶ 143-145, 150.

As applicable, Mr. Lee argues the cat's paw theory in that Mr. Igne, with clear animus against Mr. Lee as a person with PTSD, influenced the decision to terminate Mr. Lee based on Mr. Igne's false claims. *See Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) ("[I]f a [biased] subordinate ... sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.")

## B. Plaintiff Clearly Makes Out His Prima Facie Case of Disability-Related Retaliation and Whistleblower Retaliation

The ADA retaliation and Hawai'i Whistleblower Protection Act retaliation prima facie elements are essentially identical.

> First, there must be a showing that the employee engaged in protected conduct as it is defined by the HWPA. Second, the employer is required to take some adverse action against the employee. Third, there must be a causal connection between the alleged retaliation and the whistleblowing. In other words, to meet the causal connection requirement, the employer's challenged action must have been taken because the employee engaged in protected conduct.

*You v. Longs Drugs Stores California, LLC,* 937 F. Supp. 2d 1237, 1258 (9th Cir. 2013) and compare to ADA retaliation test at Defs. Motion at pg 22-23. Mr. Lee has met every element of these tests.

## There is Causal Connection Between Mr. Lee's Protected Activity and the Retaliation

"Causation sufficient to establish the ... [causal link] element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir.1987).

## There is a Clear Temporal Relation Between Mr. Lee's Reporting of Illegal Activity and His Termination

The 9th Circuit has held that proximity in time may support an inference of retaliation sufficient to survive summary judgment. *See Allen v. Iranon,* 283 F.3d 1070, 1077-78 (9th Cir.2002) ("This proximity in time constitutes circumstantial evidence of retaliatory motive."). *See Davis v. Team Elec. Co.,* 520 F.3d 1080, 1094 (9th Cir.2008) ("We have held that `causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.'") Causation may be inferred when an adverse employment action occurred "fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.");*see also Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir 2003) ("Depending on the circumstances, three to eight months is easily

within a time range that can support an inference of retaliation."); *Allen v. Ironon,* 283 F3d 1070, 1078 (9th Cir 2002) ("**_[A]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory."_**) (emphasis added)(citation omitted). *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 919 (9th Cir.1996) (four-month period between protected activity and layoff was sufficiently close to satisfy the "causal link" prong), and *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (three-month period sufficient to infer causation). *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir.2000) ("[W]e have held that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant.").

"Although a lack of temporal proximity may make it more difficult to show causation, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference. *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3rd Cir. 1997). In the Instant Matter there clearly was a "pattern of antagonism" starting immediately after the reporting of the sexual assault/harassment that culminated in Mr. Ho's termination.

It is undisputed that Mr. Lee reported illegal activity (gas theft from government, disability discrimination) in the workplace to his supervisor in

November 2019 and went on stress leave the same day. Lee Decl. at ¶¶ 106-111. On December 5, 2019, Mr. Lee objected to the violation of the law related to his CAC/secret security clearance card. Id. at 114-121. This was while Mr. Lee was on stress leave. Mr. Lee was terminated before he could return from leave, so the time period of his leave should be disregarded as to the calculation of the time between his reporting and the adverse action. Moreover, as is admitted by Defs, they had allegedly decided to terminate Mr. Lee in January 2020, nearly immediately after he reported the illegal activities in the workplace. This occurred one and two months, respectively, after his reporting of discrimination and illegal activity in the workplace creating a strong inference of retaliation. Moreover, Mr. Lee reasserts, incorporates and argues that L3 did not have a valid basis for his termination, as argued *supra,* which further shows a causal connection between his objection to discrimination/illegal activity and his termination.

## III.  CONCLUSION

For all of the reasons set forth herein and supported by the attached declaration and exhibit, as well as all of the records and files herein, this Honorable Court must deny Def.'s Motion.

DATED:   Honolulu, Hawaii; October 22, 2021.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff Preston Lee