Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>       Plaintiff,<br><br>  vs.<br><br>L3HARRIS TECHNOLOGIES, INC.;<br>JOHN DOES 1-10; JANE DOES<br>1-10; DOE CORPORATIONS 1-10;<br>DOE PARTNERSHIPS 1-10; DOE<br>UNINCORPORATED ORGANIZATIONS<br>1-10; and DOE GOVERNMENTAL<br>AGENCIES 1-10,<br><br>       Defendants. | Civil No.<br>20-00489 LEK-KJM<br>(Other Civil Action)<br><br><br><br><br><br><br><br>(Pages 1 - 74) |

DEPOSITION OF GILBERT CASTRO

taken on behalf of Defendants, commencing at 8:59 a.m., Wednesday, September 22, 2021, pursuant to Notice.

Reported by:    JESSICA AKITA, RPR
                   Certified Shorthand Reporter
                   Hawaii License No. 461


EXHIBIT "A"

Page 26

1  A. Over --
2  Q. -- to put on pants?
3  A. Yes. Well, he wasn't yelling to put on
4  pants. He was just getting his attention.
5  Q. He was yelling his name?
6  A. Yes.
7  Q. And was he signaling to indicate what he was
8  trying to get his attention for like to -- motioning to
9  put on his pants?
10 A. He was just yelling.
11    By the time Preston looked back, then he saw
12 him kind of waving his hands and telling -- kept telling
13 him to -- it's hard to talk when the machine is so loud,
14 yeah? So turn off the machine, you know, so. Yeah. He
15 was -- he was yelling for his attention.
16 Q. Okay. And then at that point did you go to
17 the truck and get the rain pants?
18 A. I -- I -- I knew already, so I had the rain
19 gear for -- when -- as Preston was walking up, then Sean
20 kind of explained to him, you know, you got to wear your
21 safety gear. He's the lead man, yeah. But you don't
22 have to yell at your team members when you -- you
23 yourself as the lead man can just shut the machine down
24 and talk to him, you know? I knew already, so I just
25 walked over to the van and handed Mr. Lee his rain gear.

Page 27

1  "Hey, put this on. Please put this on so we can keep
2  pressure washing."
3     But Sean was kind of upset, but I would get
4  upset too. I would get upset because I would be yelling
5  -- he was yelling at me, yeah -- yelling at Mr. Lee, not
6  getting his attention so fast.
7  Q. Did you think it was inappropriate for Sean
8  Igne to tell Mr. Lee to put on pants?
9  A. It's not a -- it wasn't appropriate -- I
10 mean, it was appropriate to him to put on the pants, but
11 not kind of like making a big whole incident where
12 everybody's just walking around you. He could have just
13 make -- turn off that machine and kind of cool
14 everything down and kind of -- how he pursues things is
15 differently, you know?
16 Q. So, if I understand correctly, you think it
17 was appropriate for Sean Igne to tell Preston to wear
18 pants, but you didn't think that the way he went about
19 doing it was the best way; is that right?
20 A. Yes. Yes. Yes.
21 Q. Now, at the end of the workday, that same
22 workday --
23 A. Uh-huh.
24 Q. -- I understand there was a incident in the
25 office; is that correct, between Preston and Sean?

Page 28

1  A. Yes.
2  Q. And in Exhibit 2, in the last paragraph on
3  the first page, the third line says, "I heard Preston
4  yelling at Sean in an angry tone about why he had to
5  wear long pants while Sean was working in short pants.
6  And if he, Preston, was going to have to wear long
7  pants, then Sean better be wearing long pants the next
8  day."
9     You see that?
10 A. Yes.
11 Q. Does that sentence accurately reflect what
12 you heard in the office that day?
13 A. Exactly.
14 Q. Now, the statement also says that you heard
15 Preston swearing at Sean.
16    Is it correct that Preston was swearing at
17 Sean that afternoon?
18 A. He said some words of swearing. Yes.
19 Q. Like what, the "F" word?
20 A. "F" word and, you know, he was just very
21 upset.
22 Q. Was -- did you think that Preston's conduct
23 towards Sean in the office was appropriate?
24 A. Well, two guys was going at it. So if one
25 swear, the other one going swear. So two guys was just

Page 29

1  going off at each other.
2  Q. Okay.
3  A. Had start with, you know, just the build up,
4  yeah, during the day of him coming to him that morning
5  kind of, you know, winding him up for the finale at the
6  end like this --
7  Q. Okay.
8  A. -- so.
9  Q. So in your statement that's Exhibit 2, you
10 don't say anything about Sean swearing at Preston. I
11 don't see that anywhere in this statement.
12    Do you see that anywhere?
13 A. No. But two guys was swearing at each other
14 in -- because I was on the other side listening because
15 I was doing my time card. Yeah. So two guys
16 automatically going -- was swearing at each other.
17 Q. And why is it that you didn't say anything in
18 your statement about Sean swearing during this incident?
19 A. They never ask me to put if Sean was
20 swearing.
21 Q. Who never asked you?
22 A. Rod Martin when they asked me to give a
23 statement.
24 Q. Okay. Why did you not put something in here
25 about that before you signed it if that was what

Page 30

1  happened?
2  A. I just told you what I heard, you know, and I
3  cannot give all the details, you know? I'm not one
4  police officer, so I don't know. I just listened. I
5  heard him swearing. I heard Sean swearing and that's
6  it. I mean, if I missed them, I missed them. I didn't
7  -- I didn't put it in. But they didn't ask me to ask if
8  Sean was swearing. I just heard Preston.
9  Q. Did -- did Mr. Martin ask you what happened
10 that afternoon?
11 A. Yeah.
12 Q. Okay. And did you give him a full accounting
13 of what happened?
14 A. Yeah. A rough -- rough thing, what had
15 happened.
16 Q. Did you ever amend this statement that you
17 gave to Mr. Martin?
18 A. No. I never amend anything. I go back and
19 check it or rephrase things.
20 Q. Did you ever tell him, oh, hey, I missed
21 something in my statement that wasn't included?
22 A. I never really thought about telling in
23 detail what had happened because having one argument is
24 normal, you know? We -- we get arguments all the time.
25 And he swore. I swore. What you expect? Everybody's

Page 31

1  so -- so hyped up already, and I cannot catch every
2  detail what that person said, what that person said. So
3  I'm -- I'm not -- I'm not perfect in telling who was
4  innocent in the whole thing, you know?
5  Q. This incident on November 6, 2019, was that
6  the first time you heard Preston yell at somebody at
7  work?
8  A. He yells at me. I yell back, but it was just
9  to make the day as -- as comfortable as possible for me,
10 yeah? But it's all work-related. But for other people,
11 not really. I don't -- if -- if he probably yells at
12 people, it's not around me, you know, just to, you know,
13 say "Hi, bye," you know, but that's it. Not violently,
14 yeah, with anybody.
15 Q. Okay. Earlier, I think you said that
16 Exhibit 2 was not exactly what happened?
17 A. Uh-huh.
18 Q. When you first read Exhibit 2, you said,
19 "Some of this was correct and some of this is not what
20 happened"; is that -- is that correct?
21 A. Yes.
22 Q. Okay. So what -- what is it that is not
23 correct about this statement?
24 A. (Reading) That guy Jose Felix -- Felix Jose
25 wasn't in the picture over here. Only -- only Kathleen

Page 32

1  Lambrix that was in the whole -- whole, you know, kind
2  of -- having one personal explanation for -- for what I
3  was getting in trouble for. We didn't have Felix Jose
4  in -- in this paragraph, or just only Kathleen Lambrix.
5  Q. Okay. I'm sorry. I don't see where it says
6  Felix Jose here.
7  A. Yeah. That's why when I -- I read it, you
8  know, they only had Kathleen's name.
9  MR. ROSENBAUM: He's saying that that was
10 left out and --
11 THE DEPONENT: Yeah. They left out Felix
12 Jose, the safety -- one of our safety members in -- in
13 our supply.
14 BY MS. JONES:
15 Q. Okay. So you're saying in paragraph 2 --
16 A. Uh-huh.
17 Q. -- of Exhibit 2 --
18 A. Yes.
19 Q. -- you just didn't include that this guy
20 Felix Jose was also present during this discussion?
21 A. Yes.
22 Q. Is there anything else that is not accurate
23 about Exhibit 2?
24 A. No. Everything is pretty -- pretty updated.
25 Just wasn't right where I didn't see Felix's name inside

Page 33

1  that included the whole conversation.
2  Q. Okay. Now, I understand that you were later
3  interviewed by a man named Scott Taylor --
4  A. Uh-huh.
5  Q. -- for an investigation that he was doing to
6  an allegation that Sean Igne was stealing gasoline.
7  A. Uh-huh.
8  Q. Do you recall that interview?
9  A. Yes.
10 Q. Did you know Mr. Taylor prior to that
11 interview?
12 A. Not really. He's around, but I don't know
13 him personally.
14 Q. Okay. You knew who he was?
15 A. Yes.
16 Q. And did you respond truthfully to
17 Mr. Taylor's questions?
18 A. Yes.
19 (Exhibit 3 was marked.)
20 BY MS. JONES:
21 Q. The court reporter has handed you what's been
22 marked as Exhibit 3 to your deposition. If you can take
23 a look at that document, two pages, and let me know when
24 you're ready.
25 A. Yes.

Page 34

```
 1   Q.  You're ready?
 2   A.  Yeah. I'm ready.
 3   Q.  Okay. Do you recognize this document?
 4   A.  Yes.
 5   Q.  Is that your signature on the second page --
 6   A.  Yes.
 7   Q.  -- of this document?
 8   A.  Yes.
 9   Q.  Okay. So after Mr. Taylor interviewed you,
10   did he provide this document for you to review and sign?
11   A.  He provided it to me and, yeah, I signed it.
12   Q.  Okay. Did you review it before you signed
13   it?
14   A.  I kind of looked at it and I had to say what
15   I had to say. Yeah.
16   Q.  Did you make any corrections to the document?
17   A.  No.
18   Q.  So up at the top, the first two lines --
19   A.  Right.
20   Q.  -- it says, "I voluntarily provide this
21   statement to Scott Taylor who was conducting an inquiry
22   into an allegation that Sean Igne systematically stole
23   gas from the 'MOGAS,' all in caps, station for personal
24   use."
25        Do you see that?
```

Page 35

```
 1   A.  Yes.
 2   Q.  Do you know what the MOGAS station is?
 3   A.  Yes.
 4   Q.  What is that?
 5   A.  That's our gas station for refueling
 6   equipment.
 7   Q.  And you understand -- you understood when
 8   Mr. Taylor was interviewing you that he was
 9   investigating an allegation that Sean had been stealing
10   gasoline?
11   A.  Right.
12   Q.  And Mr. Taylor told you that the purpose of
13   the interview was for his investigation of this gas
14   theft allegation?
15   A.  Wasn't just that. Was more what's happening
16   around, you know, if I saw anything else --
17   Q.  Okay.
18   A.  -- you know?
19   Q.  So you could have told him about other issues
20   if there were other things going on?
21   A.  Yeah. But, I mean, our issues is for -- to
22   -- to do our eight hours and get home, yeah?
23   Q.  So about halfway down on the first page, it
24   indicates that Mr. Taylor asked you if you had observed
25   Sean Igne pump gas at the MOGAS station since 2007; you
```

Page 36

```
 1   see that?
 2   A.  Yes.
 3   Q.  And then it indicates that your response was,
 4   quote, "Yes, many times over the years into the Manu Kai
 5   vehicle and the Manu Kai 5-gallon gas cans, one for
 6   straight gas (pressure washer) and one for mixed gas
 7   (blower). The cans go into a locked locker once the job
 8   is finished."
 9        Do you see that?
10   A.  Yes.
11   Q.  So first of all, Manu Kai is an entity that
12   was providing services to the Navy; is that right?
13   A.  Yes.
14   Q.  So that's basically the company gas cans; is
15   that right?
16   A.  Yes.
17   Q.  And this answer that I just read, does that
18   accurately reflect what you told Mr. Taylor?
19   A.  "Many times five gallons." Yes.
20   Q.  It then says that he asked if you had ever,
21   "Observed Sean Igne pump gas into a personal 5-gallon
22   gas can."
23        You see that?
24   A.  Where you at?
25   Q.  It's the next question down from where we
```

Page 37

```
 1   just looked at.
 2   A.  Okay. Okay.
 3   Q.  And it appears -- the response you gave was
 4   "No. Just the red Manu Kai metal gas cans"; you see
 5   that?
 6   A.  Yes.
 7   Q.  And does that accurately reflect what you
 8   told Mr. Taylor?
 9   A.  Yes.
10   Q.  Did you tell Mr. Taylor at any time during
11   this interview that Sean Igne had been stealing
12   gasoline?
13   A.  I told Mr. Taylor, "If I would steal gas, I
14   wouldn't tell nobody."
15   Q.  Okay.
16   A.  So I didn't -- I didn't tell him exactly
17   that. But I would be -- I wouldn't tell anybody until
18   I've seen it, and I've seen it.
19   Q.  Okay. Let me -- I want to be clear.
20   A.  Right.
21   Q.  Did you tell Mr. Taylor that Sean Igne was
22   stealing gasoline during this interview, yes or no?
23   A.  No. No.
24   Q.  Did you tell Mr. Taylor that -- at any other
25   time, did you tell Mr. Taylor at any time that Sean Igne
```

Page 38

1 was stealing gasoline from the base?
2   A. No.
3   Q. Did you tell Mr. Taylor at any point during
4 the interview that Sean Igne was engaged in any other
5 inappropriate conduct?
6   A. No.
7   Q. And did Rodney Martin also ask you about
8 whether -- about this gas theft allegation?
9   A. No.
10  Q. If you look here on Exhibit 3 --
11  A. Uh-huh.
12  Q. -- one of the questions right after what we
13 looked at, it says:
14     "Q. Has anyone ever approached you about
15 this issue before today?"
16     And then it says:
17     "A. Rod Martin, after his meeting with
18 Preston, and I told him the same thing."
19     Do you see that?
20  A. Uh-huh.
21  Q. Looking at that, does it refresh your
22 recollection that Rodney Martin asked you about the gas
23 theft allegation?
24  A. He -- he asked me about it, but I told him
25 no.

Page 39

1   Q. You told him that you had not --
2   A. I -- I never seen anything at that time. But
3 as I see all this gas incidents coming up and I go, "I
4 guess it's about time to open up and see," you know,
5 that I saw a lot of things that gas was missing and --
6 but in -- in the whole incident, I never exposed all
7 these incidents of taking gas.
8   Q. Okay. You never -- at any time, did you tell
9 Rodney Martin that Sean Igne was stealing gas?
10  A. No. I didn't say anything.
11  Q. And is the first time that you said that in
12 2021?
13  A. I was kind of -- I was kind of scared
14 exposing, you know, a lot, especially the gas -- this
15 gas incident because of having, you know, friends and
16 allegations to where, you know -- you know, I worked
17 with these guys hand in hand, and being as exposed with
18 the gas issue, you know, going -- going hurt everybody.
19 It's just -- it's time to expose everything and tell the
20 truth before I get more in trouble in not telling
21 anything.
22  Q. Okay. So my question was: Is the first time
23 that you ever said anything about Sean Igne stealing gas
24 in 2021?
25  A. Yes.

Page 40

1     (Exhibit 4 was marked.)
2 BY MS. JONES:
3   Q. The court reporter has just handed you what's
4 been marked as Exhibit 4 --
5   A. Uh-huh.
6   Q. -- to your deposition. Please take a look at
7 this document and let me know when you're ready.
8   A. Okay. I'm ready.
9   Q. Okay. Do you recognize this document?
10  A. This came from --
11  Q. It's just a yes or no question --
12  A. Yes.
13  Q. -- do you recognize it?
14  A. Yes. I recognize it.
15  Q. Okay. And is that your signature at the
16 bottom?
17  A. Yes.
18  Q. Okay. And is that your handwriting right
19 above it with the date?
20  A. Yes.
21  Q. And what about the handwriting up at the top
22 in paragraphs one, two, and three; is that yours?
23  A. Yes.
24  Q. And L3Harris received this document from the
25 union.

Page 41

1   A. Okay.
2   Q. And you've got a shirt on today that says,
3 "IBEW1260."
4   A. Right.
5   Q. Is that the union that you belong to?
6   A. Yes.
7   Q. Okay. How long have you been a union member?
8   A. Since '95.
9   Q. Since you started out at the base?
10  A. Yes.
11  Q. And is this a document that the union typed
12 up for you?
13  A. They typed it up. Yes.
14  Q. Yeah. You didn't type this document; right?
15  A. No. I haven't -- yeah, I wouldn't type this
16 thing out.
17  Q. Yeah. So who at the union typed this out, if
18 you know?
19  A. I don't know anybody from the union that --
20 that actually typed this thing up.
21  Q. You don't remember who -- who typed this up?
22  A. No.
23  Q. Do you -- do you remember who gave it to you?
24  A. No. No.
25  Q. Did you review this document before you

Page 46

1  Do you see that?
2  A. Uh-huh.
3  Q. Okay. Is that accurate?
4  A. See, L3Harris and Ke'aki, that's -- that's
5  one company. So I work for the two guys -- the two
6  companies, but it's split, yeah? So no matter if
7  they -- they say L3Harris or Ke'aki, you just got to
8  know your -- your -- your side of the company.
9  Q. Yeah. So you were on the Ke'aki side; right?
10 A. I'm on the Ke'aki side.
11 Q. Then in paragraph 6 --
12 A. Uh-huh.
13 Q. -- it says, "On or about November 15, 2019";
14 do you see that?
15 A. Yes.
16 Q. Now, the document that we looked at earlier
17 today --
18 A. Uh-huh.
19 Q. -- which is Exhibit 2, you still have
20 Exhibit 2?
21 A. Yes. Uh-huh.
22 Q. Now, Exhibit 2 reflects that this incident
23 between Sean and Preston occurred on November 6, 2019;
24 you see that?
25 A. Okay. Right.

Page 47

1  Q. So your declaration says, "On or about
2  November 15, 2019"; you see that?
3  A. Yeah. I see that.
4  Q. Okay. So I guess my question is: The date
5  that's in your declaration, November 15, 2019, where did
6  that date come from?
7  Is that something that you supply -- that you
8  told Mr. Lee's attorney, or did he just put that in the
9  document for you to sign?
10 A. I -- yeah, I think Mr. Lee's attorney put
11 that in, but I kind of realized that we're there for one
12 certain time, yeah? So -- I mean, the times that we are
13 working on one building, you cannot be accurate for what
14 this -- this actually was, yeah? So we're there one
15 certain time, so I going be like couple days short or
16 what, but I don't know exactly what day it happened.
17 Q. You're not sure what day it was?
18 A. I don't know what day what was.
19 Q. Okay. I just want to be clear, though, there
20 was only one incident --
21 A. Uh-huh.
22 Q. -- where you're referring to the same
23 incident in paragraph 6 --
24 A. Uh-huh.
25 Q. -- as you're referring to in your statement

Page 48

1  that's Exhibit 2; is that right?
2  A. Right.
3  Q. It's the same thing?
4  A. Same thing, just --
5  Q. Right --
6  A. -- the dates. I don't know how accurate do
7  you want. I got to go back to my time card and check it
8  out, but it's kind of way back. I don't even remember
9  what I even -- you know, you cannot remember what you
10 ate that day, you know, what you drank. I don't know.
11 Q. Yeah. No, I -- I understand. I just want to
12 make sure that you're not talking about two separate
13 things. It's the same --
14 A. No.
15 Q. -- thing. You're just not --
16 A. Yeah.
17 Q. -- sure of the date --
18 A. Just the dates --
19 Q. -- is that right?
20 A. -- might be little bit off, but -- yeah.
21 It's -- it's just dates, but the same incident. Yes.
22 Q. Okay. And did Mr. Lee's attorney provide you
23 with a copy of your earlier statement, Exhibit 2, before
24 you signed your declaration?
25 A. No. I didn't have -- I don't think I had

Page 49

1  this.
2  Q. Okay. And when you say you "didn't have
3  this," you mean Exhibit 2; right?
4  A. Yes.
5. Q. Now, in this declaration at paragraph 10 --
6  A. Uh-huh.
7  Q. -- it says you saw Mr. Igne stealing gas; you
8  see that?
9  A. Yes.
10 Q. Okay. What's the basis for your statement
11 that Sean Igne was stealing gas?
12 A. Like how I saw him?
13 Q. Yeah. What --
14 A. Driving --
15 Q. -- makes you think he was stealing gas?
16 A. The gas can was coming out of his truck while
17 we was passing to go around the -- the vehicles, and he
18 was taking the gas can out and putting it back in the
19 work truck.
20 Q. What gas can?
21 A. The Manu Kai gas cans. One. One gas can.
22 Q. So you saw Mr. Igne --
23 A. Uh-huh.
24 Q. -- take a Manu Kai gas can out of his
25 personal vehicle?

13 (Pages 46 to 49)

Page 50

1  A. Yes.
2  Q. And put it in the work truck?
3  A. Yes.
4  Q. And that's the basis for your statement that
5  he was stealing gas?
6  A. Several times.
7  Q. Okay. Did you ever see Mr. Igne putting
8  gasoline from the base into his truck?
9  A. Putting -- putting the gas in the -- in the
10 cans, holding it for a couple days. And come Friday,
11 without anybody seeing, you know, puts it in his truck.
12 Come Monday, we go around and we see him taking it out,
13 out of his truck --
14 Q. You see him taking --
15 A. -- empty cans.
16 Q. -- the can out?
17 A. Yeah.
18 Q. Okay. But my question is did you ever see
19 Mr. Igne putting gasoline from the base into his truck?
20 A. Like dumping them in, or putting the can in
21 his truck?
22 Q. Either way.
23 A. Yeah.
24 Q. You saw -- what did you see?
25 A. Putting the gas can in his truck, the full

Page 51

1  one.
2  Q. You saw Mr. Igne putting a full Manu Kai gas
3  can into his personal vehicle?
4  A. Yes.
5  Q. Okay. When did you see that?
6  A. Oh. Many times. Fridays majority, as we
7  working, yeah, because we're always passing by the
8  trucks, and the -- the gas cans there during the week.
9  And at the weekend -- before that Friday, we -- we look,
10 it's gone.
11 Q. And what -- what is the time period in which
12 you saw Mr. Igne putting these gas cans -- full gas cans
13 into his personal vehicle?
14 A. What you mean? Timeframe, every week?
15 Fridays, maybe.
16 Q. No. I mean, what years was this happening?
17 A. Couple years. I'd say two-thousand -- what
18 is this? 2019. I'd say two-thousand, like, fourteen,
19 '15, before I went off to go to my other job. So prior
20 to that, maybe like 2012.
21 Q. Okay. So I'm not clear. When -- when is it
22 that you saw this?
23 A. What day, or what year?
24 Q. What years?
25 A. 2012 all the way up to 2015. Then I came

Page 52

1  back in '18 because I was off; right? In that two,
2  three years that I was gone, I was in the other shop.
3  So when I came back, things was the same where the gas,
4  you know, of course was -- was used to accommodate in
5  his truck.
6  Q. Okay. So when you came back in 2017 or
7  2018 --
8  A. Right.
9  Q. -- you, again -- you're saying you, again,
10 observed Sean Igne putting the Manu Kai gas can into his
11 truck?
12 A. Yes.
13 Q. Okay. And for -- and that was continuing
14 until when?
15 A. It's continuing until -- until this incident
16 of the pressure washing. So if this incident was 2019,
17 it ended it in 2019 when the heat was on of, you know,
18 allegations of stealing gas and everything.
19 Q. And in the next paragraph, you say that
20 Mr. Igne would falsify his timesheet; do you see that?
21 A. Uh-huh.
22 Q. And how did he falsify his timesheet?
23 A. Well, me and Preston work together. So, you
24 know, when -- everybody takes off during the year -- the
25 whole year, yeah? And at the end, everybody takes off,

Page 53

1  and he takes off, and he still has more hours than all
2  of us put together. And he's not putting in the right
3  amount of hours to accommodate the days of taking off.
4  Q. So you're saying that Sean Igne has more
5  vacation time at the end of the year than everybody
6  else?
7  A. Yes.
8  Q. And that's -- so --
9  A. I mean, anytime you work -- sorry -- 20 years
10 and up, we accommodate so many hours every two weeks on
11 each side, paid absence and vacation, and we use almost
12 ident -- almost identical with everybody on hours that
13 we take off. But at the end of the year he has a lot.
14 He has a lot of hours to accommodate at the end of the
15 year where he has to take out, like, three months,
16 of -- two, three months of the year.
17 Q. And so how is he falsifying his timesheets,
18 then?
19 A. Not putting in the -- the right amount of
20 hours to accommodate the job.
21 Q. Okay. Did you ever see him filling out his
22 timesheet and putting something on it that was wrong?
23 A. You know, before we went to this computerized,
24 paperless time card, we had paper time cards that we
25 could see and we handed in every week, day in, day out.

Page 54

1  And just by looking at that you can really see the hours
2  that he take off because you see everybody's time card.
3  Just put in one honest day's worth of your time and, you
4  know, just to justify. Preston took off this day; okay?
5  You put them in, vacation. Sean took off -- Sean took
6  off this day and don't put the right amount of hours in
7  the -- the block, yeah, for vacation or paid absence.
8      Q.  And you saw that on his timesheet?
9      A.  Well, you know, Preston shows me. Preston
10 sees them because he has -- if Sean's not there, he has
11 to be the one to hand in the time card. And you -- you
12 overlook everybody's time card. So, yeah, Preston shows
13 me and I see them and, yes, it's -- it's been seen from
14 me.
15     Q.  Okay. So this -- you're talking about the
16 paper time card?
17     A.  Yes.
18     Q.  Okay. Do you know when you guys switched
19 from the paper time cards to the computerized system?
20     A.  Oh. This is fresh too. I don't know. Maybe
21 two-thousand -- right before I went, maybe 2015.
22     Q.  Okay. So when you came back after your
23 leaving for your --
24     A.  Right.
25     Q.  -- auto body work, you guys were using the

Page 55

1  electronic system --
2      A.  Yes.
3      Q.  -- for your time cards?
4      A.  Yes.
5      Q.  And at any time did you report to anybody
6  that Sean Igne was falsifying his time cards?
7      A.  Well, you know, it's -- we never been turning
8  in anybody, so, no. No. I didn't say anything to
9  nobody.
10         MS. JONES:  Sorry. We've been going
11 about an hour, and we usually take a break to let the
12 court reporter have her --
13         THE DEPONENT:  Yeah. Yeah.
14         MS. JONES:  -- to rest her fingers. So
15 let's take a short break and come back in five minutes;
16 okay?
17         THE DEPONENT:  Okay. Yeah.
18         (Whereupon, a recess was taken
19         from 10:15 a.m. until 10:22 a.m.)
20         MS. JONES:  Okay. Back on the record.
21         THE DEPONENT:  Yeah. All good.
22 BY MS. JONES:
23     Q.  I understand that in the past, you and your
24 coworkers at the base had a habit of getting ice at the
25 beginning of the day to fill up your cooler --

Page 56

1      A.  Uh-huh.
2      Q.  -- to keep your drinks cold so you have a
3  cold drink at the end of the workday; is that right?
4      A.  Yes.
5      Q.  Okay. And did something happen recently
6  where you're not allowed to take ice anymore?
7      A.  Yeah. I guess had one incident where someone
8  turned Sean in and because of Sean taking excessive ice,
9  they kind of shut the ice giving away. I mean, yeah,
10 you can go in and fill up your ice jug and -- for the
11 day, and then use it for the day. But he takes them, I
12 guess, for usage at home and -- excessive ice to bring
13 it home, and I guess someone turned him in.
14     Q.  Okay. And so because of that, you guys lost
15 your privilege --
16     A.  Privilege.
17     Q.  -- to fill up your cooler to getting ice?
18     A.  Yes.
19     Q.  Okay. And you guys upset with Sean for
20 losing --
21     A.  You know what --
22     Q.  -- your ice privileges?
23     A.  -- we're over upset. We just -- we just
24 waiting for the -- the whole thing to blow off and we
25 can take ice again. I mean, we take ice but not that

Page 57

1  much like there's a party every weekend for him. But
2  for us is like to -- our cold drinks for our -- our
3  drinks for our kids, you know, after we pau practice and
4  whatnot. But, yeah, took away a lot of -- a benefit
5  from -- for us.
6      Q.  Okay. Going back to your auto body business
7  that we talked about earlier --
8      A.  Yes.
9      Q.  -- have you advertised for any job openings
10 for that business in the past year?
11     A.  I don't advertise them too much, but people
12 always ask me if they need help, I can call them for --
13 for accommodate a job for them. And I have jobs that I
14 would rather keep it for myself to make money. Yeah.
15 But for jobs, I don't have too much to accommodate
16 everybody.
17     Q.  Okay. Have you hired any employees to do
18 painting work?
19     A.  I tried, but no success. I can see them in
20 -- several hours in the job and I go, "That's enough,"
21 you know? It's hard to find good help.
22     Q.  Okay. Has Mr. Lee ever asked you about doing
23 work for your auto business?
24     A.  Several times and I told him, "No," because
25 of -- you know, I rather do it myself than give you a

Page 58

1   cut of, you know, my paycheck. So, yeah, I come across
2   some jobs that I'm kind of busy. But after a while when
3   he's not -- you know, when he -- I'm busy, he's busy.
4   And sometimes when I'm not busy, then he come -- he asks
5   me if I -- I -- I need help on the job, but I'm kind of
6   done already.
7       Q.  Okay. So are there times when you had worked
8   for Mr. Lee, but he was not available?
9       A.  He wasn't available because, you know, he has
10  other things to attend. But when I'm busy and I need
11  help, then he's -- he's kind of busy too, yeah?
12      Q.  Okay. When is the last time you asked him if
13  he was available for -- to do a job?
14      A.  I'd say two months.
15      Q.  Two months ago?
16      A.  Yeah.
17      Q.  Did he tell you what he was doing that he was
18  too busy to take the job?
19      A.  I don't know. Washing his car or polishing
20  something, you know?
21      Q.  What was the job that you had for him?
22      A.  Pressure washing a vehicle. But by the time
23  he was kind of done, I was done myself. I just was kind
24  of lazy on that day.
25      Q.  I don't have any further questions for you at

Page 59

1   this time. Mr. Rosenbaum might have some questions.
2           MR. ROSENBAUM: Yeah, just very quickly.
3                   EXAMINATION
4   BY MR. ROSENBAUM:
5       Q.  Mr. Castro, is it common in the workplace for
6   the guys to curse?
7       A.  In some way, yeah, because we talk among each
8   other. It's like -- in a local way, it's kind of like a
9   -- a gesture, but nothing bad to where we're going to
10  fight somebody, you know what I mean? But as you look
11  around, anyplace where I've worked, it's normal. But,
12  like I say, let's go to court and you cannot do all that
13  cursing and whatnot. You have to kind of be -- kind of
14  civilized, you know, presenting yourself and everything.
15  But, hey, you get me out there, I'm -- I'm just a
16  typical local boy from the island, and you'll hear them,
17  you know? It's -- I mean, around the kids you got to
18  watch. Around the ladies, you got to watch. But among
19  guys, it's like gossip, you know? It's like a normal
20  thing. But, you know, you got to know when to -- to
21  make a fine line to kind of stop it, you know?
22      Q.  And in the workplace, the majority of the
23  guys there are local guys; right?
24      A.  Oh. All locals. All locals.
25      Q.  Okay. So amongst the guys in the workplace,

Page 60

1   it's not uncommon for them to say, "You fucka," or
2   whatever; correct?
3       A.  Right. It's common. They just probably so
4   energized to see you because they haven't seen you for a
5   long time, or you did something good to where it was
6   your birthday or Happy New Year, you know? It's -- it's
7   gestures, yeah? Maybe people take it the wrong way.
8   But you got to know who to tell it to, you know what I
9   mean, because they can always turn you in.
10      Q.  And on the date in question where Sean
11  approached Mr. Lee and told him -- you know, was yelling
12  over the pressure washer on that incident, at that time
13  was Mr. Igne, was he wearing shorts?
14      A.  Yes.
15      Q.  And was he wearing tennis shoes?
16      A.  Yes.
17      Q.  And was that his common work attire?
18          MS. JONES: Objection. Vague.
19  BY MR. ROSENBAUM:
20      Q.  Was wearing shorts his common work attire?
21      A.  Yes.
22      Q.  Was wearing tennis shoes Mr. Igne's common
23  work attire?
24      A.  Yes.
25      Q.  Ms. Jones asked you about the ice issue

Page 61

1   that's come up recently.
2       A.  Uh-huh.
3       Q.  Do you know if Mr. Igne was taking 100 quarts
4   of ice to fill up his big cooler?
5       A.  Yes. Every other day or whenever the thing
6   goes down.
7       Q.  I want to turn your attention to Exhibit 4.
8       A.  Uh-huh.
9       Q.  And you testified you received this from the
10  union; correct?
11      A.  Yes.
12      Q.  And you didn't -- you didn't write any of
13  this up; did you?
14      A.  No.
15      Q.  Okay. So I want to just go through it. Look
16  at number 4.
17      A.  Uh-huh.
18      Q.  It reads, "I have read Sean's statement,
19  dated November 6, 2019, attached and witnessed and
20  agreed that Preston's aggressive and hostile behavior is
21  unprofessional, threatening, and adversely affects my
22  ability to work in and around Preston"; you see that?
23      A.  Yes.
24      Q.  Did I read that correctly?
25      A.  Yes.

## Page 62

1 Q. And do you agree with that statement, as you
2 sit here today?
3 A. I signed it. Yes. But in -- in my
4 perspective, working hand in hand with him, nobody
5 perfect. You got goods, you got bads. I -- I'm his
6 partner, so I really have to be the one that he's always
7 against him. If you cannot be -- if you cannot tame
8 somebody down, he has more control than -- than all of
9 us. Like him, you can calm him down. "Hey" -- meaning
10 how you pursue yourself on him, calm him down, you know?
11 Anything can be -- can get really comfortable in -- in
12 the working environment. I mean, he probably was upset,
13 you know, in some certain days. But, yeah, you know,
14 talking -- you can talk to this guy. This guy's really
15 -- he might not like hear what he has to say, but you --
16 you really talk to him in one -- in one normal way, you
17 know, being as one friend to him or a partner, you can,
18 you know -- you can calm -- calm guys down and work
19 normally.
20   Q. Were you ever afraid of Preston Lee in the
21 workplace?
22   A. No.
23   Q. Were you ever threatened or verbally
24 threatened by Preston Lee in the workplace?
25   A. No. No. No.

## Page 63

1   Q. Were you ever physically threatened in the
2 workplace by Preston Lee?
3   A. No.
4   Q. Did you ever witness Preston Lee ever
5 physically threaten anybody in the workplace?
6   A. No.
7   Q. Did you ever witness Preston Lee ever
8 verbally threaten anybody's well-being in the workplace?
9   A. No.
10   Q. Do you believe that Preston Lee is a threat
11 -- or was a threat to anybody at the workplace at
12 L3Harris?
13       MS. JONES: Objection to the form of the
14 question.
15       THE DEPONENT: No.
16 BY MR. ROSENBAUM:
17   Q. So when you signed this document, did you
18 have an opportunity to make any changes to it?
19   A. I didn't change anything. I just signed it
20 because they handed it to me and to -- to accommodate
21 what they was trying to do to him, I just signed it.
22   Q. And did you feel pressured to sign this
23 document by the union?
24   A. I wasn't pressured. I just was kind of
25 looking over it and kind of giving my -- my second

## Page 64

1 opinion on it and having my personal beliefs on what I
2 believe about him differently than -- even if I signed
3 it, I understand, you know, how to communicate with this
4 person.
5   Q. Did anybody from L3Harris management ever ask
6 you if Preston Lee was a threat to anyone in the
7 workplace?
8   A. I think Scott Taylor.
9   Q. And what was your response?
10   A. No.
11   Q. And did anybody besides Scott Taylor ever
12 approach you regarding Preston Lee's emotional or
13 psychological state in the workplace?
14       MS. JONES: Objection. Vague.
15       THE DEPONENT: No.
16 BY MR. ROSENBAUM:
17   Q. Can you look at number five? It says,
18 "Preston's aggressive and hostile behavior at work
19 creates a hostile work environment for me, Sean and
20 others who work with Preston"; do you see that?
21   A. Yes.
22   Q. You cannot say how other people feel; right?
23 You can only speak to how you feel; right?
24       MS. JONES: Objection to the form.
25       THE DEPONENT: Right.

## Page 65

1 BY MR. ROSENBAUM:
2   Q. Okay. So you didn't know if other people
3 were -- felt threatened by Preston Lee; did you?
4   A. No. I got -- I got one thing, you know --
5   Q. Uh-huh.
6   A. -- being as aggressive, there was an incident
7 where Sean had to take TDI or the stress leave. While
8 he was on that stress leave for that week, he called us
9 up, me and -- me and my partner, now David, telling us
10 to go get a TRO on Preston. I go, "What you mean a TRO?
11 We cannot get one TRO on him."
12       So -- "Oh, you guys got to go make
13 statements."
14       And I go, "Eh, we're not doing anything."
15       So we went on to HR and asked Julie Broyles
16 if -- if we make one statement where Preston is really
17 threatening us, then you make one TRO. Why we got to
18 make one TRO? And I guess we kind of realized. I go,
19 "No do nothing until all said and done," you know,
20 because we're going be more in trouble. This is -- this
21 is one -- one matter among the company, Preston, and
22 Sean than bringing -- putting all us witnesses in. So
23 we felt -- me and David, we felt that, no, we don't have
24 to make a TRO on him.
25   Q. And what did Ms. Broyles say?

Page 66

```
 1    A.  "You're right. If you guys feel threatened,
 2   do not make a TRO on him. Make Sean make a TRO on him."
 3    Q.  You mean if you do not feel threatened?
 4    A.  If we feel threatened from Preston, make a
 5   TRO. Yes.
 6    Q.  Okay.
 7    A.  Yes.
 8    Q.  But if you don't feel threatened --
 9    A.  If you don't feel threatened, don't do
10   anything.
11    Q.  Okay.
12    A.  But --
13    Q.  So essentially she's telling you that Sean --
14   that you let Sean --
15    A.  Right.
16    Q.  -- do the work?
17    A.  Let Sean do the dirty work, not me.
18    Q.  Okay. Do you feel like you were a part of
19   Sean's dirty work after looking at Exhibit 4?
20        MS. JONES: Objection to the form of the
21   question.
22        THE DEPONENT: I feel like, you know, we
23   got caught in a crossfire. We've seen a lot of things
24   over the years. And if it's going to be justice to
25   accommodate the whole incident, you know, I have nothing
```

Page 67

```
 1   to hide on accommodating any help that I can provide for
 2   -- for everybody.
 3   BY MR. ROSENBAUM:
 4    Q.  And do you know what a hostile work
 5   environment is?
 6    A.  Yeah, like -- hostile, maybe like, you know,
 7   real -- real antsy, always want to fight people or, you
 8   know, real -- real cocky among everybody.
 9    Q.  Okay. And do you believe that Preston Lee
10   created a situation like that at work?
11    A.  I don't think he -- he made anything to
12   accommodate something like that.
13    Q.  So he did -- in other -- in other words, I
14   just want to clarify your testimony, are you saying that
15   he did not create a hostile work environment?
16    A.  He did not.
17    Q.  Okay. Number 6 says, "I'm very uncomfortable
18   with working with Preston"; do you see that?
19    A.  Yes.
20    Q.  And was that true?
21        Were you personally uncomfortable working
22   with Preston?
23    A.  You know, as I look at it now, not really
24   because we was partners. We work side by side with each
25   other. In my personal work around him, I have to trust
```

Page 68

```
 1   him, you know, because we're on one plank, 15 feet in
 2   the air. I cannot think that, you know, if he -- if he
 3   was that -- if I was uncomfortable, I wouldn't be up
 4   there with him.
 5    Q.  Okay.
 6    A.  But he was more like a, you know, support for
 7   me to accommodate things.
 8    Q.  Okay. So you trusted Preston?
 9    A.  Yes.
10    Q.  And you felt secure working with Preston?
11    A.  Oh. Yes.
12    Q.  And it also states that, "At times, I've
13   been concerned about my personal safety at work."
14        Did Preston Lee ever create a situation
15   that caused you to be concerned about your personal
16   safety at work?
17    A.  No.
18    Q.  Okay. It also says, "I'm also concerned
19   about the safety of others, including Sean and Rodney
20   Martin, our supervisor."
21        Were you concerned about the safety of those
22   two men?
23    A.  Not really because they could take care --
24   everybody could take care of their own business to
25   accommodate what they have to do to -- to help each
```

Page 69

```
 1   other or, you know, to -- to make things right, you
 2   know?
 3    Q.  Okay. And number 7 says, "I believe that
 4   Preston's aggressive and hostile behavior creates an
 5   unsafe hostile work environment."
 6        Do you believe that Preston's "aggressive and
 7   hostile behavior" created an unsafe and hostile work
 8   environment?
 9        MS. JONES: Objection. Vague.
10        THE DEPONENT: He's -- he's pretty
11   aggressive in everything that he do. But if you
12   approach him in one certain way, when you accommodate
13   anything if you want something from him -- I mean, we're
14   human. We can talk, you know what I mean? So it's not
15   like you cannot -- you cannot talk to this guy.
16   BY MR. ROSENBAUM:
17    Q.  And when you say "aggressive," would you
18   agree with me that what you mean is that he's actually a
19   very intense human being?
20        MS. JONES: Objection.
21        THE DEPONENT: He's intense in some other
22   ways, but his -- just being around him, you know, he's
23   real -- he can be in that other stage where he's
24   very -- you know, fun working. He's workable. He's
25   workable.
```