UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE,<br><br>            Plaintiff,<br><br>   vs.<br><br>L3HARRIS TECHNOLOGIES, INC.,<br>JOHN DOES 1-10, JANE DOES 1-10,<br>DOE CORPORATIONS 1-10, DOE<br>PARTNERSHIPS 1-10, DOE<br>UNINCORPORATED ORGANIZATIONS 1-<br>10, DOE GOVERNMENTAL AGENCIES<br>1-10,<br><br>            Defendants. | CIV. NO. 20-00489 LEK-KJM |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant L3Harris Technologies, Inc.'s ("L3Harris") Motion for Summary Judgment on All Claims ("Motion"), filed on September 29, 2021. [Dkt. no. 49 (redacted).[1]] Plaintiff Preston Lee ("Lee") filed his memorandum in opposition on October 22, 2021, and L3Harris filed its reply on October 29, 2021 [Dkt. nos. 60, 66.] The Court finds this matter suitable for disposition without a hearing pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii ("Local

---

[1] L3Harris filed the unredacted version of the Motion under seal on October 1, 2021. [Dkt. no. 54.]

Rules"). L3Harris's Motion is hereby granted for the reasons set forth below.

## BACKGROUND

This action concerns a workplace dispute and the events that followed. L3Harris is a civil contractor that supplied services, with its joint venture partner, Keaki Technologies Inc. ("Keaki"), to the United States Navy at the Pacific Missile Range Facility ("PMRF") at Barking Sands on Kauai. Lee worked as a painter for L3Harris. Lee's work was directed by lead man, Sean Igne ("Igne"), and Lee and Igne's supervisor was Facilities Supervisor Rodney Martin ("Martin"). [L3Harris's Separate and Concise Statement of Material Facts in Supp. of Motion for Summary Judgment ("L3Harris's CSOF"), filed 9/29/21 (dkt. no. 50), at ¶¶ 1-3;[2] Lee's Concise Statement of Facts ("Lee's CSOF"), filed 10/22/21 (dkt. no. 61), at ¶¶ 1-3 (stating L3Harris's ¶ 1 is undisputed).]

## I. Lee's Initial Meeting with Human Resources

On March 13, 2019, Lee participated in a meeting with L3Harris's human resources ("HR") representatives ("3/13/19 Meeting") where the parties discussed that Lee was diagnosed with post-traumatic stress disorder ("PTSD"), and Lee stated he

---

[2] Docket number 50 is the redacted version of L3Harris's CSOF. The unredacted version was filed under seal on October 1, 2021 ("L3Harris's Sealed CSOF"). [Dkt. no. 55.]

2

did not need accommodations. [L3Harris's CSOF ¶ 14; Lee's CSOF at ¶ 14 (partially disputing L3Harris's CSOF ¶ 14 on other grounds).] Lee was not disciplined during the 3/13/19 Meeting. [L3Harris's CSOF ¶ 15; Lee's CSOF ¶ 15 (partially disputing L3Harris's CSOF ¶ 15 on other grounds; L3Harris's CSOF, Decl. of Amanda M. Jones ("Jones Decl."), Exh. B (excerpts of trans. of 6/25/21 depo. of Lee) ("Lee Depo. Trans.") at 180.]

## II.  **The Incident**

On November 6, 2019, Igne witnessed Lee pressure-washing while wearing shorts and asked Lee to change into rain pants. [L3Harris's CSOF ¶ 16; Lee's CSOF ¶ 16.] Because Lee could not hear Igne's requests due to the pressure washer's noise, Igne attempted to get Lee's attention by yelling and honking a vehicle's horn. [Lee Depo. Trans. at 30—31; L3Harris's CSOF, Decl. of Lindsay Haen ("Haen Decl."),[3] Exh. O (Lee's written statement to Martin regarding the 11/6/19 events, dated 11/7/19).] A coworker then walked over to Lee and gave him a pair of rubber rain pants. [Lee Depo. Trans. at 24.]

Later during the day of the pressure-washing incident, Lee went to the office where Igne was. According to Lee, he did not yell at Igne, but he admits he swore at Igne because Igne swore at him first. Lee states he told Igne that, if he had to

---

[3] Haen is the Director, Human Resources of L3Harris's Mission Networks Division. [Haen Decl. ¶ 1.]

3

wear his personal protective equipment ("PPE"), then Igne needed
to wear his.  Lee then told Igne that, if he did not bring his
PPE the following Monday, then he would turn Igne in.  According
to Lee, it was at this point when Igne swore at Lee and Lee
swore back at Igne.  [Id. at 39-40.]  They exchanged swear words
"twice, maybe three times," then Lee walked away.  [Id. at 40.]
Lee contends in his deposition testimony that he did not yell at
Igne.  [Id. at 39.]  But, in his written statement to Martin the
day after the incident, Lee wrote that he yelled at Igne.  [Haen
Decl., Exh. O ("that's when I started yelling and swearing at
him").]

          The next day, Igne submitted a written complaint to
Martin.  [L3Harris's CSOF, Decl. of Rodney Martin ("Martin
Decl.") ¶ 4.]  Martin states Igne expressed to him that he "felt
threatened by" Lee and "did not feel comfortable working with
[Lee] after" their interaction.  [Id.]  Martin investigated the
incident by speaking with Lee and the other workers present and
took statements from those involved.  [Id.]  Although Lee and
Igne "had somewhat differing versions of the interaction,"
Martin states "the statements by [Lee's] co-workers generally
supported Mr. Igne's version of events and that Mr. Lee was
swearing, angry and aggressive towards Mr. Igne."  [Id.]

          One of Lee's coworkers, David Hesapene ("Hesapene"),
submitted a written statement to Martin the day after the

incident.[4]  [Haen Decl., Exh. P (Hesapene's written statement to
Martin regarding the 11/6/19 events, signed 11/7/19).]  There,
Hesapene states that, around 5:45 p.m., he heard Lee "going off,
yelling at [Igne]."  [Id.]  Hesapene heard Lee "swearing the F
word at [Igne] and [Igne] yelled back in defense."  [Id.]
Although Hesapene "couldn't hear everything that was being said
clearly," he states Lee "was extremely loud and angry and not
acting in a civil manner."  [Id.]  The day after the incident,
Lee said to Hesapene, "'I don't care if I going to lose my job,
I just going to punch [Igne] through his face.'"[5]  [Id.]  After
Hesapene told Lee, "I thought you guys settled this years ago,"
Lee said "' F _ _ _ [Martin], F _ _ _ [Igne], nobody can touch
me, not [Martin], not [Igne] or HR.'"  [Id.]  However, Hesapene
testified in his deposition that he did not believe Lee was
going to punch Igne.  [Lee's CSOF, Decl. of Joseph T. Rosenbaum

---

[4] In this individual's deposition, he spelled his last name
as "Hesapene," see Jones Decl., Exh. CC (excerpts of trans. of
9/22/21 Hesapene depo.) at 4, but his declaration spells his
last name as "Hasapene," see generally Lee's CSOF, Decl. of
David Hasapene ("Hesapene Decl."). For simplicity, the Court
refers to this individual as "Hesapene."

[5] Lee denied saying he was going to punch Igne through the
face, but he admitted that he might have said he would have
liked to punch Igne. See Lee Depo. Trans. at 49.

("Rosenbaum Decl."), Exh. B (excerpts of trans. of 9/22/21
Hesapene depo.) ("Hesapene Depo. Trans.") at 44.[6]]

Another coworker, Mark Vegas ("Vegas"), also submitted
a written statement to Martin the day after the incident.
[L3Harris's CSOF, Haen Decl., Exh. Q (Vegas's written statement
to Martin regarding the 11/6/19 events, dated 11/7/2019).]
Vegas states that, around 5:45 p.m., he could hear Lee "explode
in anger with [Igne] about something to do with having to wear
pants. [Lee's] voice was very loud as he yelled and swore at
[Igne] and seemed to get louder . . . ." [Id.] Vegas also
states "[t]here was such a flurry of words coming out of [Lee's]
mouth that it was difficult to remember everything [Lee] was
saying plus [he] was in another office with the door closed but
[he] could still hear [Lee] yelling." [Id.] The next day,
Vegas heard Lee "bragging in the shop out loud that [Igne] tried
and he cannot touch me, [Martin] cannot touch me and HR cannot
touch me." [Id.]

The last coworker present during the incident, Gilbert
Castro ("Castro"), also wrote a statement to Martin. [Haen
Decl., Exh. R (Castro's written statement, dated 11/7/19).]
Castro "heard [Lee] yelling at [Igne] in an angry tone" and

---

[6] The Hesapene Deposition Transcript does not include the
reporter's certification. However, L3Harris does not question
the deposition transcript's authenticity.

"swearing." [Id. at PageID #: 530.]  Although Castro "could not
hear all the details that were being said because [he] was in
another room and the office door was closed[,]" he "could tell
that [Lee] was very angry and was very loud."  [Id. at PageID
#: 530-31.]

Martin states that, during his investigation, Lee's
coworkers expressed their concerns about Lee's "volatile
conduct," and that they were concerned Lee "was a loose cannon
and they did not know when [Lee] was going to snap because of
how angry he would become about little things."  [Martin Decl.
¶ 5]  However, Hesapene testified in his deposition that he did
not believe Lee's aggressive behavior created a hostile work
environment for him, Igne, Martin, or in general.  [Hesapene
Depo. Trans. at 39-41.]  Castro testified similarly.  [Rosenbaum
Decl., Exh. A (excerpts of trans. of 9/22/21 depo. of Castro)
("Castro Depo. Trans.") at 63.[7]]

III.  **Lee's Meeting with Martin and Lee's Leave of Work**

After his investigation, Martin determined that Lee's
conduct toward Igne violated L3Harris's policies.  Later that
month, Martin met with Lee and a HR representative and they
issued a written disciplinary warning to Lee.  The meeting did

---

[7] The Castro Deposition Transcript does not include the
reporter's certification.  However, L3Harris does not question
the deposition transcript's authenticity.

not result in a suspension, demotion, or pay cut.  Lee then told
Martin during the meeting that Igne stole gas on the base.
[L3Harris's CSOF ¶¶ 20-21; Lee's CSOF ¶¶ 20-21.]  Martin told
Lee that they would discuss the accusation against Igne later.
[Martin Decl. ¶ 6.]

     At the conclusion of the meeting, Lee told Martin that
he was going to the doctor and then voluntarily left work.  Lee
subsequently filed a workers' compensation claim.  He also
submitted doctor's notes to L3Harris, which stated he was unable
to work for the remainder of November and all of December 2019,
January, February, and March 2020.  [L3Harris's CSOF ¶¶ 22-23;
Lee's CSOF ¶¶ 22-23.]  On December 5, 2019, Ross West ("West"),
a Keaki program manager, asked Lee to give back the security
clearance card previously issued to Lee.  See Lee's CSOF, Decl.
of Preston Lee ("Lee Decl.") at ¶ 114.

**IV.  The Investigation Into Lee's Accusation Against Igne**

     After Lee went on leave, Martin investigated Lee's
accusation that Igne was stealing gasoline and found no evidence
to support the allegation.  [Martin Decl. ¶ 10.]  In December
2019, West informed L3Harris that Lee made a complaint to the
Navy regarding Igne stealing gasoline.  West assigned a Keaki
employee named Scott Taylor ("Taylor") to investigate the
complaint.  [L3Harris's CSOF, Decl. of Danielle Stewart

("Stewart Decl.")[8] ¶ 6.[9]]  Taylor's investigation report noted
that Lee told Taylor that he witnessed Igne steal gasoline from
2007 to 2010.  [L3Harris's CSOF, Decl. of John Kreider ("Kreider
Decl."),[10] Exh. V (email correspondence dated 12/11/19
transmitting Taylor's) at PageID #: 538.]  According to Taylor,
when he asked Lee why he was "just now reporting this in 2019,"
Lee said "[b]ecause [Igne] just turned me in, so I will turn him
in."  [Id. at PageID #: 540.]

    Taylor noted that during his phone interview with Lee,
Lee "talked in a rage with excessive profanity throughout." [Id.
at PageID #: 541.]  Taylor was "shocked by [Lee's] degree of
anger, given that [Lee] was about three weeks removed from his
18 Nov 19 counselling."  [Id.]  Taylor found that Lee "has
serious psychological issues, to include anger management and
low self-esteem, and has demonstrated a pattern of violent
behavior."  [Id. at PageID #: 538.]  His findings also stated
"[t]hat severe friction has existed for several years between
Preston Lee and his co-workers and supervisor that has led to an

---

[8] Danielle Stewart was employed at L3Harris from July 2018
to May 2021 as a Human Resources Business Partner and Human
Resources Manager.  [Stewart Decl. ¶ 1.]

[9] See infra Discussion Section I regarding Lee's objections
to two of the declarations submitted by L3Harris.

[10] John Kreider ("Kreider") is employed at L3Harris as a
General Manager, Surveillance and Automated Solutions.  [Kreider
Decl. ¶ 1.]

exceptionally hostile work environment." [Id.] Taylor therefore recommended that "HR address Preston Lee's obvious mental instability," and that "Lee not be reassigned to his current position to reduce the possibility of violence." [Id. at PageID #: 539.]

Taylor ultimately determined that under the preponderance of the evidence, there was insufficient evidence to support the claim that Igne committed gasoline theft. [Id.] He sent his report to West, and West sent the report to L3Harris. [Id. at PageID #: 536-37] In the email to L3Harris, West wrote:

> I also requested a formal investigation to be conducted by [the Naval Criminal Investigative Service]. Due to the recent two active shooter events, many personnel are raising concerns about Preston Lee's stability. Preston himself has openly told his co-workers that he has been diagnosed with PTSD and has had other issues. Those concerns were addressed by HR in a confidential manner in the past, but I believe we need to elevate it concerns to a corporate level based upon the findings [Taylor] presented. Apparently the situation with Preston Lee's stability is deteriorating.

[Id. at PageID #: 536.]

After receiving Taylor's report, L3Harris also received from the International Brotherhood of Electrical Workers, Local Union 1260 ("IBEW") statements signed by Lee's coworkers expressing concern with Lee returning to the workplace. [Stewart Decl. ¶ 7.]

10

## V.   <u>The Decision to Terminate Lee's Employment</u>

In January 2020, after reviewing the circumstances involving the incident between Lee and Igne, the statements obtained by both Taylor and the IBEW, and consulting with L3Harris's legal counsel, Stewart recommended to her manager, Amanda Arnold ("Arnold"), that Lee's employment be terminated due to his "aggressive conduct," and to "maintain a safe and healthy workplace." [<u>Id.</u>] Kreider approved of Stewart's recommendation. [Kreider Decl. ¶ 4.]

Before L3Harris could notify Lee about the termination decision, Lee presented a doctor's note to L3Harris extending his leave. Lee's termination was therefore postponed. [L3Harris's CSOF at ¶ 28; Lee's CSOF at ¶ 28.] On February 27, 2020, Lee dual filed with the EEOC and the Hawai`i Civil Rights Commission ("HCRC") a Charge of Discrimination against L3Harris, alleging disability discrimination and retaliation. [Jones Decl., Exh. L.]

Also in February 2020, clinical psychologist Peter Bianchi, Ph.D., conducted an independent psychological examination of Lee in connection with Lee's workers' compensation claim. [L3Harris's CSOF at ¶ 29; Lee's CSOF at ¶ 29; Stewart Decl. ¶ 10.] Lee's doctor released Lee to return to work effective April 1, 2020. To evaluate the situation, L3Harris placed Lee on paid administrative leave effective

11

April 1, 2020.  [L3Harris's CSOF at ¶¶ 31, 32; Lee's CSOF at
¶¶ 31, 32.]  In an April 5, 2020 letter, L3Harris asked
Dr. Bianchi for a further opinion regarding Lee.  <u>See</u> Haen Decl.
at ¶ 10; L3Harris's Sealed CSOF, Exh. AA (letter from
Dr. Bianchi, dated 4/7/20, responding to 4/5/20 letter request).
L3Harris specifically asked for, among other things,
Dr. Bianchi's opinion "regarding the likelihood of another
episode such as the situation on 11-18-19."  In an April 7, 2020
letter, Dr. Bianchi opined "that without treatment the prognosis
for successful maintenance of occupational functioning without
another episode as the situation on 11-18-19 is at best
guarded."  Dr. Bianchi further opined that it was incumbent upon
Lee's treating physician, Dr. Williamson, to certify that Lee
was cleared to return to work.  [<u>Id.</u>]

        L3Harris also asked West for Keaki's position
regarding Lee returning to work following his administrative
leave.  [Stewart Decl. ¶ 12.]  According to Stewart, West stated
that Keaki would not allow Lee to return to the employee areas
of the base for which access cards were required, unless Lee or
L3Harris could provide medical clearance guaranteeing that Lee
was not a danger to himself or coworkers.  [<u>Id.</u>]

        After discussing with Arnold, Kreider, and legal
counsel, Stewart made a second recommendation to terminate Lee's
employment.  [<u>Id.</u> ¶ 13.]  On June 22, 2020, L3Harris terminated

Lee's employment.  [Id. ¶ 14.[11]]  According to Stewart, the final decision to terminate Lee's employment was based on: Lee's comments to Dr. Bianchi; Keaki's refusal to give Lee access to the base unless L3Harris could guarantee that he would not be a danger to himself or others; and the reasons for the initial recommendation to terminate Lee's employment.  [Id.]

On November 13, 2020, Lee filed this action.  The operative pleading is the First Amended Complaint, which alleges: (1) disability discrimination, in violation of the Americans with Disabilities Act ("the ADA") ("Count I"); (2) a retaliation claim under the ADA ("Count II"); (3) a state law disability discrimination claim pursuant to Haw. Rev. Stat. § 378-2 ("Count III"); (4) a state law retaliation claim, pursuant to § 378-2 ("Count IV"); and (5) a state law retaliation claim, pursuant to Hawaii's Whistleblowers' Protection Act ("HWPA"), Haw. Rev. Stat. § 378-62 ("Count V"). [Dkt. no. 20.]  In the instant Motion, L3Harris argues it is entitled to summary judgment on all of Lee's claims because,

---

[11] L3Harris submitted an erratum because the original Stewart Declaration omitted paragraphs 14 and 15.  See Errata Regarding Decl. of Danielle Stewart in Supp. of Defendant L3Harris Technologies, Inc.'s Separate and Concise Statement of Material Facts in Supp. of Its Motion for Summary Judgment, Filed September 29, 2021 [Dkt. 50-3.], filed 10/11/21 (dkt. no. 58).

even in viewing the evidence in the light most favorable to Lee, he cannot establish the elements of any of his claims.

**DISCUSSION**

I.   **Lee's Request to Strike Declarations**

Lee seeks to strike Stewart and Kreider's declarations "as to any events that Ms. Stewart and Mr. Kreider did not have personal, firsthand knowledge of, such as what occurred in the workplace and at meetings with HR on Kauai for L3[Harris]." [Mem. in Opp. at 13.]  Lee does not point to any specific paragraphs in either declaration that should be stricken. Moreover, Lee neither cites to case law nor civil procedure rules to support his position.  L3Harris contends the declarations should not be stricken because they are being used to establish the legitimate, non-discriminatory reasons for terminating Lee's employment.  [Reply at 12 n.5.]  The Court agrees with L3Harris.

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "Courts will look to the Federal Rules of Evidence to determine if the contents of an affidavit would be admissible."  Parker v. CB Richard Ellis Haw., Inc., No. CV 09-

00574 DAE LEK, 2010 WL 5388362, at *3 (D. Hawai`i Dec. 21, 2010) (citations omitted).

Here, the two declarations concern Stewart and Kreider's recollection of events pertaining to them and their roles within L3Harris, including the reasons supporting Lee's employment termination. As such, the declarations are proper. See, e.g., Casumpang v. Hawaiian Com. and Sugar Co., 2014 WL 4322168, at *16 (D. Hawai`i Aug. 29, 2014) (stating that statements made by employees to associate general counsel and HR director were not hearsay because their real purpose was to establish that the company had a legitimate good-faith basis for suspending and terminating the plaintiff). Lee's request to strike the declarations is therefore denied.

## II.  Lee's Discrimination Claims Under the ADA and Hawai`i Law

"Discrimination and retaliation claims under the ADA are both subject to the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." Curley v. City of N. Las Vegas, 772 F.3d 629, 632 (9th Cir. 2014) (citations omitted).

> Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination (or retaliation). The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the

15

employer was pretextual.  See Raytheon [Co. v.
Hernandez], 540 U.S. [44,] 49–52 & n.3, 124 S.
Ct. 513 [(2003)]; Brown [v. City of Tuscon], 336
F.3d [1181,] 1187 [(9th Cir. 2003)]; Snead [v.
Metro. Prop. & Cas. Ins. Co.], 237 F.3d  [1080,]
1093 [(9th Cir. 2001)].

Id.

Title I of the ADA provides that "[n]o covered entity
shall discriminate against a qualified individual on the basis
of disability in regard to job application procedures, the
hiring, advancement, or discharge of employees, employee
compensation, job training, and other terms, conditions, and
privileges of employment."  42 U.S.C. § 12112(a).  To establish
a prima facie case of discrimination under the ADA, "the
plaintiff must show that: (1) she is a disabled person within
the meaning of the statute; (2) she is qualified, with or
without reasonable accommodation, to perform the essential
functions of the job she holds or seeks; and (3) that she
suffered an adverse employment action because of her
disability."  Braunling v. Countrywide Home Loans Inc., 220 F.3d
1154, 1156 (9th Cir. 2000) (citation omitted).  The Hawai`i
statute prohibiting disability discrimination, Haw. Rev. Stat.
§ 378-2, is "textually similar" to the ADA and therefore uses
the same analysis.  French v. Haw. Pizza Hut, Inc., 105 Hawai`i
462, 467, 99 P.3d 1046, 1051 (2004).  Thus, the Court analyzes
Lee's ADA and state law discrimination claims together.

16

A.   **Lee's Harassment Claims**

As a preliminary matter, L3Harris argues that any disability discrimination claims based on events prior to Lee's termination fail as a matter of law.  In his memorandum in opposition, Lee does not address any of L3Harris's arguments related to Lee's purported disability discrimination claims based on events prior to his employment termination.  Although Lee seemingly alleges disability discrimination before his termination, his claims are unclear.  The only claim Lee seems to allege is that, since disclosing his PTSD diagnosis, he "was harassed and unfairly disciplined."  [First Amended Complaint ¶ 19.]  To the extent Lee brings harassment or hostile work environment claims under the ADA, the Ninth Circuit has not yet resolved whether a plaintiff can bring such claims under the ADA.  See McIntyre v. Eugene Sch. Dist. 4J, 976 F.3d 902, 916 (9th Cir. 2020).

Assuming that a hostile work environment claim is actionable under the ADA,

> a hostile work environment claim exists when there is severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class."  See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66-67 (1986)).  To be actionable, the environment must be both objectively and subjectively offensive.
>
> When determining whether an environment was sufficiently hostile or abusive, courts examine all of the circumstances, including the frequency

17

of the discriminatory conduct, its severity,
whether it was physically threatening or
humiliating, and whether it unreasonably
interfered with an employee's work performance.
See Faragher v. City of Boca Raton, 524 U.S. 775,
787-88 (1998). Simple teasing, offhand comments,
and isolated incidents (unless extremely serious)
do not amount to discriminatory changes in the
terms and conditions of employment. Id. at 788;
McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113
(9th Cir. 2004) ("Simply causing an employee
offense based on an isolated comment is not
sufficient to create actionable harassment").

Under the ADA, plaintiffs must exhaust
administrative remedies by filing a charge of
discrimination with the EEOC within 180 or 300
days of the alleged unlawful employment practice.
See 42 U.S.C. § 12117(a) ("The powers, remedies,
and procedures set forth in sections 2000e-4,
2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this
title shall be the powers, remedies, and
procedures this subchapter provides to the
Commission, to the Attorney General, or to any
person alleging discrimination on the basis of
disability in violation of any provision of this
chapter, or regulations promulgated under section
12116 of this title, concerning employment."); 42
U.S.C.A. § 2000e-5 (charge must be filed within
180 days of unlawful practice, but is extended to
300 days when a person initially institutes
proceedings with a state or local agency);
Stiefel v. Bechtel Corp., 624 F.3d 1240, 1243-44
(9th Cir. 2010) (administrative exhaustion
required under ADA); Ramirez v. Reeve-Woods Eye
Ctr., 2014 WL 2807638, at *4 (E.D. Cal. June 20,
2014) ("exhaustion of administrative remedies is
required under the ADA").

Crowley v. Wal-Mart Stores, Inc., CIVIL NO. 16-00293 SOM/RLP,

2018 WL 4345251, at *8 (D. Hawai`i Sept. 11, 2018).

Lee claims he was harassed in the workplace because:

(1) Igne told HR that he was afraid to work with Lee because of

his PTDS; (2) in or about February 2019, Igne asked Lee why he did not retire given his disability; (3) in or about March 2019, Vegas asked in a union meeting how Lee could work if he had a disability rating for PTSD; and (4) a L3Harris electrician, Tony Pereira, stated at the same union meeting that L3Harris needed to let Lee go because his PTSD diagnosis is a liability for the company.  See Lee Decl. ¶¶ 30—34.  Lee does not provide the exact dates of these purported harassing statements.  Yet, even assuming these statements were made on March 31, 2019, Lee did not file a claim with the EEOC and the HCRC until February 27, 2020, which is not within 180 or 300 days as required. Accordingly, to the extent that Lee claims harassment or a hostile work environment based on the statements made in February and March 2019, those claims are time-barred.[12]  Summary judgment is therefore granted in favor of L3Harris with respect to these claims.  See Fed. R. Civ. P. 56(a) (stating summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

---

[12] "The continuing violations doctrine extends the accrual of a claim if a continuing system of discrimination violates an individual's rights up to a point in time that falls within the applicable limitations period."  Douglas v. Cal. Dep't of Youth Auth., 271 F.3d 812, 822 (9th Cir. 2001) (internal quotation marks and citation omitted).  Lee does not assert that these claims are timely given a continuing violation.

B. **Lee's Claims Relating to his Employment Termination**

The parties do not dispute the first element needed for a prima facie disability discrimination claim, *i.e.*, that Lee is an individual with a disability within the meaning of the ADA. See Mem. in Supp. of Motion at 15. As such, only the second and third elements for a prima facie ADA discrimination claim are analyzed.

1. **Whether Lee is a "Qualified Individual"**

The Ninth Circuit has stated:

Section 12111(8) of the ADA explicitly defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

However, the "Equal Employment Opportunity Commission ('EEOC'), the agency to which Congress delegated authority to implement Title I of the ADA, has promulgated a regulation expanding this definition." Johnson v. Bd. of Trustees of Boundary Cty. Sch. Dist. No. 101, 666 F.3d 561, 564–65 (9th Cir. 2011) (internal citations omitted) (citing 56 Fed. Reg. 35,726, 35,735 (July 26, 1991)). The EEOC promulgated 29 C.F.R. § 1630.2(m) to further elaborate upon the meaning of the term "qualified." That subsection sets forth a two-step inquiry for determining whether the individual is qualified. We first determine whether the individual satisfies the prerequisites of the job; more specifically, whether "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires." At step two, we determine whether, "with or without reasonable accommodation," the individual is able to

20

"perform the essential functions of such position."  29 C.F.R. § 1630.2(m).

Anthony v. Trax Int'l Corp., 955 F.3d 1123, 1127-28 (9th Cir. 2020).

Neither party addresses this issue.  Because Lee worked as a painter for L3Harris from 2006 until his termination, see, e.g., Lee Depo. Trans. at 17:13-15, and the parties do not dispute the issue, there is sufficient evidence to raise a genuine issue of material fact whether Lee satisfies the prerequisites of the job.

However, the parties disagree on whether Lee, with or without reasonable accommodation, can perform the essential functions of his job.  L3Harris relies on Mayo v. PCC Structurals, Inc., 795 F.3d 941, 944 (9th Cir. 2015), to argue Lee cannot appropriately handle stress or interact with others, and therefore he cannot perform the essential functions of his job.  See Mem. in Supp. of Motion at 19; Mayo, 795 F.3d at 944 ("An essential function of almost every job is the ability to appropriately handle stress and interact with others." (citation omitted)).  In Mayo, the Ninth Circuit held that "[a]n employee whose stress leads to serious and credible threats to kill his co-workers is not qualified to work for the employer, regardless of why he makes those threats."  795 F.3d at 944-45.  There, the plaintiff's employment was terminated because he "threaten[ed]

21

to kill his co-workers in chilling detail" at least five times. Id. at 944.

Mayo is not analogous because the facts here do not compare to the "extreme" circumstances in Mayo. See id. at 945 n.4. Depending on the account, Lee told Hesapene the day after the incident with Igne that he was going to punch Igne through the face (or that he would like to punch Igne). See, e.g., Hesapene Depo. Trans. at 43; Lee Depo. Trans. at 49. That is the only threat Lee made. Notably, Hesapene testified in his deposition that he neither believed Lee created a hostile work environment nor that Lee was going to follow through and punch Igne. [Hesapene Depo. Trans. at 39-40, 44.] Castro also testified that he did not believe Lee was a threat to anyone in the workplace. [Castro Depo. Trans. at 63.] Both Castro and Hesapene testified that they never witnessed Lee threaten anyone at the workplace before. [Id. at 63; Hesapene Depo. Trans. at 39.] Unlike in Mayo, where the threats were serious and credible, it is questionable here whether Lee's threat was credible.

Viewing the evidence in the light most favorable to Lee as the nonmoving party, see Harris v. Cnty. of Orange, 17 F.4th 849, 855 (9th Cir. 2021), Lee's adverse reactions stemming from the one incident are not enough to conclude, as a matter of law, that Lee cannot perform the essential functions of his job.

See Mayo, 795 F.3d at 944 (noting that "an employee can be qualified despite adverse reactions to stress"). Furthermore, "to the extent that an employer challenges an ADA plaintiff's claim that he can perform the job's essential functions, . . . it [is] appropriate to place a burden of production on the employer to come forward with evidence of those essential functions." Bates v. United Parcel Serv., Inc., 511 F.3d 974, 991 (9th Cir. 2007) (citations omitted). L3Harris only raises concerns with Lee's ability to appropriately handle stress and interact with coworkers. No other evidence that Lee cannot perform the essential functions of his job has been provided. Conversely, Lee states he can perform the essential functions of the job because he has been able to do so for the past twenty-six years without any negative performance evaluations. [Lee Decl. at ¶¶ 18, 47, 60–61.] Accordingly, Lee raises a genuine issue as to whether he can perform the essential functions of his job.

L3Harris also argues Lee should be estopped from claiming he is a qualified individual because statements in his Department of Veterans Affairs ("VA") disability application contradict his current contention that he possesses the ability to appropriately handle stress and interact with others. [Mem. in Supp. of Motion at 17–20.] The United States Supreme Court has considered "the legal effect upon an ADA suit of the

application for, or receipt of, disability benefits." Cleveland
v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 800 (1999) (citations
omitted).  Although Cleveland concerned the legal effect of
receiving Social Security Disability Insurance ("SSDI") upon an
ADA claim, the Supreme Court stated that, "[w]hen faced with a
plaintiff's previous sworn statement asserting 'total
disability' or the like, the court should require an explanation
of any apparent inconsistency with the necessary elements of an
ADA claim."  Id. at 807.  The Ninth Circuit has interpreted
Cleveland to apply to "any application for, or receipt of,
disability benefits."  Smith v. Clark Cnty. Sch. Dist., 727 F.3d
950, 956 (9th Cir. 2013) (citing Cleveland, 526 U.S. at 800,
806, 807, 119 S. Ct. 1597).  VA disability applications and
claims are therefore assessed under the Cleveland framework to
determine their effect on ADA claims.

       To determine the legal effect of Lee's VA disability
claim on his ADA claim, a two-step analysis is required.  First,
it must be determined whether, as a legal matter, a claim under
the ADA "inherently conflicts" with a VA disability claim "to
warrant a negative presumption against the ADA claim."  Id. at
956 (brackets, quotation marks, and citations omitted).  Second,
if there is no inherent conflict, then a court must analyze
whether the VA disability claim "genuinely conflict[s]" with the

24

ADA claim "so as to negate an essential element of [the] ADA claim." Id. (citation and internal quotation marks omitted).

First, a VA disability claim does not, as a matter of law, inherently conflict with an ADA claim. Like SSDI, Public Employees' Retirement System ("PERS"), Family Medical Leave Act ("FMLA"), and private disability insurance claims, which can coexist with an ADA claim, see id. at 957, so too can a VA disability claim. Because a VA disability claim does not necessarily "account for an applicant's ability to work with reasonable accommodation, it is possible that a person could claim he or she qualifies for disability benefits and still be able to work if accommodated." Cf. id.

Second, Lee's VA disability claim does not "genuinely conflict" with his ADA claim. On February 7, 2019, the VA made a determination regarding Lee's disability claim based on his PTSD. [Jones Decl. at ¶ 5; L3Harris's Sealed CSOF, Exh. D (VA disability decision) at PageID #: 778.] The VA considered many documents in making its decision, including a 2018 PTSD evaluation performed by a psychologist. See generally Jones Decl. at ¶ 10; L3Harris's Sealed CSOF, Exh. I. The findings in the 2018 PTSD evaluation show that, although it may be challenging for Lee to perform the essential functions of his job, he is not necessarily precluded from doing so.

Moreover, the findings in the 2018 PTSD evaluation, which L3Harris argues are inconsistent statements, along with the rest of the evidence supporting the VA disability determination, are neither "so blatant as to demonstrate that [Lee] is playing fast and loose with the courts," nor "so damaging that no rational trier of fact could rule in [Lee's] favor."  See Fredenburg v. Contra Costa Cnty. Dep't of Health Servs., 172 F.3d 1176, 1179 (9th Cir. 1999) (internal quotation marks omitted).

Furthermore, in Smith, the plaintiff's statements in her PERS and FMLA applications appeared to negate an essential element of her ADA claim - i.e., whether she could perform the essential functions of her job - because her applications stated she was unable to work and was unable to perform either her current job or any comparable job.  727 F.3d at 958.  That is not the case here because the VA disability decision did not address Lee's ability to work.  Lee also did not make such a claim in his VA disability application.  L3Harris's estoppel argument is therefore rejected.

Because there is a genuine issue of material fact concerning whether Lee is a qualified individual under the ADA, and Lee is not estopped from claiming he is a qualified individual, summary judgment as to that issue is improper.

26

## 2. Whether Lee was Terminated Because of his Disability

"[A]n ADA discrimination plaintiff bringing a claim under 42 U.S.C. § 12112 must show that the adverse employment action would not have occurred **but for** the disability." Murray v. Mayo Clinic, 934 F.3d 1101, 1105 (9th Cir. 2019) (emphasis added), cert denied, 140 S. Ct. 2720 (2020). "For purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination."[13] Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1139—40 (9th Cir. 2001) (footnote and citation omitted).

In Humphrey, the Ninth Circuit stated:

> The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability. See Borkowski v. Valley Central Sch. Dist., 63 F.3d 131, 143 (2d Cir. 1995). In Kimbro [v. Atlantic Richfield Co., 889 F.2d 869 (9th Cir. 1989)], for example, we found that there was a sufficient causal connection between the employee's disability and termination where the employee was discharged for excessive absenteeism caused by migraine-related absences. See Kimbro, 889 F.2d at 875. Similarly, Humphrey has presented sufficient evidence to create a

---

[13] The exceptions to this general rule are when an employee is discharged for misconduct caused by alcoholism or illegal drug-use, or for "egregious and criminal conduct." See Humphrey, 239 F.3d at 1139 n.18 (citation and quotation marks omitted).

> triable issue of fact as to whether her
> attendance problems were caused by [obsessive
> compulsive disorder ("OCD")]. In sum, a jury
> could reasonably find the requisite causal link
> between a disability of OCD and Humphrey's
> absenteeism and conclude that MHA fired Humphrey
> because of her disability.

Id. at 1140.

Here, L3Harris was aware of Lee's PTSD diagnosis, as evidenced by the 3/13/19 Meeting. See, e.g., Stewart Decl. ¶ 4. According to Lee, the human resource representatives present at the meeting asked Lee many questions relating to his PTSD diagnosis, including if he wanted to hurt himself or others, if he had anger problems, if he needed anger management classes, if he needed a psychiatrist, and if he needed any accommodations. Lee states he answered "no" to all those questions. [Lee Decl. ¶¶ 57–60.] Although Lee answered the questions in the negative, a jury could reasonably conclude that L3Harris's questions to Lee about his PTSD show that it was aware of the possible symptoms or stereotypes associated with PTSD. Additionally, L3Harris received Dr. Bianchi's February 2020 psychological report about Lee, which highlighted some of Lee's PTSD symptoms. [Haen Decl. at ¶ 9; L3Harris Sealed CSOF, Exh. Z at PageID #: 893.] The evidence, when viewed in the light most favorable to Lee, suggests that L3Harris had reason to believe Lee's conduct was associated with his PTSD.

Ultimately, L3Harris's decision to terminate Lee's employment stems from Lee's conduct during the incident with Igne.[14]  See, e.g., Stewart Decl. ¶¶ 7, 14; Kreider Decl. ¶¶ 3-4. Lee's VA disability application and decision, and the psychological evaluation performed by Dr. Bianchi show that Lee's PTSD affects his ability to interact with others, including at work, and can make him irritable.  Viewing the evidence in the light most favorable to Lee, a rational trier of fact could find that, although L3Harris terminated Lee's employment because of his conduct surrounding the incident, his conduct was caused by his PTSD.  Cf. Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1094 (9th Cir. 2007) ("[T]he jury was entitled to infer reasonably that [the plaintiff's] 'violent outburst' . . . was a consequence of her bipolar disorder, which the law protects as part and parcel of her disability.").  Put differently: but for Lee's conduct, which could reasonably have been caused by his PTSD, Lee's employment would not have been terminated.  Accordingly, there is a genuine issue of material fact as to whether Lee's employment was terminated because of

---

[14] Lee contends his termination letter does not state the reason for his employment termination.  He also states he was never given a reason for his employment termination.  [Lee Decl. ¶¶ 125—26.]

his PTSD.  Summary judgment as to this issue is therefore inappropriate.[15]

### 3.  <u>Legitimate, Non-Discrimination Reason</u>

Because Lee has established a prima facie case of discrimination, the burden shifts to L3Harris to provide a legitimate, nondiscriminatory reason for Lee's employment termination.  The Supreme Court has explained this burden:

> The defendant need not persuade the court that it was actually motivated by the proffered reasons. <u>See</u> [Bd. of Trs. of Keene State Coll. v.] <u>Sweeney</u>, [439 U.S. 24,] 25 [(1978)].  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.

<u>Tex. Dep't of Cmty. Affs. v. Burdine</u>, 450 U.S. 248, 254—55 (1981) (footnotes omitted).

---

[15] L3Harris's sole argument against finding that Lee's employment was terminated because of his PTSD is that Lee was terminated more than a year after L3Harris learned about his PTSD.  [Mem. in Supp. of Motion at 21 (citing <u>Manatt v. Bank of Am.</u>, 339 F.3d 792, 802 (9th Cir. 2003) (nine months too long to infer causation)).]  L3Harris relies on <u>O'Brien v. R.C. Willey Home Furnishings</u>, 748 F. App'x 721, 723 (9th Cir. 2018), where the Ninth Circuit held that "causation may be inferred from timing alone where an employee is terminated shortly after his employer discovers that he is disabled."  Although Lee may not benefit from the inference of causation because he not terminated shortly after L3Harris found out about his PTSD, that does not mean L3Harris is entitled to a ruling on summary judgment that Lee cannot establish causation.

Stewart states she initially recommended to Arnold in January 2020 that Lee's employment be terminated "due to his aggressive conduct toward his co-workers" and to "maintain a safe and healthy workplace." [Stewart Decl. ¶ 7.] Stewart also states her recommendation "had nothing to do with" Lee's PTSD." [Id. at ¶ 8.] As to her second recommendation around June 2020, Stewart states:

> The final decision to terminate Mr. Lee's employment was based on several factors. First, Mr. Lee's comments to Dr. Bianchi regarding instigating a fight or argument with others for no reason raised concerns about employee safety and disruption to the workplace. His statements suggested that he had not learned from the warning he received in November 2019. Second, Keaki would not allow Mr. Lee access to the base unless L3Harris could guarantee that he would not be a danger to himself or others. Combined with the concerns described above that prompted the initial discussion to terminate Mr. Lee's employment in January 2020, I once again recommended that L3Harris terminate Plaintiff's employment . . . .

[Id. at ¶ 14.] Stewart further relied on Martin's investigation report, which concluded that Lee engaged in aggressive and unprofessional conduct towards Igne that violated L3Harris policies. [Id. at ¶ 5.] Similarly, Kreider states Lee's PTSD diagnosis was not a factor in approving the decision to terminate Lee's employment. [Kreider Decl. ¶ 5.] He also states he "approved the termination decision because of Mr. Lee's disruptive conduct in the workplace." [Id.]

31

L3Harris has provided a legitimate non-discriminatory reason for Lee's employment termination. Based on the statements from Castro, Igne, Hesapene, Vegas, Martin, Taylor, West, the IBEW, and Dr. Bianchi, L3Harris concluded after its investigation that Lee disrupted the workplace, which can serve as a legitimate non-discriminatory reason for an adverse employment action. See, e.g., Unt v. Aerospace Corp., 765 F.2d 1440, 1446 (9th Cir. 1985) (stating termination for disrupting work environment can be a legitimate, nondiscriminatory basis); Ogunleye v. Arizona, 66 F. Supp. 2d 1104, 1108 (D. Ariz. 1999) (stating the plaintiff's disruptive presence was a legitimate, nondiscriminatory reason for not renewing her contract). There appears to be some inconsistent statements made by Hesapene and Castro in their written statements submitted to Martin as compared with their deposition testimony pertaining to whether Lee created a hostile workplace. See, e.g., Hesapene Depo. Trans. at 39-40; Castro Depo. Trans. at 61-63. Nevertheless, L3Harris had sufficient reason to believe, at the time of its review, that Lee's conduct was disruptive to the workplace.

Moreover, Lee was found to have violated L3Harris's policies. See, e.g., Haen Decl., Exh. S (Disciplinary Warning, issued by Martin, dated 11/18/19, describing the company policies violated); Stewart Decl. at ¶ 5. Violation of company policies and procedures can also be a legitimate,

nondiscriminatory reason for termination.  See, e.g., Dumas v.
New United Motor Mfg., Inc., 305 F. App'x 445, 448 (9th Cir.
2008); Rezentes v. Sears, Roebuck & Co., 729 F. Supp. 2d 1197,
1205 (D. Hawai`i 2010).  As such, L3Harris has met its burden in
providing legitimate, nondiscriminatory reasons for terminating
Lee's employment.

      **4.**   **Pretext**

     The burden shifts back to Lee to show that L3Harris's
proffered reasons for termination were pretextual.  Lee "must
show that the articulated reason is pretextual either directly
by persuading the court that a discriminatory reason more likely
motivated the employer or indirectly by showing that the
employer's proffered explanation is unworthy of credence."  See
Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1062 (9th
Cir. 2002) (citation and internal quotation marks omitted).  If
Lee "rel[ies] on circumstantial evidence to show pretext, such
evidence must be both specific and substantial."  See id.
(citation omitted).  In evaluating L3Harris's proffered reasons,
the Court "only require[s] that [L3Harris] honestly believed its
reason for its actions, even if its reason is foolish or trivial
or even baseless."  See id. at 1063 (quotation marks and
citation omitted).

     "Although [Lee] has provided sufficient evidence to
support an inference of discrimination, and thus has met [his]

33

burden on [his] prima facie case, that evidence is not
[necessarily] sufficient to raise a genuine issue of material
fact regarding the truth of [L3Harris's] proffered
nondiscriminatory reasons . . . ."  See Snead v. Metro. Prop. &
Cas. Ins. Co., 237 F.3d 1080, 1094 (9th Cir. 2001) (citation
omitted).  Here, Lee raises arguments against some of L3Harris's
proffered reasons, but he does not address L3Harris's reason to
maintain a non-disruptive workplace.  Lee primarily focuses on
L3Harris's reasoning that it wanted to maintain a safe work
environment, i.e., that it was concerned Lee posed a future
threat to the workplace.  See Mem. in Opp. at 20-22.  But, even
assuming that L3Harris could not make a sufficient showing that
Lee posed a credible threat in the future, or that Lee could not
safely return to work, part of L3Harris's reason for terminating
Lee's employment was based on his past threat to punch Igne.
The Ninth Circuit has held that past threats can be "an
independent and sufficient basis for dismissal, regardless of
whether [the plaintiff] posed an actual danger."  Curley v. City
of N. Las Vegas, 772 F.3d 629, 633 (9th Cir. 2014).

In any event, Lee fails to address L3Harris's
legitimate reason for providing a work environment free from
disruption.  See id. ("Disputing only one of several well-
supported, independently sufficient reasons for termination is
generally not enough to defeat summary judgment." (citations

omitted)).  Lee generally argues the basis of his termination
was pretextual because Igne engaged in identical behavior and
was not fired, with the only difference between the two being
that Lee has PTSD and Igne does not.  See Mem. in Opp. at 18.
Lee's framing of the events fails to take the totality of the
circumstances into consideration.  The evidence shows that,
while Igne likely swore at Lee as well, Lee's behavior went
beyond that.  Lee went into the shop and initiated the
discussion with Igne about the power-washing incident.  [Lee
Depo. Trans. at 24.]  Lee's coworkers stated Lee was aggressive
and yelling.  See Haen Decl., Exhs. P, Q, R; Hesapene Depo.
Trans. at 23:2-16; Castro Depo. Trans. at 28:2-21.  Lee also
told a coworker the next day that he was going to, or wanted to,
punch Igne.  See Hesapene Depo. Trans. at 28:13-21.  After
Martin investigated the incident, he concluded that Lee violated
company policy.  [Martin Decl. at ¶ 4.]  Taylor recommended that
L3Harris "address Preston Lee's obvious mental instability."
[Kreider Decl., Exh. V. at PageID #: 539.]  Additionally, IBEW
sent L3Harris statements concerning Lee's behavior.  See Stewart
Decl. at ¶ 7.  Dr. Bianchi provided L3Harris with information
pertaining to Lee's likelihood of disruptive behavior in the
future.  See Haen Decl. at ¶ 10; L3Harris's Sealed CSOF,
Exh. AA.  Although Lee contests the veracity of some of the
statements provided to L3Harris, the evidence reasonably

35

supports L3Harris's belief that Lee was disruptive, and that it was concerned about future disruptions. Importantly, Lee has not identified any evidence to show that L3Harris's belief was not honestly held.

Finally, Lee seems to argue L3Harris's reasons are pretextual because West's email to Kreider and Arnold mentions Lee's PTSD. [Mem. in Opp. at 21.] In the email, West states he believes concerns about Lee's stability should be elevated to a corporate level because (1) there were two recent active shooter events; (2) personnel raised concerns about Lee's stability; (3) Lee was telling his coworkers he had PTSD; and (4) HR previously talked with Lee about his PTSD diagnosis. See Kreider Decl., Exh. V at PageID #: 536. Lee's argument is not persuasive. The information relayed to West concerned him enough to raise the concerns to Arnold and Kreider at L3Harris. West does not suggest or tell Arnold and Krieder that Lee's employment should be terminated based on the circumstances raised. Rather, West elevated the information to higher authority within the company for consideration. Stewart and Kreider at L3Harris then investigated numerous statements and reports before making a decision about Lee's employment. West mentioning Lee's PTSD alongside other pressing circumstances does not, by itself, raise a genuine issue of material fact that

36

L3Harris's reasons for terminating Lee's employment were pretextual.

Because Lee has not met his burden in raising a genuine issue of material fact that L3Harris's reason for terminating his employment was a pretext for unlawful discrimination, his claims for disability discrimination under the ADA and Hawai`i law must fail. Accordingly, summary judgment in favor of L3Harris as to Counts I and III is appropriate.

## III. **Lee's Retaliation Claims**

Under the ADA's anti-retaliation provision, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a). Lee "must make out a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." See Brown v. City of Tucson, 336 F.3d 1181, 1187 (9th Cir. 2003) (quotation marks and citation omitted).  The burden-shifting framework of McDonnell Douglas applies to this analysis.  See id. at 1186.  Moreover, Hawaii's statute protecting employees from discriminatory retaliation, Haw. Rev. Stat. § 378-2, is

37

subject to the same analysis as a retaliation claim under the
ADA.  See Lales v. Wholesale Motors Co., 133 Hawai`i 332, 339
n.6, 328 P.3d 341, 348 n.6 (2014).  The Court therefore
considers both claims together.

Lee engaged in a protected activity when he filed his
EEOC and HCRC claim on February 27, 2020.  See Jones Decl.,
Exh. J (Lee's answers to Interrogatories No. 14) at PageID
#: 514.  But, Lee cannot meet his burden to establish a prima
facie case of retaliation because L3Harris decided to terminate
his employment in January 2020, which was before Lee filed his
EEOC and HCRC claim.  Thus, there cannot be a causal link
between the protected activity and the employment termination.
However, even if Lee could establish a prima facie case of
retaliation, summary judgment would be proper for the same
reasons as Lee's discrimination claims.  That is, L3Harris has
provided a legitimate, nondiscriminatory reason for Lee's
employment termination and Lee cannot show that the reason is
pretextual.  See supra Discussion Sections II.B.3 & 4.  Thus,
summary judgment in favor of L3Harris as to Counts II and IV is
proper.

## IV.  **Lee's Claim Under the HWPA**

The HWPA "prohibits an employer for retaliating
against an employee who engages in certain protected
activities."  Cambron v. Starwood Vacation Ownership, Inc., 945

38

F. Supp. 2d 1133, 1142 (D. Hawai`i 2013); see generally Haw.

Rev. Stat. § 378-62.

> To establish a prima facie case for
> retaliation under the [HWPA], the plaintiff must
> prove that (1) he engaged in a protected
> activity, (2) he was subjected to an adverse
> employment action, and (3) the adverse employment
> action resulted because of the participation in
> the protected activity.  See Griffin v. JTSI,
> Inc., 654 F. Supp. 2d 1122, 1130-32 (D. Haw.
> 2008) (citing Crosby v. State Dep't of Budget &
> Fin., 76 Hawai`i 332, 876 P.2d 1300, 1310
> (1994)).

> The term "adverse action" is construed
> liberally to include various forms of
> retaliation, not only termination of employment.
> See Crosby, 876 P.2d at 1309-10.  The employee
> must show that his or her protected activity was
> the "substantial or motivating factor" for the
> adverse action.  Griffin, 654 F. Supp. 2d at
> 1131-32.  A court may infer a causal connection
> between a protected activity and a retaliatory
> action when there is proximity in time between
> the two.  Id.

Cambron, 945 F. Supp. 2d at 1142-43.  "Under this analysis,

employers are 'entitled to summary judgment if they can

demonstrate that they would have reached the same adverse

employment decision even in the absence of the employee's

protected conduct.'"  Tagupa v. VIPdesk, Inc., 125 F. Supp. 3d

1108, 1120 (D. Hawai`i 2015) (some internal quotation marks

omitted) (quoting Anthoine v. N. Cent. Counties Consortium, 605

F.3d 740, 752 (9th Cir. 2010)).  HWPA claims are reviewed under

the McDonnell Douglas burden-shifting framework.  See Chan v.

Wells Fargo Advisors, LLC, 124 F. Supp. 3d 1045, 1055 (D. Hawai`i 2015).

Here, Lee claims that the protected activities he engaged in were: (1) reporting to Martin and L3Harris that Igne stole gasoline; and (2) objecting to the violation of the law related to his security clearance card. See Mem. in Opp. at 24–25. First, Lee reported Igne's alleged gasoline thefts during Martin's investigation of the incident between Lee and Igne in November 2019. Although the decision to terminate Lee's employment was made approximately two months after Lee reported Igne's alleged thefts, an inference of causation based on proximity in time is not enough. Lee was already being investigated for misconduct before he reported the gasoline thefts. Furthermore, other than timing, Lee fails to point to any evidence that his report was the substantial or motivating factor in L3Harris's decision to terminate his employment.

Second, Lee appears to claim that he was terminated because he took issue with West asking Lee to give back his security clearance card. Specifically, Lee argues that, because West told Lee that he could give the security card to West's secretary, West was asking Lee to do something illegal. See id. at 25. Lee testified in his deposition that he neither told West that giving the security card to West's secretary was illegal nor objected to West's instruction. See Lee Depo.

40

Trans. at 101:3-102:9.  However, in his declaration in support
of his opposition, Lee states that he objected to West on
grounds that giving his secretary his security card was not
proper.  [Lee Decl. at ¶¶ 115-16.]  "[A] party cannot create an
issue of fact by an affidavit contradicting his prior deposition
testimony."  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266
(9th Cir. 1991) (citations omitted).  Even if Lee could point to
non-contradictory evidence that he informed West that giving his
security clearance to West's secretary was illegal, Lee does not
provide any evidence that his employment termination was caused
by his remark to West.

Finally, even assuming that Lee established a prima
facie case of retaliation under the HWPA, for either purported
protected activity, L3Harris has a legitimate non-retaliatory
reason for terminating Lee's employment and, Lee has not shown
pretext.  See *supra* Discussion Sections II.B.3 & 4.  Summary
judgment is therefore appropriate as to Count V.

**CONCLUSION**

On the basis of the foregoing, L3Harris's Motion for
Summary Judgment on All Claims, filed September 29, 2021, is
HEREBY GRANTED, and summary judgment is granted in favor of
L3Harris as to all of Lee's claims.  The Clerk's Office is
directed to enter final judgment and close the case immediately.

IT IS SO ORDERED.

41

DATED AT HONOLULU, HAWAII, January 31, 2022.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**PRESTON LEE VS. L3HARRIS TECHONOLOGIES, INC.; CV 20-00489 LEK-KJM; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**