Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| PRESTON LEE, | ) CIVIL NO. |
| | ) 1:20-CV-00489 LEK-KJM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| L3HARRIS TECHNOLOGIES, INC.; | ) |
| JOHN DOES 1-10; JANE DOES | ) |
| 1-10; DOE CORPORATIONS 1-10; | ) |
| DOE PARTNERSHIPS 1-10; DOE | ) |
| UNINCORPORATED ORGANIZATIONS | ) |
| 1-10; and DOE GOVERNMENTAL | ) |
| AGENCIES 1-10, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

VIDEOTAPED AND ZOOM DEPOSITION OF

PRESTON LEE

VOLUME 2

Taken on behalf of the Defendants, L3HARRIS
TECHNOLOGIES, INC., at Honolulu, Hawaii, Commencing at
9:00 a.m., on May 20, 2024, pursuant to notice.

**EXHIBIT A**

BEFORE:
SHEILA MOORE, RPR, RMR, CMRS, CRR, CSR No. 501

APPEARANCES:

For Plaintiff, PRESTON LEE:

      JOSEPH T. ROSENBAUM, ESQ.
      FUJIWARA AND ROSENBAUM, LLLC
      1100 Alakea Street
      20th Floor, Suite B
      Honolulu, HI  96813
      808.203.5436
      jtr@frlawhi.com

For the Defendants, L3HARRIS TECHNOLOGIES, INC.:

      AMANDA JONES, ESQ.
      CADES SHUTTE
      1000 Bishop Street, Suite 1200
      Honolulu, HI  96813
      808.521.9200
      ajones@cades.com

ALSO PRESENT:

      Marty Malloy, Paralegal, Cades Schutte
      Keoni Sallas, Video Specialist

      –  –  –  –  –

INDEX

EXAMINATION BY:                                          PAGE

  MS. JONES                                                4

        INDEX OF MARKED/FIRST-REFERENCED EXHIBITS

NO.                                                      PAGE

19 Supplemental Security Income Letter               11

20 SSA Application Development Document               24

21 Work History Report                               43

22 Notice of Disapproved Claim from Social Security
   Administration                                    48

23 Request For Reconsideration                       50

24 Notice of Reconsideration                         52

25 Disability Report-Appeal                          53

26 Citizens Disability Fax                           56

27 Claimant's Appointment of Representative          58

28 Internet Application Summary                      59

29 Disability Report Adult                           66

30 Notice of Award                                   70

31 Function Report Adult                             71

32 Function Report Adult                             77

33 Function Report Adult Third Party                 78

34 Function Report Adult Third Party                 80

35 Appointment Notice October 28, 2022               82

36 Statement of Claimant Or Other Person            101

*** ALL EXHIBITS MARKED AFTER DEPOSITION COMPLETED ***

VIDEO SPECIALIST:  This is the volume 2 of the deposition of Preston Lee in the matter of Preston Lee versus L3Harris Technologies, Inc., et al.  My name is Keoni Sallas, video specialist for Certified Legal Video Services.

Will the counsel please state your names.

MS. JONES:  Good morning.  Amanda Jones appearing for L3Harris Technologies, Inc., and also present is Marty Malloy, a paralegal from my office.

MR. ROSENBAUM:  Good morning.  Joseph Rosenbaum here on behalf of plaintiff Preston Lee who is present for his deposition.

VIDEO SPECIALIST:  Today is May 20th, 2024, and we're on the record at 9:05 a.m.

Will the court reporter please swear in the witness.

PRESTON LEE,

Of lawful age, called for examination, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF PRESTON LEE

BY MS. JONES:

Q.  Good morning, Mr. Lee.

A.  Good morning.

Q.   Will you please state your name for the record.

A.   Preston Lee.

Q.   Are you under the influence of any drugs, alcohol, or medications that would impair your ability to understand my questions and answer truthfully and accurately today?

A.   No.

Q.   Is there any other reason why you might have difficulty understanding questions or answering truthfully today?

A.   No.

Q.   The deposition testimony that you'll be giving will be subject to the same oath and penalties of perjury that would apply if you were giving in-court testimony in front of a judge and jury.  Do you understand that?

A.   Yes.

Q.   And we did take your deposition a few years ago in this matter and we went over some instructions for the deposition at that time, but since it's been a little while I just want to remind you about some important things as we go through today's deposition.

First, if at any time you do not understand my question, please let me know and I'll rephrase the question to try to make it clearer.

Q.   So the purpose for today's continued deposition is to ask you some questions regarding the claims that you made for Social Security benefits.  I may refer to the Social Security Administration as SSA.

Will you understand that?

A.   Yes.

Q.   Are you still receiving Social Security Disability benefits?

A.   Yes.

Q.   And you receive that every month?

A.   Yes.

Q.   And that's a little over $3,000 a month that you're still getting?

A.   Yes.

Q.   When you were submitting information to the Social Security Administration in connection your disability benefits claims, did you submit any information that was untrue or inaccurate?

A.   No.

Q.   Did you make any false statements to the Social Security Administration?

A.   No.

Q.   Did you at any time tell the Social Security Administration that information you had provided to them was inaccurate?

A.   No.

Q.   Did you tell the Social Security Administration at any time that you needed to correct or amend information that you previously provided to them?

A.   No.

MS. JONES:   If I can ask Mr. Malloy to pull up the first exhibit, Supplemental Security Income letter.

Q.   Mr. Lee, can you see the document on the screen?

A.   Yeah.

Q.   This is a document that was produced by the Social Security Administration in this case.  Do you recognize -- and for the record we'll mark this as Exhibit 19 to your deposition, which is a continuation of the exhibits used in your previous deposition.  Do you recognize the document on your screen?

A.   No.

Q.   Near the top of the document about a quarter of the way down, do you see your name?

A.   Yep.

Q.   And a P.O. Box?

A.   Yes.

Q.   And is that a P.O. Box that you used to receive mail in 2020?

A.    Yes.

Q.    Do you still receive mail at that P.O. Box?

A.    Yes.

Q.    Is there any reason to think you did not receive this letter from the Social Security Administration?

A.    Is there a reason -- say that again.  What now?

Q.    Is there any reason that you could think that you would -- you did not receive this document from the Social Security Administration that reflects it went to your P.O. Box?

A.    I have no clue.

Q.    Did you receive mail from the Social Security Administration at your P.O. Box?

A.    Yes, I did.

Q.    And when you received mail from the Social Security Administration, what would you do with it?

A.    I would read it.

Q.    And then what would you do with it after you read it?

A.    I would fill out what I have to fill out because the reason why I did all this was to get Social Security.

Q.    Okay, so if they would send you a form that you needed to fill out, you would fill out the form?

A.   Yes.

Q.   And then you would submit it to the Social Security Administration?

A.   That's how it works, yes.

Q.   And when you would submit things to the Social Security Administration, how did you do that?

A.   I mail them to the address, whatever the thing was on the paper.

Q.   Okay.

A.   But looking at this paper, I never received this.   I didn't get this.

Q.   You're sure about that?

A.   I guarantee you.

Q.   Why is that?  Why is it that you're so sure?

A.   Because I didn't -- I didn't do any paperwork prior to me getting fired.  How can I get a letter on June 16th when I was still employed?

Q.   Okay, so up at the top of this document, the letter date is June 17, 2020.  See that up at the top?

A.   Yes, and on the bottom it says June 16th, 2020.

Q.   So the first paragraph says, On June 16, 2020, we talked with you about your eligibility --

A.   That is all.

Q.   Hold on.  Just hold on for a minute, Mr. Lee. Says, On June 16, 2020, we talked with you

Q. about your eligibility for Supplemental Security Income and then in parenthesis it says SSI.

Do you see that?

A. It doesn't matter.

Q. I'm just asking do you see that on this letter?

A. Yes.

Q. And did you have a call with the Social Security Administration on June 16, 2020?

A. Negative. No. Never. I couldn't have gotten a phone call or I couldn't have gotten any paperwork prior to June 22nd, because I didn't even think about Social Security at that time. I was employed, and planning on working. So I don't know where you coming up with all this paperwork on June 16th or whatever, because I gonna tell you right now, one, I never see anything, and two, I didn't fill out any paperwork prior to me getting terminated. So I don't know where we going with this, and let's move on.

Q. Mr. Lee, this is a document that the Social Security Administration produced in response to a subpoena in this case. So I didn't create this document, it's something that Social Security Administration provided.

A. Well, I didn't sign anything prior to me getting terminated. So we can go back and forth with

this all day.

Q.   Is it possible that somebody contacted Social Security Administration on your behalf prior to the termination?

A.   I have no clue.  I don't even understand what you're saying.

Q.   Do you know what Supplemental Security Income is?

A.   No.

Q.   Okay, we can take the exhibit down now.

When you would receive letters or other documents from Social Security Administration, did you have a place in your house where you would keep those records?

A.   Yes.

Q.   And where's that?

A.   I gotta tell where I keep my stuff?  I have a folder.  Do you need to know that?

Q.   So you have a folder where you keep all of the Social Security Administration documents?

A.   At that time, yes.

Q.   And where is that folder now?

A.   I threw it away.

Q.   When did you throw it away?

A.   After I got my first Social Security check.

Q. In 2023?

A. If I got -- if I started getting my Social Security in 2023, and I threw it away in 2023, I can not tell you what day. I cannot tell you what time. I no longer have it in possession and it's shit-canned.

Q. And it's -- I'm sorry, I didn't hear --

A. I threw it away.

Q. Why did you throw it way?

A. Because I got my benefits. I don't need -- why should I keep the paperwork? It's just rubbish to me. I don't understand. Am I supposed to have kept it? No, I'm asking.

MR. ROSENBAUM: Just answer her question. You don't have to ask her anything.

Q. So do you have any documents from the Social Security Administration?

A. For the tenth time, I don't have nothing. I threw it -- as soon as I got my first check -- I'm gonna repeat myself, I'm sorry if you didn't hear me -- as soon as I got my first check from the Social Security, I threw away all my paperwork.

Q. So when is the first time you had any contact with the Social Security Administration?

A. After I got fired.

Q.   At any time did you go to the Social Security office on Kauai in connection with your disability?

A.   For my Social Security I think I -- I think I did.  I'm not sure, because I went down there a couple times to help out fellow shipmates and fellow friends of mine that they was trying to get Social Security, and because I went through everything I'm the one that did their footwork for them.  So the fact --

Q.   I'm sorry, did you say -- go ahead.

A.   In fact, just, I say Christmas I just helped somebody get their Social Security during Christmas.  Yes, and I went down there and I did all the speaking for this individual.

Q.   So you were helping a friend obtain Social Security benefits?

A.   Yes.  And he got it --

Q.   And those --

A.   -- because of me.

Q.   Okay.  And those are disability benefits?

A.   Disability Social Security benefits.

Q.   Okay.  And these times when you were helping friends get Social Security, that was after you got your benefits?

A.   Yes, ma'am.

Q.   When you were -- so did you ever for your own

22

Social Security claim go down to the Social Security office in Kauai?

A.    Yes, I think I did.

Q.    And you spoke to somebody there in person?

A.    Yes.

Q.    Was anybody with you?

A.    No.

Q.    And do you know what the reason was that you went in in person to talk to somebody?

A.    I think what happened was, I'm not sure, but I think they called me in after they got my doctor's report or whatever you call them, paperwork or whatever.  I think they called me in to explain to me how the thing -- how everything works, because I didn't understand the procedures.  They just gave -- they -- I don't know if they wrote me a letter or they contacted me on the phone, or they did both, because they had to set up a flight from Kauai to Honolulu, I had to catch a cab or a Uber, or whatever it was, I had to see one doctor in the morning and then I had to see one doctor in the afternoon.  And I had -- I had to do this by a certain time or else.  I had to do this or else.  They gave me all the rules, and then I had to make sure I could make the flight.

And then I went and seen the doctor, I seen the

psychiatrist, and then I came back and then they called me. I forget how long or whatever. They called me to come in when they got the doctor's report and then they explained everything to me and then that's how I got -- that's how the thing worked and that's how I got my Social Security, my SSI or whatever.

Q.  Okay.

A.  I don't remember the lady's name or the guy's name, and I don't remember the doctor's name. I don't know the -- the guy doctor, the lady doctor, I don't remember their name and I don't really -- I don't know. But I had to see them. It should be in the report or whatever.

Q.  Who are the friends that you helped get Social Security disability benefits?

A.  Bert Shimabukuro, and he ended up getting a hundred percent.

Q.  Anybody else?

A.  No, other people I just call.

Q.  Who are you calling for?

A.  I had one friend that asked how did I get the Social Security, so I explained to him the procedures that I went through.

Q.  And who was that friend?

A.    David Shimogawa.

Q.    Anybody else that you were helping with getting benefits?

A.    No.

Q.    During any of the times that you called the Social Security Administration about your benefits claims, was anybody with you?

A.    Excuse me, ma'am, repeat that question.  Oh, no, no, for a fact, no, I went by myself.

Q.    Right, you said when you went down to the office, the Social Security office, you went by yourself, but sometimes did you also have phone calls with the Social Security Administration about your claims?

A.    About my claims?  My claim?

Q.    Yes.

A.    I'm not sure.

Q.    You don't remember if you had any phone calls?

A.    No.

Q.    I'm gonna have Mr. Malloy pull up the next exhibit which we'll mark as Exhibit 20 to your deposition.

Mr. Lee, on your screen is a document that will be marked Exhibit 20 to your deposition.  Can you see the document?

A.   Yes.

Q.   This is another document that was produced by the Social Security Administration in response to the subpoena in this case.

Do you recognize this document?

A.   I guess, I'm just looking at the days because I don't remember all this stuff, but the dates is after I got terminated, so it could be.

Q.   Okay.   So in the -- right below your name and address up at the top it says, On June 25th, 2020, we talked with you and completed your application for Social Security benefits.   Do you see that?

A.   That might have been -- yes.

Q.   And does that sound accurate to you that you spoke with the Social Security Administration on June 25th, 2020?

A.   It could be, because that was after when I was terminated.

Q.   And do you know if that was a phone call or an in-person visit?

A.   No.   What do you mean?   If they came to my house?

Q.   Well, a phone call or you went down to the Social Security office.

A.   I couldn't tell you which one it was.

Q.   Okay.   And when you called about -- and completed this Social Security benefits application, do you know if anybody was with you?

A.   No.   At no time anybody was with me because I was -- everybody that I know goes to work.   And I was fired at that time so I was home by myself.

Q.   Okay, so if we -- just below that first paragraph, do you see it says, What you need to do?

A.   Um-hum.

Q.   And then there's five bullet points after that; do you see that?

A.   Yeah.

Q.   It then says that you need to review the summary to make sure your statements were recorded accurately -- sorry -- correctly.

     Do you see that?

A.   Yes.

Q.   Did you review the summary of the application when the Social Security Administration sent it to you?

A.   I must have, because I have Social Security Disability.   I'm not -- I cannot remember that far back.

Q.   Okay.

A.   And I have PTSD.   I have a short memory.   I

don't know -- you keep bringing up all these papers and, I'm sorry, but to tell you the truth, if I read it then I might, you know what I mean, I might know, but other than that, I have no clue what you talking about and I cannot comprehend all this stuff because of my education and with my -- with my disability.  I don't know if I can be any help because my answers all gonna be the same.  I don't remember.  I have hard time remembering, and I have issues, and I'm sorry for it, but, you know -- I'm sorry.  I don't know what to tell you.

MR. ROSENBAUM:  Just do the best that you can do when she asks the questions.

Q.  Do you recall that the Social Security Administration provided you information and asked you to review the information to determine if it was correct?

A.  I guess so.  I don't know.

MR. ROSENBAUM:  Don't guess.  You either remember or --

THE WITNESS:  Okay, I don't remember. What I'm trying to say is, I must have did it because I have -- you understand -- do you understand what I'm trying to say?  I don't understand the question, because I have Social

Security Disability, I have to have filled out the paperwork to get Social Security Disability.

Now when I filled out to get it, I don't remember. When I filled it out, I don't remember. The doctors I had to go see, I don't remember. But apparently I did everything to the best of my knowledge. Even when I went to see the doctors I had to do all kinda tests. I had to do -- they asked me questions. I just did what I had to do and then they end up saying that I qualified, and then I got it.

So all I know for a fact that I was fired on the 22nd of June, and I lost my mind when I got fired because I was devastated. And I was in deep shock, panic. I didn't know how I was gonna pay my bills. And one thing came up was Social Security, and I don't know if I called them, they called me, I wrote to them, they wrote to me, back and forth. And then they said I had to go see the doctor. I see the doctor, and then next thing you know I get Social Security benefits.

So your question is, if I see this document before? I must have. Do I remember the document? I have no clue. Do I have Social Security benefits? I have a hundred percent. Do

I remember how I got it?  I don't know how I got it.  And do I have any paperwork?  I have nothing.

So you can just -- we can just keep going through this, but my answer's gonna be the same.  And to tell you the truth, I'm getting more confused as we go and, I'm sorry, but I don't understand.  I don't remember reading this, I don't remember doing none of this.

And I'm sorry, I just -- it's my disability and my -- my education that I don't understand this stuff.  So, you know, I don't know what to tell you.

BY MS. JONES:

Q.  I'm just gonna ask you some specific questions.  If you don't remember or you don't know, you can tell me that.  If you do remember something or you do know, then let me know what it is.

So the fourth bullet point on this document under, What you need to do, says, Review the reporting responsibilities so you are aware of the changes or events that you need to report to us.

Do you see that?

A.  Um-hum.

Q.  Is that a yes?

30

A.   Yes, I'm sorry.

Q.   And did you have an understanding that you had certain responsibilities to report changes or events to Social Security?

A.   Yes, but there was no changes probably at that time.

Q.   Okay.   And then below the bullet points it says, Important Reminder in all caps.

Do you see that?

A.   Important reminder, yes.

Q.   And below that it says, Penalty of perjury.

Do you see that?

A.   Yes.

Q.   And then the paragraph below that says, You declared under penalty of perjury that you examined all the information on this form and it is true and correct to the best of your knowledge.   You were told that you could be liable under law for providing false information.

Do you see that?

A.   Yes.

Q.   And when you spoke with Social Security Administration, did they tell you that the statements that you were giving to them were being made under penalty of perjury?

A.    Yeah, I guess they told me that, but --

MR. ROSENBAUM:  Do you remember them telling you that?

THE WITNESS:  What they trying to say is don't lie, right, when you fill out.  I never lie.

MR. ROSENBAUM:  But specifically she's asking you do you recall them telling you that, you acknowledging that this is submitted under penalty of perjury?

THE WITNESS:  No.

BY MS. JONES:

Q.    Do you recall getting a document like this telling you that the statements that you are making to Social Security were made under penalty of perjury?

A.    Did that -- I don't know.  I don't remember. I'm not sure.

Q.    Okay.  Did you have an understanding at the time you were submitting information to the Social Security Administration that you were required to tell the truth?

A.    Yes, and I did.

Q.    I want to scroll to the third page of this document.  That says page 3 up at the top right.  And then the title of the document is Application Summary

32

For Disability Insurance Benefits. And then below that it says, On June 25, 2020, we talked with you and completed your application for Social Security benefits.

Do you see that?

A. Yeah. Yes.

Q. And then it provides various pieces of information, a summary of what it says were your statements at the time.

And do you believe it's correct that on June 25th, 2020, you applied for disability benefits with the Social Security Administration?

A. Yes.

Q. And then below that is your name, Social Security, and date of birth; do you see that?

A. Um-hum, yes.

Q. And that information is all correct?

A. Um-hum, yes.

Q. And then a few lines down it says, I became unable to work because of my disabling condition on November 18, 2019.

Do you see that?

A. Yes.

Q. And is that what you told the Social Security Administration on June 25th, 2020?

A.  I guess.

Q.  Do I have any reason to think you did not say that?

A.  No.

Q.  And how did you come up with that date of November 18, 2019?

A.  That was the last day I work and I went to see the doctor.

Q.  Have you done any work since November 18, 2019?

A.  No.

Q.  At any time after November 18, 2019, have you told anyone that you were capable of working?

A.  No -- wait, wait, wait.  Am I capable of working?

        MR. ROSENBAUM:  Did you tell anyone since November, 2019, that you are capable --

        THE WITNESS:  No.

BY MS. JONES:

Q.  At any time since you filed this application with Social Security Administration in June, 2020, did you inform the Social Security Administration that you were able to work?

A.  No.

Q.  The next line on the document says I am still disabled.

34

Do you see that?

A.   Yeah, I got it.

Q.   And is that what you told the Social Security Administration; that you were still disabled?

A.   Yes.

Q.   And was that information truthful?

A.   Yes.

Q.   Did you ever report any changes to this information about when you became unable to work or your disability status to the Social Security Administration?

A.   Not to my knowledge.

Q.   Further down, the second paragraph from the bottom, it says, I have filed or intend to file for Workers' Compensation, Public Disability or Black Lung benefits, but I am not receiving benefits.

Do you see that?

A.   Yes.

Q.   Is that what you told the Social Security Administration?

A.   Yes, because at this time I wasn't getting any benefits, that's why I was trying to get some.

Q.   Okay, and what -- which of these were you -- had you filed or were you intending to file?

A.   I don't understand.  What do you mean?

Q. It says, I have filed or intend to file for Workers' Compensation, Public Disability, or Black Lung benefits.

A. That's social -- is that Social Security? Because if -- I don't know -- I don't know what is Black Lung and all that.

Q. Well, what were you -- what were you saying when you -- when you told Social Security --

A. No, I have --

Q. Hold on. Wait, let me finish.

What were you telling Social Security when you said I have filed or intend to file for Workers' Compensation, Public Disability, or Black Lung benefits, and I am not receiving benefits?

A. Probably just read the compensation for Social Security. I don't know -- I didn't put nothing in full, Public Disability, Black Lung benefit. I didn't fill that out.

Q. Okay. You did file a Workers' Compensation claim, right?

A. Yes.

Q. And that claim was denied, correct?

A. Workers' Comp. I was on Workers' Comp from the 18th.

Q. Are you sure?

MR. ROSENBAUM: Objection, form of the question. I think you guys are miscommunicating.

THE WITNESS: I don't know. My last day of work was on the 18th of November and I was getting paid while I was still staying at home because I couldn't work at that time. They was giving me TDI or whatever. I don't know what is that, you know what I mean? And I was on TDI all the way till June 22nd.

BY MS. JONES:

Q. But you did file a Workers' Compensation claim, right?

MR. ROSENBAUM: Do you remember that?

THE WITNESS: Working comp is for TDI, right?

MR. ROSENBAUM: It's different.

THE WITNESS: Well, no then, I didn't -- I didn't fill it out, no.

BY MS. JONES:

Q. You don't recall that you had a pending Workers' Comp claim?

A. No.

Q. Do you recall that the Workers' Comp claim was denied?

MR. ROSENBAUM: He doesn't recall that he

even had a claim.

THE WITNESS:  Yeah, I don't know what you're talking about.

MS. JONES:  Mr. Rosenbaum, please refrain from commenting.

BY MS. JONES:

Q.  You don't remember the Workers' Comp claim at all; is that correct?

A.  No.  No.

Q.  Let's turn to page 4 of this exhibit.  Okay, about halfway down on the page it says, Remarks.  I'll blow that up for you.

Okay, can you see that, Mr. Lee?

A.  Yes.  Yes.

Q.  The third line down, says, I understand that I must report any change in my work activity.

Do you see that?

A.  Yes.

Q.  Did you understand that you were required to report it to the Social Security Administration if you got another job?

A.  Yes.

Q.  It then says, I understand that if I work and earn over these income limits that are listed there, while applying for or receiving disability it may

cause a suspension/termination of my benefits/application.

Do you see that?

A. Yes.

Q. Did you -- so did you understand as of June, 2020, that if you got a job and received over $1,260 a month while applying for or receiving benefits that your application for disability benefits could be suspended?

A. Well, I didn't worry about that at that time because from November 18 to today I have not worked.

Q. Okay. Did you have -- go ahead.

A. From November 18 to present, I have not worked a day. I have not received any payment from anybody or from any organization. I did not work. So when I come to -- when I come to reading this application I just skip it because I didn't work. So I never really read every single line and do it all there because I know that doesn't even pertain to me.

Q. Because you had no intention of getting any other job?

A. It's not that I didn't have any intentions, I want to work, but I cannot. I wish I could. Today I want to -- today I wish I had my job. Right now I want to go back to work if I could, but because of my

disability it's prohibiting me from working, from November 18th, 2019, to present.  What is it, the 20 whatever -- 2024.

So when I read this thing, I just trying to explain something to you, ma'am, let's say -- let's say it was on the 25th of whatever date, whatever the date, I don't know the date, whatever the date it was.

Q.   The document is June 25th, 2020.

A.   It could have been the 25th, it could have been the 30th, it could have been one month later.  When I was getting all these papers, when I read the thing, it doesn't even pertain to me.  I just skip it because, one, I wasn't working and, two, I couldn't work.  And I never lie about anything.  I put everything down and it is -- you know, I filled it out the best I could, and --

Q.   Okay.  I want to turn page 7.  At the top it says page 7 and the document is entitled, Changes to be Reported and How to Report?  And then it lists various things that need to be reported to the Social Security Administration.

Do you recall reviewing or being told by Social Security that there was information that if you had changes that you needed to report that to them?

A.   I guess.

41

Q.   Up at the top.

A.   Yes.  If my -- if you are under age at 65, yes.

Q.   The first bullet point says your condition improves.  See that?

A.   Yes.

STENOGRAPHER:  Mr. Rosenbaum, sometimes I hear you speaking and I can't make out what you're saying and I know some of it is for the record, some not.  I'm having a hard time deciphering.

MR. ROSENBAUM:  I will speak up and put everything on the record.  I'm just trying to help him identify on the -- on the exhibit where to look.

STENOGRAPHER:  Thank you.

BY MS. JONES:

Q.   Mr. Lee, did you understand that you had an obligation to report to the Social Security Administration if your condition improves?

A.   Yes.  Definitely.

Q.   Okay.  And at any time did you report to the Social Security Administration that your condition had improved from what you initially reported in June, 2020?

A.   No.  The reason why they report nothing because

my condition didn't improve.  As a matter of fact, it's getting worse.

Q.   If we can scroll down a little bit more.  Okay, stop right there.

You see there's sort of a box on the page and it says in caps, Notice About Documents?

A.   Yes.

Q.   And then it says, We recommend that you keep all documents you submitted to us.

Do you see that?

A.   Yes, I see it.

Q.   And did you keep all the documents that you submitted to Social Security?

A.   Not one.

Q.   Did you have them at some point?

A.   As soon as I got it in the mail I threw it away.

Q.   Okay, I think you were talking about the documents that you received from Social Security.  You said you put them in a folder and then you threw them away once you got the benefits, right?

A.   Right.

Q.   What about the documents that you submitted, that you gave to Social Security; did you keep those for some period of time?

A.   If I gave it to Social Security I don't have it, right?  I don't understand the question.  If I gave it to them that means they got it.  They should have kept it, not me.

Q.   So when you were submitting things you didn't keep a copy for yourself?

A.   No.  I'm not a good record keeper or whatever you call them.  I don't know what you call them.  I don't know, a library and how you store stuff and everything, I'm not too good with that kinda stuff.

Q.   When you filed the claim for Social Security benefits in June, 2020, did anyone help you with that claim?

A.   No.

Q.   We can take this exhibit down.  I now would like to show you what will be marked as Exhibit 21 to your deposition.  It's entitled, Work History Report, and it's another document that we have received from the Social Security Administration.

          MS. JONES:   If you can pull that up, Marty.

Q.   Mr. Lee, can you see the document on your screen?

A.   Yes, ma'am.

Q.   And do you recognize this work history report?

A.   Yes.

Q.   Do you recall that you submitted this work history report in connection with your claim?

A.   Can you make it bigger for --

Q.   Yes.

A.   Um-hum.   Yeah.   Yeah.

Q.   So this is something you gave to Social Security?

A.   Yes, ma'am.   It's perfect.

Q.   Okay.   And when you were submitting information about your work history, did you provide truthful information?

THE WITNESS:   What she's telling me?   If this is true?

MR. ROSENBAUM:   What you submitted regarding your work history, was it truthful?

THE WITNESS:   According to what I looking at, but, you know -- yeah, everything is true, but the bottom -- the -- they both contractors, yeah, you right, that's the right dates, everything.

MS. JONES:   Okay.   Can we turn to the next page, Marty?

BY MS. JONES:

Q.   Mr. Lee, do you recognize that's your

bottom part.

Q.   Okay, so looking at the last page at the bottom of the page of the document, Mr. Lee, can you see that?

A.   Yes.

Q.   Is that your handwriting?

A.   Yes.

Q.   There's an email address that's listed on the document; do you recognize that?

A.   Yes.

Q.   Is that an email account that you had in 2020?

A.   Yes.

Q.   And do you still have that account?

A.   I think I do, I'm not sure.

Q.   Did you use that email account for correspondence regarding your Social Security benefits claims?

A.   Yes, I'm pretty sure I did.

Q.   And have you looked to see what emails you have in that account regarding your Social Security benefits claims?

A.   I haven't used that since I left work in November 18th, 2019.  Maybe once or twice at home, but I don't even mess on the computer ever since I lost my job.

Q.   Have you looked in that email account to see if you have correspondence regarding your Social Security benefits claims?

A.   I doubt it.

Q.   We can take this document down.

I'm going to show you what will be marked as Exhibit 22 to your deposition, it's the Notice of Disapproved Claim from Social Security Administration. If you can pull that up.

MR. ROSENBAUM:  We've been going about an hour.  Do you want a break periodically?  How do you want to handle that?

MS. JONES:  Do you need a break right now?

MR. ROSENBAUM:  I just want to grab some water and use the bathroom real quick.

MS. JONES:  We can go off the record for five minutes.

VIDEO SPECIALIST:  Going off the record at 10:05 a.m.

(Recess taken.)

VIDEO SPECIALIST:  We're back on the record at 10:11 a.m.

BY MS. JONES:

Q.   Sir, we just had a short break.  Was there any prior testimony that we needed to revisit or you

wanted to amend?

A.    No, ma'am.

Q.    So on the screen we have what's been marked Exhibit 22 to your deposition.    It's a document that we received from Social Security Administration called Notice of Approved Claim [sic].

Do you recognize this document?

A.    Not really, but I guess.

Q.    Do you recall that at one point the Social Security Administration notified you that it was disapproving your Social Security claim?

A.    Yes.    Yes.    Yes.

Q.    And how did you find that they had disapproved that claim initially?

A.    I think I got a letter said it was disapproved.

Q.    Okay.    And you just don't recall if this is the letter or not?

A.    Yes, I don't know if this is the exact letter or what it said, but the main word was it was disapproved.

Q.    Okay.    And so what did you do after you received that notification?

A.    They had a -- I don't know if they had a letter or a phone number to -- to appeal the finding.

Q.    Is that a request for reconsideration?

A.    If that's the word they used.  I just -- I put it in -- I put it -- I put it back in because I didn't understand how they disapproved it.  And then when I put it back in, they gave it to me.  I don't know what was the big -- you know, I don't know what happened.

Q.    So you disagreed with the Social Security Administration disapproving your claim; is that correct?

A.    Yes.  Yes.

Q.    Let's take that document down and I now to pull up what we'll mark as Exhibit 23 to your deposition which is entitled, Request For Reconsideration.

Can you see that document, Mr. Lee?

A.    Yes.

Q.    And do you recall receiving this document from Social Security?

A.    I guess.  I'm not sure.  I cannot remember.

Q.    Okay.  Right under Request For Reconsideration it says, On December 2nd, 2020, we talked with you and completed your request for reconsideration for Social Security benefits; do you see that?

A.    Yes, I see that, yes.  December 2nd, yes.

Q.    And so does this refresh your recollection that you submitted a request for reconsideration of the decision?

A.   Yes, I know -- I don't know if this was the paper I filled out, but I know I filled out the paper for reconsider -- reconsideration for my Social Security, and then I filled -- I filled out whatever the paperwork that they made me fill out, and then I handed it back in, and then I ended up getting disability Social Security, yes.

Q.   And you see it lists here your name and your Social Security number and then right after that it says, I request a reconsideration.  I disagree with the determination made on my claim for disability-worker or job benefits because 100 percent disability of PTSD.

Do you see that?

A.   Yes, ma'am.

Q.   And was that the reason that you disagreed with their disapproval of your claim?

A.   Yes, ma'am.

Q.   So it was your position that your PTSD rendered you disabled from working?

A.   Yes, ma'am.

Q.   And below that it says, I am submitting additional evidence with this request; do you see that?

A.   Yes.

52

Q. And do you know what additional evidence you submitted with your request?

A. I have no clue. I don't know. Did I? I'm not sure. Maybe, if I --

Q. I don't know either, Mr. Lee. That's what it says and I wasn't clear what additional information was -- or evidence was submitted so I just wanted to see if you recalled.

A. No. Not at this time.

Q. Did you have anyone helping you with your request for reconsideration?

A. Again, no. The whole time I did everything, and just like now, I stay home by myself because my wife works. And I do everything by myself because I have nobody to help me. That's why I don't understand half the stuff I'm doing, and probably that's why the thing was -- was denied the first time, because I probably filled it out wrong because I don't know how to fill out this kinda paperwork stuff. And when I do fill it out, I get all confused and I get headaches and stuff, and then it just -- it's just hard for me to do this kind of stuff.

Q. We can take this document down. I want to show you what will be marked as Exhibit 24. It's a Notice of Reconsideration, dated April 12, 2021.

Do you see that on your screen, Mr. Lee?

A. Yes, ma'am.

Q. And do you recall receiving this letter from the Social Security Administration?

A. No, I don't, but it looked like it has my name on it so I must have had it.

Q. It talks about a right to appeal, about the middle of the page.

A. Okay.

Q. Do you know if you filed an appeal?

A. I did file an appeal, that's how I got my Social Security.

Q. And you just don't recall specifically whether this was the document that you got?

A. I have no clue.

Q. All right, we can take that one.

Let's now show you a document entitled, Disability Report-Appeal that was produced by Social Security Administration, which we'll mark as Exhibit 25 to your deposition.

Do you see that on your screen?

A. Yes.

Q. Do you recognize this document?

A. No.

Q. Do you recognize the handwriting in the

document?

A.    Yes.

Q.    Is that your handwriting?

A.    Yes.

Q.    Now this document didn't have a date on it that I could see, but do you recall when you submitted your appeal?

A.    Not -- no, I don't.  I cannot remember that far back.

Q.    Okay.  Did -- do you know if anybody helped you with this appeal?

A.    Nobody helped me with any paperwork, ma'am, from the first time to the appeal to now.  My answer gonna be the same for every -- every thing we talk about.  I did it by myself.  Nobody was with me.

I have problems reading, comprehending, and I don't remember, and I don't have any documents whatsoever.  I threw everything away the first time I got my first check, and I don't know what else to say, ma'am.

MS. JONES:  You can take this down.  You can stop sharing, Marty.  Thank you.

Q.    Mr. Lee, you did at some point appoint Andrew Youngman of Citizens Disability as your representative to deal with the Social Security Administration,

right?

A.   I don't recall.

Q.   Do you recall Citizens Disability?

A.   To tell you the truth, what happened was, I was sitting at home and I seen a commercial, and they said that they can help me get my Social Security if I paid them $7,000.  And being not too bright, being alone, being under the stress that I was at, I said, I'll do whatever I have to do to get the Social Security.

So I called this company, I don't know if that's -- he's the guy or what, I don't even know if that's the right thing I'm talking about, they trying to fill out the paperwork for me to get my Social Security, and I couldn't understand -- he couldn't understand me and I couldn't understand him.

So we was filling out this paperwork, and then when we got done they was supposed to contact me. Prior to that -- he took couple weeks or whatever he said it was gonna take, blah, blah, blah, how much time, well, I don't know, prior to that the Social Security contacted me and told me I had to see two doctors, and I went to see the two doctors from the Social Security, and then I ended up getting my Social Security.  So I never need that guy Michael, whatever, that Citizens or whatever.  I never go with them.

I don't know if that's what we're talking about. I'm confused, I don't know.

Q. Let's mark as Exhibit 26 to your deposition a document that Social Security -- this is one of the documents that we got when you made the request to Social Security for records a few months back. It's a fax from Citizens Disability. If you can pull that up.

Okay, so the first page of the document is this a fax, it says Citizens Disability on it, and it says, Enclosed please find a signed request from Preston Lee to establish a protective filing date for their Social Security Disability and/or Supplemental Security Income Benefit.

Do you see that?

A. Yes.

Q. Let's go to the second page. All right. And then this says, Dear Social Security Representative, and seems to indicate that you are retaining Andrew Youngman of Citizens Disability, LLC, to represent you for this claim.

Do you see that?

A. Yes.

Q. And then there's a signature down at the bottom. Is that your signature?

A.    Yes.

Q.    So taking a look at this, does it refresh your recollection at all about appointing Andrew Youngman to represent you with respect to your Social Security Disability?

A.    No.    No clue.

Q.    Do you remember signing this?

A.    No.

Q.    Do you remember talking to Andrew Youngman?

A.    No.

Q.    Did you provide information to Andrew Youngman or Citizens Disability?

THE WITNESS:    Okay, you know what, I got a question.    Do I ask you or do I ask her?

MR.    ROSENBAUM:    Can we take a two-second break?    He has some question he wants to ask me.

MS.    JONES:    Okay.

VIDEO SPECIALIST:    Going off the record at 10:24 a.m.

(Discussion had off the record.)

VIDEO SPECIALIST:    Back on the record at 10:25 a.m.

BY MS.    JONES:

Q.    Mr. Lee, you just had a break at the request of your attorney.    Was there some testimony that you

wanted to revisit or correct?

A.   Yes, I'm confused, that's why.

Q.   Okay, go ahead.

         MR. ROSENBAUM:  What she's asking you is do you want to change anything you previously said?

         THE WITNESS:  No, no, no, no, everything is good.  Just that I'm confused that I don't understand some stuff.

BY MS. JONES:

Q.   Okay.  So is there any reason to think that you did not sign this document appointing Andrew --

A.   No.

Q.   -- Andrew Youngman of Citizens Disability as your representative?

A.   No, I signed it.

Q.   Okay.  All right, let's take this down, and then I want to mark as Exhibit 27 to your deposition a document entitled, Claimant's Appointment of Representative.

         Mr. Lee, can you see that on your screen?

A.   Yes, I can.

Q.   This is another of the documents that were given to us by your counsel when you made the request to Social Security for records.

Do you recognize this document?

A.   No.

Q.   Let's scroll to the last page of the document.

Can you see at the bottom of the page it says claimant's signature?

A.   Yes.   That's my signature.

Q.   Is there any reason to think you did not sign this document and authorize it to be submitted to Social Security?

A.   No.

Q.   Do you know how you received these documents in order to sign them?

A.   I guess they mailed it to me.   I'm not sure.   I never see this guy before.

Q.   We can take this down.   Next I'm gonna mark as Exhibit 28 to your deposition a document entitled, Internet Application Summary.   This is one of the documents that was produced by Social Security Administration in response to the subpoena.

Do you see that on your screen, Mr. Lee?

A.   Yes.

Q.   So up at the top, the second line says, We received your benefits application on October 6th, 2021.

Do you see that?

60

A.   Um-hum.

Q.   Is that a yes?

A.   No, it cannot be.

Q.   Do you see where it says that on the document?

A.   Oh, yeah, yeah, yeah, okay.

Q.   Okay.

A.   Yeah, yeah.

Q.   So do you recall that you filed a second, a new application for benefits after the initial one that you filed in June, 2020?

A.   Yeah, I'm not sure, but I must have.  I can't recall.

Q.   You don't remember filing a second claim?

A.   I remember filing a second claim, yes, I do. Yes.

Q.   Okay.  And was somebody helping you with the second claim?

A.   Nobody helped me.  I'm sorry.  That's why I probably have to do a second claim because I did the first one wrong because I don't know how to do that stuff.

Q.   So if you go down towards the bottom, in the application summary of this page; see where it says application summary?

A.   Yes, ma'am.

Q.   And then it has your name, part of your Social Security, date of birth.  Do you see that?

A.   Yes, ma'am.

Q.   And then it says, Disabled, yes.  Do you see that?

A.   Yes.

Q.   And then below that it says, Start date of disability June 23, 2020; do you see that?

A.   Yes.

Q.   So you recall when we looked at your June 20, 2020, application, there was that November 18, 2019, date that you said the disability started.  This one has a different date.

A.   My disability -- my disability didn't start in November 18.  My last day of work was November 18.

Q.   Did you ever tell the Social Security Administration that the date of disability November 18, 2019, was incorrect?

MR. ROSENBAUM:  Objection --

THE WITNESS:  I don't understand.

MR. ROSENBAUM:  -- calls for a legal opinion, legal conclusion, or a medical opinion or medical conclusion.

MS. JONES:  Go ahead, Mr. Lee.

MR. ROSENBAUM:  Did you tell them that was

-- may not have been the correct date?

THE WITNESS:  Let me ask a question.  They asking me what the last time I worked was November 18th.  That's the last day I worked.

MR. ROSENBAUM:  That's what you understood them to mean?

THE WITNESS:  Yeah.  I never --

MR. ROSENBAUM:  Did you ever inform them of any other date?  Did you change -- go back to them and tell them, oh, that's a wrong date?

THE WITNESS:  No, it's not, it's the right date.

MR. ROSENBAUM:  There you go.

BY MS. JONES:

Q.  Do you know why this application has a different date on it than the earlier application that you submitted?

A.  No.

Q.  Did anyone tell you to put a different date on this?

A.  No.  How can anybody tell me if I'm doing it by myself?  I don't understand.  You're confusing me.

MR. ROSENBAUM:  This guy, Youngman, you -- you indicated he's your representative.  So did he assist you in doing this; do you recall it?

63

THE WITNESS:  I recall him assisting me, but.

BY MS. JONES:

Q.  What did Mr. Youngman assist you with?

A.  Helping me fill out this paper -- this paperwork.

Q.  And did Mr. Youngman tell you what date to list as the date of disability?

A.  No.

Q.  Did you talk to him about what date to list?

A.  I have no clue.

Q.  You don't recall having a discussion with Mr. Youngman about what date to list; is that correct?

A.  He must have asked me when was the last -- the last day I was paid for work, and that was June 22nd. That's why I started my disability on June 23rd. That's what I understand this paper to be, because I got -- I got -- I got terminated on June 22nd.  And I wanted to fill out my Social Security on June 23rd; right here is the right date.  Because I was terminated on the 22nd of June.

So I recall him asking me, Mr. Lee, when were you terminated?  I said the 22nd of June, because he told me that -- he asked me when was the last day, so that's when I did this, on the June 23rd.

Q.   Did you discuss any other aspect of your application with Mr. Youngman?

A.   I don't recall, I'm not sure.

Q.   Did you talk to him about what disabling conditions you had?

A.   It was so long ago, I'm not sure.

MS. JONES:   Okay, we can take this down. Can you stop sharing, Marty?

Q.   Did Mr. Youngman or Citizens Disability advise you about what medical conditions to list in your application?

A.   Did they tell me what to put; is that what you saying?

Q.   What medical conditions to list in your application?

A.   No, he didn't.

Q.   There was a longer list of medical conditions in the application that was submitted in 2021, than what was submitted in 2020.  So that's why I was asking if that was something that you had talked to them about.

A.   I don't know what I talked to Joe yesterday.  I can't remember that far back.  I'm sorry.

Q.   Can we go back and pull up Exhibit 28 again, the Internet Application Summary?

Just to re-orient, you recall this is October 6, 2021, that they received your -- this benefits application?

A.   Yes.

Q.   And then if we go to the next page, it has additional information, and then at the bottom it says employer details, we can blow that up for you.

You see that, employer details?

A.   Employer.  Yes.

Q.   And then it asks, works for an employer in 2020, and you said yes, and it says worked or will work for an employer in 2021, and it says no.

Do you see that?

A.   Yes.

Q.   Did you talk to Citizens Disability about whether you would be working in 2021?

A.   I have no clue.

Q.   The next line says, Will work for an employer in 2022, and you said no.

Do you see that?

A.   Yes.

Q.   Is it correct in 2021, you had no intention or plan of working in 2022?

A.   I cannot answer that question.

Q.   Why not?

A.   I don't remember.

Q.   This says, Will work for an employer in 2022, and it says no.   So do you recall --

A.   No.

Q.   -- telling Citizens Disability or Social Security that you were not planning to work for an employer in 2022?

A.   I have no clue.   I don't remember answering any of that.

Q.   Okay, let's mark now as Exhibit 29 the Disability Report Adult.   This is Exhibit D to the requests for admissions that we sent to you.

Do you see that on your screen?

A.   Yes.

Q.   So in response to the requests for admissions you said this was a report from Mr. Youngman that he submitted to the Social Security Administration on your behalf.

Do you recall reviewing this document before it was submitted?

A.   No.

Q.   You don't recall?

A.   No, it's too long ago, I don't remember.   Every paper you showing -- every paper you showing me the answer is gonna be no, I'm sorry.

Q.   Okay, so is it possible that you saw this and you just don't recall it at this time?

A.   I don't recall.

Q.   Do you recall Mr. Youngman sending you things to review before you submitted it?

A.   I don't recall that, I don't even remember Mr. Young.

Q.   Mr. Youngman.

A.   Well, whatever his name.  I'm sorry.  Andrew. I'm sorry, I don't remember Mr. Andrew Young -- yeah, Mr. Andrew Youngman.

Q.   Do you remember anybody at Citizens Disability that you spoke to?

A.   No.

Q.   So if we look at the second page of this document, and section 3 kind of in the middle there says medical conditions.  We'll blow that up for you.

Do you see that section 3?

A.   Yes.

Q.   And you see there's five medical conditions listed there?

A.   Yes.

Q.   And then I also for completeness just want to show you on page 11 of the document, under remarks, and then you see it says, 3A, medical conditions, and

then it lists three more things?  Do you see that?

A.  3A.  Oh, yes.

Q.  Okay.  So that's what I was saying about how there were more medical conditions listed --

A.  Yes.

Q.  -- in this application.

And are those all conditions, the ones we looked at in 3A and then --

A.  Yes.

Q.  -- the continuation in section 11, are those all conditions you had as of 2021?

A.  I still have all of that and that's the reason why I cannot remember all of this stuff.

Q.  Okay.  And you had all of these conditions prior to the termination of your employment, correct?

A.  I didn't even know I had PTSD, and I had PTSD from 1992.

Q.  So my question is, all the conditions that are listed in this document that's Exhibit 29, in section 3A and the continuation in section 11, you had all those conditions prior to the termination of your employment with L3Harris, correct?

A.  Yes, ma'am.

Q.  And did you talk to Mr. Youngman about which of these conditions to list?

A.    I don't know if I talked to him or what, but that's my conditions.  I have all of these things is wrong with me.  Yes, it's true.  I get all these problems.  And I still got it now, today.

Q.    So these -- this information about your medical conditions is all correct; is that right?

A.    Yes.

Q.    And you didn't ever go back to the Social Security Administration and tell them that any of this was wrong?

A.    I don't know, no.  I don't know if I did or not.

Q.    Do you recall ever correcting any of this?

A.    No.

MS. JONES:  Okay, we can take this one down, and we can stop sharing.

Q.    So the Social Security Administration did ultimately decide that you were entitled to Social Security Disability benefits, correct?

A.    Yes, I guess, because I have the benefits.

Q.    And how did you find out that you were getting benefits?

A.    They told me.

Q.    I'm just wondering if -- did they call you or was it because you got something in the mail?  How did

you get the notification?

A.   To tell you the truth, I serious, I don't remember, it's too far back.  I cannot -- unless you like me lie to you I don't know to say.

MR. ROSENBAUM:  You're not lying to anyone, so don't even say that.  Answer the question.

THE WITNESS:  I don't know what -- I don't know how I got it.  I don't know if they called me.  I don't know if they wrote me a letter.  The only thing that pops up in my mind was I got money, and that's all I care about is when they paid me.  I don't remember a date, I don't know the time, and I'm sorry, I cannot remember.  You seen my disabilities on the form so I don't know what to say, I'm sorry.

BY MS. JONES:

Q.   Let's mark as Exhibit 30 a document from Social Security entitled, Notice of Award.  It's dated March 21, 2023.

Mr. Lee, do you see that document on your screen?

A.   Yes.

Q.   And do you recognize this as something you received from Social Security?

A.    No.

Q.    Is it possible that you received this and you just don't recall it?

A.    Definitely.

Q.    After the Social Security Administration informed you that you would be getting some benefits, did you file any further appeals or requests for reconsideration that you can recall?

A.    I don't recall.

Q.    Do you have any pending requests for reconsideration or appeals with Social Security?

A.    No, ma'am.

Q.    After receiving the benefits from Social Security, did you contact them to provide any updates about your condition or work status?

A.    No, I did not contact anybody.

Q.    Let's mark as Exhibit 31 to your deposition, a document entitled, Function Report Adult.  This was Exhibit E to the requests for admissions.

Can you see that on your screen, Mr. Lee?

A.    Yes, ma'am.

Q.    Do you recognize this document?

A.    No.

Q.    Do you recognize the handwriting on the document?

A.  Yes.

Q.  Is that your handwriting?

A.  Yes.

Q.  Do you recall having to provide information to Social Security about your condition and what you were able to do and not do?

A.  No.

Q.  Do you know if anyone helped you in completing this form?

A.  No.

Q.  Can I have you just look through this document and let me know whether there's any information on this paper that is inaccurate or wrong?

A.  If you read it, now you understand why I cannot remember stuff and the problems that I have.  I read this, everything is true.  And if you'd read them you wouldn't ask me the same question because it says right here what's wrong with me.

Q.  I just -- this is an eight-page document, Mr. Lee, and I just want to know if there's anything that you see on this form that is not correct, any information that's not correct?

MR. ROSENBAUM:  So why don't we go page by page because I don't know if Marty Malloy is able to scroll at the pace that he's gonna read it.

He can only see the first page obviously.

MS. JONES:  Yeah, sure, so when you're done with this page, you just let us know and then he can scroll down to the next page for you.

THE WITNESS:  Done.

MR. ROSENBAUM:  Take your time, don't rush.

THE WITNESS:  Next page, please.  Next page.  Next page.  Next.  Next.  Could you go back, please?  Okay, next.  Okay, next.  Okay, I'm done.

BY MS. JONES:

Q.  Okay, having had a chance to look through all the pages on Exhibit 31, do you recognize that that was your handwriting throughout the document?

A.  Yes.

Q.  And was there anything in Exhibit 31 that you saw that was not correct?

A.  No.

Q.  Do you recall having had a chance to review it that you filled out this function report?

A.  I just reviewed it, it's right.  It's good.

MR. ROSENBAUM:  She's asking you now that you reviewed it do you recall originally filling it out?

THE WITNESS:  No.

BY MS. JONES:

Q.  And do you have any reason to think you did not fill out this document?

A.  No, I guess not.

Q.  And did you understand -- well, strike that.

Can we look at the last page of this document?

So in this section E, it seems to say because of my issues I'm on my third marriage; is that correct?

A.  Yes.

Q.  And that's your handwriting?

A.  Yes.

Q.  What did you mean when you said because of my issues I'm on my third marriage?

A.  I'm on thigh third marriage.

Q.  And are you saying that's because of your various medical conditions, that that impacted your previous marriages?

A.  Yes.

Q.  And when did you get divorced the second time?

A.  I cannot tell you the first time, I cannot tell you the second time.

Q.  You also said I lost my kids I think; is that right?

A.   Yes.

Q.   And what did you mean by that?

A.   My wife took my kids, and they left.

Q.   Because of your medical conditions?

A.   Yes.

Q.   And when did that happen?

A.   A long time ago.

Q.   And then it says I lost everything.  What did you mean by that?

A.   I lost everything.  Exactly what it says.

Q.   Because of these medical conditions that you have?

A.   Yes.

Q.   And what are the conditions that you think caused you to be on your second marriage?

A.   We can go back from the paper we just saw, and it -- and it states what's my problems.  You want to go back to it?  The one that we went through that you just looked at?  It states the five things that I have wrong with me.

Q.   Do you need to look at that?

A.   You asking me the question and I'm saying you just saw it written down on the paper.  If you want to go back and look at it you can.  Let's go back.

Q.   Well, I'm just -- I'm asking, it says because

of my issues, right, I am on my third marriage, I lost my kids, I lost everything.

So I just want to understand when you say my issues, what are you talking about?

A.   If you scroll back, it's gonna show that it says I have PTSD, I have sleep apnea, I have different -- scroll back and then it'll explain itself.

Q.   Do you want to see the exhibit we looked at before?

A.   I want you to look at it.

MR. ROSENBAUM:   It's the same exhibit we have in front of him.  He's saying up at the top it lists all his issues, his medical issues, and he's saying those are the issues he's referencing in the end.

Q.   Is this what you wanted to look at, Mr. Lee? The first page of this exhibit?

A.   This page and the exhibit before this, it explains all the problems I have, and all these problems is the reasons why I got divorced.  And this is the same reasons why I lost my kids.

MS. JONES:   Okay.  Marty, if we could just go back to Exhibit 29, which is the Disability Report-Adult, and then scroll to the next page.

Q.   Is this what you were talking about, Mr. Lee?

A.   Yes, you see all this, this -- these -- the medical conditions?  And they get two more on the next page that we talked about earlier?

Q.   Yes.

A.   Okay, that's the reasons why I am the way I am. That's why I cannot remember, that's why I have short-term memory.  That's why I get hard time filling out these forms.  That's why I lost my family, that's why I'm on my third marriage.  If you just look at this, it will explain the reasons why I am the way I am.

Q.   You can take this one down.  All right, I'm gonna mark as Exhibit 32 another Function Report, which was Exhibit F to the requests for admissions sent to you.

And I'm just gonna have you do the same thing, Mr. Lee, just look through this document and let Mr. Malloy know when you're ready to see the next page, and when you're done I'm just going to ask you if you recognize the handwriting and if there's anything that's inaccurate in the report.

A.   Okay, next please.  Next.  Next.

Q.   Having looked at Exhibit 32, Mr. Lee, do you recognize the handwriting as being yours?

A.   Yes.

A.  Yes.

Q.  Okay, so up at the top, in that section 23A there's sort of a paragraph written there.

A.  Yes.

Q.  And the third line says -- I think it says, His right hand he lost a lot of usage, can't carry heavy things, are very limited.

Do you see that?

A.  Yes.

Q.  Do you agree that your problems with your right hand prevented you from carrying heavy things?

A.  Yes.

Q.  And you're right-handed?

A.  Yes.

Q.  Sorry, was that a yes?

A.  Yes.  Can we take a break?  I need to ask Joe something real quick, please.  Take me five seconds.

Q.  Sure, we can take a break.

STENOGRAPHER:  Do you mind if we take our five-minute break now?

VIDEO SPECIALIST:  Going off the record at 11:11 a.m.

(Recess taken.)

VIDEO SPECIALIST:  Back on the record at 11:16 a.m.

BY MS. JONES:

Q.  Mr. Lee, we just had a break and you also had requested a minute to speak with your attorney.  Was there any of your testimony that you needed to amend or re-visit?

A.  No.

Q.  So before we took that break we were looking at Exhibit 34, section D, which is page 8 of 10.  And I just wanted to -- the last line in that section 23A, question 23A, I believe it says he gets very upset and irritated with others.

Do you see that?

A.  Yes.

Q.  And do you agree that you get very upset and irritated with others?

A.  Just like now, definitely.

Q.  Okay, we can take this one down, and I want to mark as Exhibit 35 to your deposition an Appointment Notice Dated October 28, 2022.

Mr. Lee, do you see that on your screen?

A.  Yes, ma'am.

Q.  Okay, so the first page is just the address page.  So if we can scroll down to the next page.  You talked earlier in your deposition you recalled having flown to Honolulu, taken a cab and had some medical

appointments.

Do you recall that?

A.   Yes.

Q.   I think that this appointment notice may reflect the appointments that you were talking about, so when you're ready we can scroll to the next page and I think it lists the doctors that you were gonna see.  I want to see if that jogs your memory about the doctors.

A.   Am I supposed to -- what am I supposed to do?

Q.   Can you just look at this document?  I want to see if this refreshes your memory as to how you learned of the appointments, medical appointments you had?

A.   No, no.  No, I don't, I'm sorry.

Q.   Let's look at the next page of this.  And then if you can zoom in on the top.

Do you see it has Hawaii Diagnostic Radiology Services, and then Dawn Harada and Antoine Cazin?  Do you see that?

A.   Yes.

Q.   Does that refresh your memory about the doctors that you had to see?

A.   No.

Q.   Do you recall getting a document like this that

told you the date that you needed to go to these medical appointments and where you needed to go?

A.    I remember having to go.  I don't remember the dates or the times or whatever, but, yes, I remember going, yes.

Q.    Do you remember that Social Security sent you instructions about where you were supposed to go and all that?

A.    Like I said, I know I had to go, but I don't remember the dates and times or where I had -- I don't know.

Q.    All right.

MS. JONES:  We can take this down, you can stop sharing for a minute.

Q.    So one of those individuals that was listed on the Social Security record that you were supposed to see is Dawn Harada, a psychologist.  Do you recall having a psychological evaluation when you had to come to Oahu for your Social Security benefits claim?

A.    I came to Oahu for a psychological examination multiple times, so if I seen her, it's a great possibility, but I had to see, like, five different psychiatrists all over Oahu.  So if I seen her, then, yes.  Do I remember going to see her?  No.  But I've seen five different doctors.  I had to go to -- I

forget where the place is, where the offices was, but I seen five different psychiatrists to get where I'm at today, to find out my diagnosis or whatever, my symptoms or whatever -- I don't know what the word I looking for.

But for me to get what I get today I had to go to five -- well, she would have been the sixth. I went to five psychiatrists for the VA, is what I'm getting at. So if she was one of them then maybe, yeah.

Q. So there is a report that she did for Social Security -- this is Dawn Harada --

A. Okay.

Q. -- and I just want to read some of the portions of the report and see if that is something that is accurate or that you recall telling the psychologist.

So Dr. Harada's report says that you reported a history of receiving psychiatric services in the mid-1990s, but did not want to take medication and were released from the psychiatrist's care.

Is that accurate?

A. I think so.

Q. Her report says -- go ahead.

A. I think so, but I'm not sure. I don't remember the doctor's name, no. You know what, you can make

think that things could happen to you that could cause your death, like, getting hit by a bus and that these reports -- that you reported that these thoughts began in the military.

Is that accurate?

A.   I don't remember telling Dr. -- what her name? Dr. Harada -- I don't remember telling Dr. Harada, but that is one of my problems that I do have.

Q.   And that started during your military service?

A.   Yes.

Q.   So towards the end of Dr. Harada's report she wrote that, Based upon psychiatric concerns alone that you do not have the capacity to adapt and cope with the usual demands of a low-stress/entry-level position of employment.

Do you have any disagreement with that statement?

A.   Well, I don't understand what you just said, but if you asking me if I can work, if I can work, definitely I can work.

MR. ROSENBAUM:  Are you understanding the question?

THE WITNESS:  No.

MR. ROSENBAUM:  Can you repeat the question because I don't think he's understanding

it?

BY MS. JONES:

Q.  Mr. Lee, did you just say that you definitely can work?

A.  Yes, there's nothing wrong with me.

MR. ROSENBAUM:  I don't think you're understanding the question.  You just said the whole time you cannot work anymore because of your PTSD.  You can't currently work, right?

THE WITNESS:  I can go work right over here, but not for a company, but.

MR. ROSENBAUM:  You can do household things --

THE WITNESS:  Yes, I can do things without no supervision, yes.

BY MS. JONES:

Q.  Are you able to hold an employment position?

A.  No.

Q.  And that's because of your PTSD you think?

MR. ROSENBAUM:  Objection, calls for medical opinion or medical conclusion.

Q.  Go ahead.

A.  I'm not sure.

Q.  So you believe that you don't have the ability to hold down a job?

A. No.

Q. No, you cannot?

A. No, I cannot.

Q. Do you recall you also had to see a medical doctor for a physician examination in connection with your Social Security claim here in Honolulu?

A. I guess, yeah.

Q. There's a report by a Dr. Antoine Cazin that was also from December of 2022. Did you review any of the medical reports that were done in connection with your Social Security claim?

A. Not one.

Q. Okay. Well, in Dr. Cazin's report, and that's C-a-z-i-n, he said that he saw you for this evaluation in December of 2022, and that your main complaints were: one, chronic lower back pain; two, history of right wrist injury; three, right knee condition; four, decreased hearing and tinnitus; and five, psychological conditions.

So with respect to the chronic low back pain, his report says that you reported having fallen from the roof of a helicopter on which you were working in 2000.

Is that accurate?

A. Yes.

Q.   So you had a work-related injury in the year 2000, falling from a helicopter?

A.   Yes.

Q.   And that caused back problems?

A.   Yes, till now.

Q.   Okay, so from 2000, up until today, you've had chronic low back pain?

A.   Yes.

Q.   And are you taking pain medication for that presently?

A.   Hydrocodone.

Q.   How long have you been taking pain medication for your back?

A.   From when I fell.

Q.   You've been taking Hydrocodone the whole time?

A.   No, I took other medicines before, but I take that now.  But I don't take it every day.  But if you ask me if I take medicine, that's medicine I take.

Q.   Okay.  With respect to the right wrist injury, Dr. Cazin's report says that you broke your right wrist when you were working on a helicopter in 1991; is that correct?

A.   That's totally wrong.  I broke my right hand, not my wrist.

Q.   Okay, but that was in 1991?

A.   Yes.

Q.   And that was a work-related injury?

A.   Yes.

Q.   Did you have to have surgery for that?

A.   I just had surgery a couple years ago.

Q.   You didn't have surgery right when it happened?

A.   No.

Q.   And he wrote that the consequence of this injury is decreased range of motion of the wrist and fingers of the right hand, as well as incapacity for the thumb to make opposition with most of the four other fingers.

Is that accurate?

A.   Accurate.

Q.   And how long has that been going on?

A.   From when I -- from when I broke my hand.

Q.   He says there is also a weak hand grip; is that correct?

A.   Yes, my left hand is stronger than -- that's what I'm trying to explain to you.  My left -- I can still do my job, but my left hand is stronger than my right hand.  Just like I feel like I'm left-handed now.

Q.   And you also had some right knee problems that you mentioned to him also.

A.   Yes.

Q.   Do you recall talking about that?

A.   Yeah.  Yeah, my knee, I fell down when I was working.  I fell down when I was painting, off a roof, and I hurt my right knee.

Q.   When was that?

A.   I can't -- I don't -- I can't give you a date. I'd be lying.  I don't know.

Q.   And that still bothers you today?

A.   Yes.

Q.   There was an earlier psychological evaluation by a Dr. Richard Sonnenberg on Kauai.  Do you recall meeting with a Dr. Sonnenberg?

A.   No.

Q.   He's a psychologist.  Do you recall seeing a psychologist on Kauai in connection with your Social Security claim?

A.   No.

Q.   His report indicates that you saw him via teleconferencing.  Dos that refresh your memory at all?

A.   No, I don't remember him.  I don't remember the conference.  I don't remember nothing.

Q.   So Dr. Sonnenberg did a report that was produced by the Social Security Administration in

99

response to the subpoena.  I just want to read you parts of it and have you tell me whether or not the statements that are in there are accurate.

He wrote in his report that was dated November 4, 2020, Mr. Lee had an extremely traumatic upbringing, his parents essentially abandoned the family when Mr. Lee was in the ninth grade.  There was also a younger brother in the six grade at home at that time as well, end quote.

Is that accurate?

A.  Yes.

Q.  He went on to talk about your PTSD diagnosis relative to your military service and he wrote that you are refusing most therapeutic interventions and relying on alcohol as a medicating agent at this point in time.

Is that correct?

A.  Yes.

Q.  Dr. Sonnenberg did an addendum to his report after the initial one, and he wrote that he had completed his first report, Mr. Lee told me his request for disability benefits had been denied and we discussed my report generally to ascertain as to whether anything I said or had neglected to say may have contributed to that denial.

Having heard that, does that refresh your recollection at all about Dr. Sonnenberg?

A.    I don't know who he is, I don't know what he looks like, I don't know when I saw him.  I don't even know what you talking about, so.  I draw a blank at the whole thing.  I don't know where we're going with this.

Q.    Do you recall after you got notified initially that your Social Security benefits claim was disapproved that you talked with one of the medical professionals that evaluated you?

A.    No.

Q.    I want to mark as Exhibit 36 to your deposition a Statement of Claimant Or Other Person form that was produced by the Social Security Administration.  I'll have Marty pull that up for you.

Can you see that on your screen, Mr. Lee?

A.    Yes, ma'am.  Can you make it bigger, please?  I cannot -- with my glasses I cannot.

Q.    Yeah, we'll make it bigger for you.

A.    Thank you.

Q.    Okay, when you're finished looking at that I'll just have him go to the next page.  Just let him know when you're ready.

A.    Okay.  Next.

MR. ROSENBAUM:  I'm sorry, what are you asking him to do regarding the document?  Just read it over?

MS. JONES:  Yes, just look at it.

THE WITNESS:  Okay.

BY MS. JONES:

Q.  Do you recognize this document, Mr. Lee?

A.  No.

Q.  You see a signature there on the second page of this document?

A.  That's my signature.

Q.  Okay.  Can we go back to the first page?  Looks like there's some initials at the end of that typed statement.

Do you see that?

A.  Yes.

Q.  Is that your initials?

A.  Yes.

Q.  Do you know who typed out the typed portion of this for you?

A.  No.  How I gonna know that?

Q.  Well, it looks like you initialed and signed this document.  I'm just wondering where -- where this came from and who the typing was done by.

A.  I have no clue.

Q.   Do you know why -- do you recall why you submitted this document to Social Security?

A.   No.

Q.   Okay, we can take this one down.  In addition -- you testified earlier that you're still getting the Social Security Disability benefits.

Are you also receiving still the VA disability benefits?

A.   Yes.

Q.   And between the two of those -- those two sources, is that about seven thousand a month that you're receiving?

A.   Approximately.  I guess.  I'm not sure.

Q.   Is the amount that you are receiving in disability benefits from Social Security and the VA about the same as what you were getting when you were working?

A.   I wasn't getting that when I was working.  I don't understand the question.

MR. ROSENBAUM:  Is the amount of money you're now receiving monthly the same as what you would have earned had you continued to work?

THE WITNESS:  Yes, close.

BY MS. JONES:

Q.   Did you file your tax returns in 2023?  For

2023?

A. Yes. Well, you know what, I take that back. I can take it back?

MR. ROSENBAUM: You can take it back.

THE WITNESS: Yeah, I don't do nothing. I don't understand. I just give the papers to my wife and she can go do. I don't know --

BY MS. JONES:

Q. Go ahead.

A. I don't know, I mean, I get the mail, I give it to her and she do whatever. And I think I had a tax return for 2023. I think I had a tax return for -- not for this 2024, yet, but, yeah, I don't do it. I don't know.

Q. But you think you submitted a tax return for 2023?

A. I think my wife might have submitted a tax return for me in 2023.

MR. ROSENBAUM: But you're not sure?

THE WITNESS: No.

BY MS. JONES:

Q. Do you know if you were taxed on any of the Social Security benefits that you received?

A. I shouldn't, because it's tax free.

Q. What about the VA benefits?

A. Tax free.

Q. Your understanding is you didn't pay taxes on any of the benefits from the VA --

A. No.

Q. -- or Social Security; is that correct?

A. That's correct, I'm disabled.

MS. JONES: Can we can back to Exhibit 33, please, which is the, I think internally it was document 18, Marty? Function Report Adult Third Party.

Q. Mr. Lee, we pulled back up on the page the document that will be marked Exhibit 33 to your deposition, this function report that appears was filled out by your wife. And I know you didn't recall having seen this before, but I just want to go through again and have you take a look at the document since you -- we looked only at a couple of the pages. So if you can just take a look at it and then I'm just gonna ask you once you've had a chance to read through it if there's anything in this report that you think is wrong.

So go ahead and read it, and when you're ready to look at the next page just let Mr. Malloy know.

A. Go ahead, next page. Okay, so what's the question?

105

Q.  So if you can -- I'm just gonna have you look through all the pages, you're not quite at the end yet.  And I'm just gonna ask you if there's anything in the document that you believe is incorrect or wrong.

A.  We went through this already.

Q.  No, Mr. Lee, we looked at the function reports that you did.  This is one of the two reports that your wife did.  So I want you to look at the statements that she made and tell me if you think any of it is inaccurate.

A.  Okay, next.  We went through this already, right?  Okay.  Next.  Next.  Next.  Next.  Next. Next.

Q.  That's the last page.  Okay, having looked through Exhibit 33, Mr. Lee, is there anything in this document that you believe is incorrect?

A.  No.  I don't think so.

Q.  I'm gonna pull up the next function report which is Exhibit 34.  This is one other function report that appears to have been completed by your wife.  You can take a look at the document, and when you're finished I'm gonna ask if there's anything in it that you saw was incorrect.

A.  Next.

Q.   Let him know when you're ready to move.

A.   Next.   Next.   Next.   Next.   Next.   Next.   Next.
Next.

Q.   That's the last page, Mr. Lee.

So in looking through all the pages of Exhibit 34, was there anything in the document that is not correct?

A.   I don't know.   No.   Good.

Q.   Everything in this Exhibit 34 is accurate, as far as you can tell?

A.   Yes.

Q.   Okay, we can take that document down.

Mr. Lee, we saw that Yahoo email account on one of the documents you submitted.

Do you have any other email accounts?

A.   No.

Q.   Do you know if anybody else emailed anything in connection with your Social Security claim for you?

A.   If anybody did something for me?   No.

Q.   Did you ever ask anybody to email something for you in connection with your Social Security claims?

A.   I don't think so.

Q.   Did you ask anybody to scan any documents for you?

A.   Maybe.   My sister-in-law.

Q.   Your sister-in-law helps with -- helped you with something?

A.   Yes, every time Joe needs something my sister-in-law does that scan, print, or whatever, sign, and I mail it back.

Q.   Okay, did you have your sister-in-law help you with Social Security submissions?

A.   I have no clue.  I don't know.

Q.   How would you give your sister-in-law the documents?

A.   I would drive to her house, walk up to the door, give it to her, she would walk to her computer, scan it for whatever they copy, whatever, and give it back.

Q.   And then what would happen with the scans that she made?

A.   I have no clue.  I don't know.

Q.   Would she send it to you via email?

A.   She not gonna send me nothing.  I don't like nothing.  I don't go on the computer.  I don't understand what you asking.  I don't know how to use the computer.

If Joe calls me tells me I gotta sign this and scan this and print this, I don't know how to do it. That's why I just take it to her, she scans it,

whatever, I sign it or whatever, then give it to -- she send it to Joe. She does all that. I don't even log on. I don't think I went on the computer since I got fired.

Q. Okay. So you don't recall your sister --

A. No.

Q. -- emailing you anything?

A. No.

Q. Okay, you know, I'd like to take maybe a ten-minute break and I think I should be pretty close to finished, but we can just use that time to check my notes.

MR. ROSENBAUM: All right, sounds good, we'll stand by.

VIDEO SPECIALIST: Going off the record at 12:06 p.m.

(Recess taken.)

VIDEO SPECIALIST: Back on the record at 12:17 p.m.

BY MS. JONES:

Q. Mr. Lee, we just took a break. Was there any of your previous testimony that you wanted to revisit or amend?

A. No.

Q. Did you ever tell the Social Security

Administration that you were capable of working?

A.   No.

Q.   Did you ever ell the Social Security Ministration that you were looking for work?

A.   No.

Q.   Having reviewed a number of documents today from the Social Security Administration records that were produced, is there anything that you believe that was submitted to Social Security that was incorrect?

A.   No.

Q.   For the record I would like to request that the email account that was listed on at least one of the Social Security forms be checked to see if there's correspondence in the email account pertaining to the Social Security claim.

It sounds like there likely was correspondence regarding the claim and that based on the testimony that it wasn't searched to see if there was anything responsive to the document request in this case.

And then other than that, I don't have any further questions for today?

MR. ROSENBAUM:  Can you stand by for one second?  Literally like about a minute.

MS. JONES:  Yep.

VIDEO SPECIALIST:  Just stay on the

record, or --

MS. JONES:  Yes, let's just stay on the record.

MR. ROSENBAUM:  Okay, yeah, we're good. We would like signature through my office.

MS. JONES:  So you're not asking any questions; is that right?

MR. ROSENBAUM:  No, I'm not.  Okay.  Thank you for your time, Mr. Lee.

VIDEO SPECIALIST:  We're going off the record at 12:20 p.m.

STENOGRAPHER:  Just real quick if I could have counsel on the transcript record your transcript orders if any.  Go ahead.

MR. ROSENBAUM:  Yes, we would like a copy of the transcript in all formats.  We don't need a copy of the video at this time, but just a copy of the written transcript.  Thank you.

STENOGRAPHER:  Amanda, how would you like your transcript?

MS. JONES:  Just the usual.

(Deposition concluded at 12:20).

- - - - -

Page 111

I, PRESTON LEE, hereby certify that I have read the foregoing typewritten pages, 1 through 112, inclusive, and corrections, if any, were noted by me, and the same is now a true and correct transcript of my testimony.

DATED: Honolulu, Hawaii, _____

_____

PRESTON LEE

Signed before me this _____

Day of _____, 20____.

_____

Case:  PRESTON LEE vs. L3HARRIS, ET AL.
Civil No.:  1:20-CV-00489 LEK-KJM
Deposition Dated:  May 20, 2024
Taken by:  Sheila Moore

JUN 7 2024

Page 112

CERTIFICATE

I, Sheila Moore, Certified Shorthand Reporter, do Hereby certify:

That the foregoing deposition was taken before me on the date and at the time shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript:

_X_ Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

____ Was NOT made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

____ Was waived.

I further certify that I am not an attorney for any of the parties thereto, nor in any way concerned with the cause.

Dated this 5th day of June, 2024, in Honolulu, Hawaii.

_____
Sheila Moore, CSR No. 501