IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PRESTON LEE,                              ) CIVIL NO. 20-00489 LEK-KJM
                                          ) (Other Civil Action)
                    Plaintiff,            )
                                          ) DECLARATION OF PRESTON LEE
        vs.                               )
                                          )
L3HARRIS TECHNOLOGIES, INC.;              )
JOHN DOES 1-10; JANE DOES 1-10;           )
DOE CORPORATIONS 1-10; DOE                )
PARTNERSHIPS 1-10; DOE                    )
UNINCORPORATED                            )
ORGANIZATIONS                             )
1-10; and DOE GOVERNMENTAL                )
AGENCIES 1-10,                            )
                                          )
                                          )
                    Defendants.           )
                                          )
_____ )

DECLARATION OF PRESTON LEE

STATE OF HAWAI'I                )
                               ) SS.
COUNTY OF KAUA'I               )

I, PRESTON LEE, do hereby declare that:

1.      Unless otherwise indicated, I make this declaration based upon my

personal firsthand knowledge. All of the statements in this declaration are true. I

understand that if I make a false statement, I may be prosecuted for perjury.

2.      I am competent to testify to the matters set forth herein.

3.      I am the Plaintiff in this lawsuit.

4.      I am a sixty (60) year old a combat veteran who served our country in the United States Navy from 1982-1992.

5.      I served two tours in the Persian Gulf in the late 1980's/early 1990's.

6.      In 1991 in the Persian Gulf, I was involved in a hostile confrontation with opposing forces at which time I feared for my life as I was gunning from a helicopter against hostile opposing forces in boats.

7.      Also, around this same time, a Navy boat right in front of my Navy boat was hit by a mine in the Persian Gulf, nine (9) men died and the boat had to be towed away to get fixed.

8.      The men on my boat couldn't sleep at night at all as we all feared that our boat would hit a mine and we would sink and die in our sleep. We would stay awake in fear.

9.      These instances caused me severe stress and fear for my life.

10.      These incidents are what gave rise to my PTSD as I would have nightmares regarding this situation that last to this day causing insomnia.  I wake up between 12 a.m. and 3 a.m. every night dreaming of the helicopter incident and I can see the opposing forces faces in my dreams and at that time I am extremely fearful in my dreams as it is occurring and this wakes me up from my sleep.

11.    I have had these PTSD symptoms since 1991 and according to my doctors I have had PTSD itself since these incidents in 1991.

12.    I never knew what PTSD was until I was informed of what it is by my doctor in or about 2016-2017 when I spoke about my PTSD symptoms with my VA doctor.

13.    I was formally diagnosed with PTSD by at least one of my doctor in or about 2017 or 2018.

14.    I was hired on or about March 20, 1994 to work on the Flight Line at the time ITT Industries ("ITT") was the main contractor for the United States Navy at Barking Sands.

15.    I worked on the Flight Line as a helicopter inspector.

16.    I was promoted during the time I worked for ITT.

17.    I had PTSD the whole time I worked at Barking Sands on the Flight Line for ITT and I never once got into any physical altercations in the workplace and never made any threats against anyone in the workplace. Never.

18.    I never had any performance issues related to my ability to perform my job duties.

19.    In November 2006, I became a painter.

20.    L3 Harris Technologies, Inc. ("L3") took over the United States Navy contract I worked under from ITT at Barking Sands in or about 2015.

21. I held the position of Painter.

22. The entire time I worked for L3 I had PTSD, I just hadn't been diagnosed yet.

23. I submitted documentation to the VA in 2017 and 2018 requesting disability benefits related to my PTSD diagnosis that occurred around the same time. Part of the documentation to the VA reflected my private thoughts and feelings related to my PTSD that I conveyed to my physicians. ***L3 did not have any of this documentation prior to my termination.*** They try to use things I said in confidence to my physicians against me to falsely characterize me as a violent threat in the workplace. However, the comments I made to my doctor were not known to L3 at the time of my termination and were only discovered via discovery in this litigation via L3's subpoena to the VA. L3 attempts to mislead this Court by referencing my comments in Defs. Motion and its Concise Statement of Facts at 6-10. Again my statements to my doctors could not have formed the basis for my termination as they as were not known to L3 at the time of my termination.

24. In February 2019, I received 100% VA disability benefits due to my PTSD.

25. At the time the VA approved my 100% disability benefits, the VA knew I was employed at L3 and there is nothing that forbids a military veteran from receiving 100% VA benefits for PTSD and/or other injuries to continue to

work in the private sector.

26.    L3 became aware of my PTSD disability via L3 Lead Sean Igne in or about February 2019 after I informed Mr. Igne I received 100% VA benefits based on my PTSD.

27.    I worked on a day-to-day basis with Mr. Igne, Gilbert Castro and David Hesapene at the paint shop for L3. I worked side-by-side with these guys on a day-to-day basis.

28.    I did not work with L3 employee Mark Vegas on a day to day basis as he was not in the paint shop. He was a rigger.

29.    Since disclosing my PTSD in the workplace, I was harassed and unfairly disciplined.

30.    L3 Lead Sean Igne, who worked with me side-by-side, told L3's human resources that he was afraid to work with me because of my PTSD.

31.    In or about February 2019, Mr. Igne asked me why I didn't just retire because I got my 100% VA benefits for PTSD.

32.    I told Mr. Igne it was none of his business.

33.    In or about March 2019, L3 Rigging Shop Lead Mark Vegas went to their union meeting and asked how I could be working if I had 100% disability for PTSD.

34.    Tony Pereira, L3 Lead Electrician, then stated: Wait a minute, Preston

has 100% PTSD disability then he is a liability for the company. We have to inform the company because if he snaps the company will get sued. They have to let him go.

35.     Mr. Igne wrote a letter to L3 to falsely portray me in a negative light as a violent person in the workplace that was a threat to him and my coworkers. This was completely false. Mr. Igne knew this was false and as listed below, Mr. Igne has been proven to be a liar and a thief of government gas and has falsified his time cards at work. He is simply a liar and a cheat.

36.     As is clear, I had PTSD since 1991 and worked at Barking Sands since 1994 and for L3 since 2015 and I never did anything violent in the workplace and I never threatened or physically harmed anyone. Never once.

37.     Although PTSD does result in irritability and other negative emotions, part of having this disability is me learning to deal with it and maintain my mental wellbeing through learning coping mechanisms and to not let situations enflame my PTSD.

38.     Through my efforts to keep my PTSD in check, I have always kept it together at work and I have never been violent with anyone at the workplace and I would never. I told L3 the same.

39.     I conveyed this to L3's human resources', Julie Broyles, when they asked me about it as noted below. I confirmed that I did not want to hurt my

6

coworkers or in any way be violent in the workplace.

40. I have never once been in a physical altercation in the workplace and I have never physically threatened anyone in the workplace.

41. Working at Barking Sands is and has always been a workplace for blue collar workers and many veterans. It is quite common for the employees to be cursing in the workplace and at each other.

42. Every day that I worked at L3 my coworkers were cursing in the workplace.

43. My former manager/supervisor Rod Martin himself would curse in the workplace. I personally heard Mr. Martin curse more than five (5) times.

44. Mr. Igne himself would also curse in the workplace. I have heard Mr. Igne curse at least twice a day when I worked with him. I worked with Mr. Igne for fourteen (14) years.

45. Rod Martin likely heard Mr. Igne curse in the workplace as it was so common.

46. I also tried to remain professional in the workplace.

47. My professional conduct is reflected in that I never had a poor performance review and, in 2019, I received from L3 an award for 25 years of dedicated service. Now L3 tries to characterize me as violent and a threat. Why was this never document until the one incident in November 2019 noted below if I

7

had such a history of violence.

48.    It is because I was never once physically violent in the workplace and they want to falsely characterize someone as violent that has PTSD.

49.    I worked at Barking Sands for 26 years and never was I violent. I might have been loud and might have cursed, but this was commonplace in this blue collar and veteran-filled workplace.

50.    In or about March 2019, I was told by my supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m.

51.    I did as instructed and met with Julie Broyles head of L3 HR in Hawai'i and Jasmine Apo an L3 HR representative.

52.    At the meeting, Ms. Broyles confirmed she was aware of my PTSD.

53.    Ms. Boynes began to ask me a series of questions listed below related to my PTSD as Ms. Apo took notes.

54.    Ms. Broyles stated because of my PTSD they had to ask me some questions.

55.    Ms. Broyles stated they had to ask me these questions because, "We are here to help you."

56.    I came to find out it was a witch hunt and they were not trying to help me, but force me out of the workplace because of L3 completely false belief and conclusion that I was a threat because of my PTSD.

57.    Ms. Broyles asked, amongst other questions:

a. Do you want to hurt your coworkers? I answered, "No."

b. Do you want to hurt yourself? I answered, "No."

c. Do you want to kill your coworkers? I answered "No."

d. Do you want to kill yourself? I answered, "No."

e. Do you have an anger problem? I answered, "No."

f. Do you want to kill people when you get angry? I answered, "No."

g. Do you need anger management classes? I answered, "No."

h. Do you need a psychiatrist? I answered, "No."

i. Do you have a drug problem? I answered, "No."

j. Do you have an alcohol problem? I answered, "No."

58.    I asked them if they were trying to fire me and Ms. Broyles and Ms. Apo said they were there to help me.

59.    Ms. Broyles asked me if I needed any accommodation.

60.    I responded, "No" as I had been functioning in the workplace up to that point for twenty-five (25) years without accommodation and without any violence or any other threatening conduct.

61.    I had been able to perform my job duties as a painter for years without anyone calling my ability to do my job functions into question. I saw no reason to need an accommodation. Nothing had changed. It was only Mr. Igne falsely saying I was a threat due to my PTSD that caused this to occur.

62.    Mr. Igne would always request I cook all the guys breakfast when we would paint a house on the base and after I got diagnosed with PTSD he

stopped doing this. Mr. Igne was not afraid of me, he was afraid of my diagnosis.

63. L3 would not end up helping me. What they did was fire me due to my PTSD.

64. After I was called in and interviewed by HR, I spoke with L3's Bill Nordmeier, the operator for grounds department, who informed me he also had just received 100% VA disability for his back.

65. Mr. Nordmeier was still working at L3s although he has 100% disability.

66. Due to the way I was questioned by HR after getting his 100% disability from the federal government, Mr. Nordmeier told me he went to L3 HR to inform them that he also got his 100% disability.

67. Mr. Nordmeier told me he went to L3 HR and disclosed that he had received 100% disability from the federal government and wanted to disclose it to L3.

68. Mr. Nordmeier told me that HR at L3 told Mr. Nordmeier that he doesn't need to disclose it and that he shouldn't talk about his disability at work as it was personal.

69. On or about April 9, 2019, I was called by L3's Scott Taylor and I reported to Mr. Taylor about Mr. Igne stealing the gasoline.

70. On or about November 15, 2019, my coworker Gilbert Castro

was verbally warned by the safety lady at Barking Sands for not wearing protective gear.

71.  After lunch on the same date, Mr. Igne yelled at me to put on pants which I immediately complied with.

72.  I was power washing at that time and was wearing shorts because I was soaking wet.

73.  I was wearing steel toed rubber boots.

74.  At that time, Mr. Igne was also wearing shorts and tennis shoes.

75.  Mr. Igne wore shorts and tennis shoes every day at work.

76.  Based on information and belief, Mr. Igne told human resources/management via a note/letter that I had previously been warned for not wear my pants. This was not true.

77.  My understanding is that Mr. Igne told L3 human resources/management that I yelled at or got aggressive with Mr. Igne when Mr. Igne asked me to put my pants on. This was a lie.

78.  On the same date, I told Mr. Igne, "Tomorrow if I have to wear long pants, you have to wear long pants. If I have to wear steel toe shoes you have to wear steel toe shoes. What is good for one is good for all. So come tomorrow morning have your PPE or else."

79.  Mr. Igne said, "Or else what, you going turn me in?"

11

80.    I respond, "Yeah"

81.    Mr. Igne: "Well fuck you"

82.    I respond: "Well fuck you too."

83.    Mr. Igne and I exchanged a couple more "fuck yous" and I realized it was wrong and walked away.

84.    I never physically threatened Mr. Igne.

85.    Mr. Igne claims that when we spoke my hands were "fisted and my chest was popped out." This is completely false. I was in no way physically threatening Mr. Igne.

86.    The following workday, I was called into Mr. Martin's office regarding the letter/note that Mr. Igne wrote to human resources/management regarding the previous day's confrontation with me.

87.    Mr. Martin asked why wasn't I wearing my pants after I had already been written up by the safety lady previously?

88.    I responded, "I never got written up."

89.    Mr. Martin was surprised and said, "What?"

90.    I said, "Yeah, I never got written up. Gilbert got written up"

91.    Mr. Martin looked at the letter and told me I better not lie.

92.    Mr. Martin again asked me if I got written up by the safety lady previously and I emphatically said no.

12

93.    I had not been written up by the safety lady. There were multiple witnesses to this fact.

94.    During this meeting I told Mr. Martin, "How can he tell me to put on long pants when he is wearing shorts and tennis shoes?"

95.    Wearing shorts and tennis shoes on the jobsite is a clear OSHA safety violation that Mr. Martin clearly had been aware of for years.

96.    Mr. Martin said he was going to investigate me and this alleged incident.

97.    I stated, "Why am I always being investigated. Why don't you investigate Mr. Igne?"

98.    To note, previously in or about October 2017, Mr. Igne lied to Mr. Martin and stated I walked up to Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and saying I was going to kick Mr. Igne's ass after work.

99.    This was proven to be a lie by the two witnesses present.

100.    In his letter to L3 regarding him being afraid of me, Mr. Igne cites to the incident on October 24, 2017. The truth of that incident is that Mr. Igne claimed that I had again clenched my fists and popped out my chest like I wanted to fight. This incident was investigated by L3 and David Hesapene, who was a direct witness told the truth. David Hesapene reported that I never had clenched fist and a popped out chest and never said I wanted to fight Mr. Igne.  Mr. Igne was

13

again lying. The investigation, done by Rodney Martin, came back that I did nothing wrong.

101.   I asked Mr. Martin to write up Mr. Igne for lying regarding the October 2017 incident and Mr. Martin did nothing.

102.   On November 18, 2019, I had a meeting with human recourses and Mr. Martin regarding the confrontation with Mr. Igne.

103.   I was told I was being written up for breaking the code of conduct for telling Mr. Igne fuck you.

104.   I responded, "I said fuck you because he told me fuck you."

105.   I then said: "You guys are always investigating me for this and investigating me for that."

106.   I asked why I was being investigated when others are not.

107.   I said if they wanted to investigate something, you should investigate Mr. Igne for stealing gas.

108.   I reported that every Tuesday and Thursday for years Mr. Igne would take 5 gallons of gas for his personal vehicle via a gas container. This is federal government gas.

109.   During his deposition, my coworker, Gilbert Catsro, admitted and confirmed that Mr. Igne had been stealing gas from the workplace. In other words, Mr. Igne was stealing gas paid for by the Untied States government.

14

110.   This could have easily been investigated and confirmed via the amount of gas Mr. Igne was using for his company vehicle compared to the amount of gas he used.

111.   I then told them I had to immediately take stress leave and that I could not work under these conditions as I felt I was being single out now that I was officially diagnosed with PTSD and those at the workplace knew about my diagnosis.

112.   I went to see my doctor that very day to be placed on stress leave.

113.   My stress leave was effective November 21, 2019.

114.   On December 5, 2019, Ross West, the L3 project manager called me and requested my CAC card and secret clearance card. The CAC and secret clearance cards are national security sensitive. We received security clearance training every year. We are supposed to give the CAC card and secret clearance card to security not to Mr. West.

115.   I was directed by Mr. West to give my CAC card and secret clearance card to Mr. West and if he wasn't there then give it to his secretary.

116.   I objected and said that was not proper as the CAC card and the secret clearance card were national security related items that need to be secure at all times.

117. I did not think I should give such items to Mr. West.

118. Following Mr. West's directive, I brought the CAC card and secret clearance card on December 6, 2020 to Mr. West's office.

119. As Mr. West was not there, I did as directed and left my CAC and my secret clearance card with Mr. West's secretary.

120. This was a clear national security violation as I should have been directed to provide the CAC card and secret clearance card to the L3 security to safeguard those security sensitive items.

121. There were other L3 employees including Melissa Castillo and William "Bill" Milke, who were on stress leave that did not have their CAC cards and clearance cards removed by L3. They did not have PTSD.

122. On or about April 1, 2020, I was ready to come back to work from stress leave and my doctor, Dr. Williamson, had released me to return to work.

123. I was told by human recourse to stay home and I would be paid my full wages.

124. I was never notified by L3 that they felt I was a threat to return to the workplace or was I given a chance to provide my side of the story. I was never called by L3 to determine if I was a threat to return to the workplace. I was never interviewed, my psychologists/psychiatrist were not interviewed, I had no

chance to refute any of L3's feelings that I was a threat to return to the workplace. L3 never did any investigation into whether I was a threat to the workplace in 2020 that included me or any doctor's or family on my behalf that would verify I was not a threat to the workplace. My twenty-six (26) years working at Barking Sands, while I had PTSD, with no violence in the workplace is evidence that I was not a threat to the workplace or my coworkers.

125.    On June 22, 2020, I was issued my termination letter that does not indicate why I was terminated.

126.    I was never told why exactly I was terminated.

127.    In February 2020, as part of my worker's compensation claim's defense by the employer to deny me benefits, I did an interview with Dr. Peter Bianchi who was a "hired gun" for the defense of my work comp claim.

128.    I have been seeing a psychologist and psychiatrist through the VA and never had they said that I was a threat to the workplace as a veteran with PTSD.

129.    During this interview, I told Dr. Bianchi that when I am at home and I am drinking that I have some negative thoughts.

130.    Dr. Bianchi's February 4, 2020 report states that: *Mr. Lee describes his moods as 'pissed, tired, lonely, sad, ready to explode, hurt, my feelings is hurt, nobody listens to me'. He states that he goes home and drinks beer*

*and watches television. He states that he doesn't count how much he drinks, that he just comes home from work, drinks beer until it's time for him to go to sleep. Mr. Lee states that during this time* **he has no thoughts of hurting himself or others**, *but 'it crosses my mind to do something stupid though, like instigate a fight or start an argument for no reason with some people just to do something, that's only when I'm drinking though'.* Defs. Ex Z attached to Defs. CSF.

131.    There is nothing there that says I thought about starting a fight at work. I have these thoughts when I am sitting at home in my garage drinking not at work. It is not about starting a fight at work.

132.    I can't recall exactly saying this quote, but clearly I have some negative thoughts related to my PTSD while I am at home drinking. I have never acted on any of these negative thoughts and the statements were not regarding the workplace as is evidence from the language of Dr. Bianchi's' report. L3 cherry picks some phrasing from Dr. Bianchi's report to try to make me out as a threat of violence in the workplace. I am not and would never be. If I wanted to attack someone in the workplace I could have. I never did and never would. I controlled my thoughts and/or feelings in the workplace. As Dr. Bianchi's reports states, I have "no thoughts of hurting myself or others."

133.    Moreover, L3 also claims it bases its decision to terminate me on Dr. Bianchi's April 7, 2020 letter.

18

134.   L3 claims at CSF at 33 that it "asked Dr. Bianchi how likely it is that there would be another episode if Plaintiff returned to work, to which Dr. Bianchi responded: "It remains my opinion that without treatment the prognosis for successful maintenance of occupational functioning without another episode as the situation on 11-18-19 is at best guarded." See Defs. Ex. AA. This is again cherry picking and not giving this Court the full story. Moreover, Dr. Bianchi is not saying that he could say I was a threat to return to the workplace. His response is not firm and at best equivocal. He said it is "at best guarded". This is not affirming anything.

135.   The truth is Dr. Bianchi's April 7, 2020 letter stated, in the following paragraphs:

"Further, you requested opinion if Mr. Lee was a danger to himself or others if he is returned to work after his "timeout" without having treatment. When Mr. Lee was evaluated on 2-04-20, he evidenced no suicidal ideation and stated 'it crosses my mind to do something stupid though, like instigate a fight or start an argument for no reason with some people just to do something, that's only when I'm drinking though'. *As a result, I am of the opinion upon Dr. Williamson's clearance for Mr. Lee to return to work, it is incumbent on Dr. Williamson to certify that at the time of clearance to return to work Mr. Lee represents no risk of danger to others.*

19

*__In addition, you requested opinion if it was medically/psychologically reasonable to return Mr. Lee to his usual and customary duties without treatment and fitness to return to work evaluation. Frankly, I am of the opinion that this determination is the province of Dr. Williamson to make upon review of my Report on Psychological Evaluation of Mr. Lee since he is the treating physician of record."__* Defs. Ex AA.

136.    Dr. Williamson was my physician/therapist and L3 did not follow Dr. Bianchi's instructions as they did not contact Dr. Williamson to see if I was fit to return to work or if I was a threat.

137.    L3 did not do a fitness to return to work evaluation. They didn't do this as Dr. Williamson knew I was fit to return to work and would have told L3 the same upon being asked.

138.    L3 did not allow Dr. Williamson to make the determination if it was safe for me to return to work or if I was a threat as Dr. Bianchi suggested they should.

139.    L3 fired me without following the advice of their own hired Dr. Bianchi. Dr. Bianchi could not and did not say that I was threat to return to the workplace. He recommended Dr. Williamson make that determination which L3 ignored, did not ask Dr. Williamson his opinion or if he could assure I was not a threat to return to the workplace. Instead, I was fired for having PTSD.

140.    We cannot lose sight of the fact that Dr. Bianchi's report is a result of me going on stress leave and filing a work comp case for a stress injury. My leave was not because I was a threat in the workplace. I took voluntary leave.

141.    L3's Human Resources Manager, Danielle Stewart also misrepresents what Dr. Bianchi's report said. In Ms. Stewart's declaration attached to Defs. CSF at ¶ 10 she states that Dr. Bianchi's report stated, "that Mr. Lee said he had thoughts of doing something stupid at work like instigating a fight or argument with another for no reason."

142.    As noted above in the quote from Dr. Bianchi's report and Dr. Bianchi's report as a whole, I never said this regarding anything at work. This is while I am home drinking. When Dr. Bianchi was reporting about my thoughts of instigating a fight I was talking about while I was at home. It has nothing to do with the workplace according to the letter of Dr. Bianchi's report. *See* Defs. Ex Z.

143.    Rodney Martin claims in his declaration attached to L3's motion that I **_could be_** volatile, becoming angry with my coworkers over minor issues. Martin Decl at ¶3. This is not true. He provides zero examples of this besides the one mutual confrontation with Mr. Igne that is discussed above.

144.    Mr. Martin claims he had discussions with me at various times over the years about the need to be civil towards my coworkers and remain calm and professional. This is completely untrue and this is not in my yearly evaluations as it

21

is not true.

145.    I was never written up in all my years at Barking Sands for being volatile, uncivil or unprofessional in the workplace until the Igne incident in November 2019. In fact, I never had a negative performance evaluation. Nothing was ever said about this to me and I was never written up for these allegations of being volatile, uncivil or unprofessional in the workplace, which are not true, until I was written up due the mutual confrontation with Mr. Igne and thereafter fired.

146.    Mr. Igne was not fired by L3 for the mutual confrontation although he was extremely hostile yelling at me and cursed at me before I cursed at him and cursed at me repeatedly while yelling at me.

147.    Mr. Igne started the cursing and yelling yet he was not perceived as a threat as he does not have PTSD.

148.    After I was terminated and as a result of being discriminated against and wrongfully terminated, my condition related to my PTSD and related symptoms deteriorated substantially.

149.    As a result of my termination and my emotional fallout related thereto, my condition of PTSD became such that I could not work, think clearly, interact with others, be around people, sleep or eat as I normally could prior to the wrongful termination.

150.    After my termination, I contacted the Social Security ("SS") office

on June 25, 2020 to file for Social Security Disability Benefits (SSD) as the exacerbation of my PTSD caused by my termination and my negative thoughts, anxiety and worry regarding the same caused me to be no longer be able to work, think clearly, interact with others, be around people, sleep or eat.

151.    Several of the documents that were produced as a result of Defendant L3Harris's subpoena to the SS office reflect that I initially filed on June 25, 2020.

152.    Up until my termination, I was ready and willing to return to work as I previously had been working and completing all of the essential job duties.

153.    After being wrongfully terminated, I was essentially losing my mind. I just wanted to be alone and rarely left my house.

154.    I fell into a deep depression.

155.    I never contacted or filed anything regarding SSD until I was terminated. I did not file anything with the SS office on June 17, 2020.

156.    No one assisted me with filing my initial SSD filing on June 25, 2020.

157.    In my June 25, 2020, SSD filing I submitted everything to the best of my knowledge and ability.

158.    My first SSD application was denied likely because I didn't know how to fill out the form or provide the necessary information and documentation.

23

159.    When I tried to fill out and file my initial SSD application, I probably filled it out wrong as I get confused and have headaches when I fill out these types of forms.

160.    As is a well-known symptom of PTSD, my PTSD causes me to have issues with my short-term memory.

161.    In my June 25, 2020 SSD filing, I put the date of disability as November 18, 2019 as that was the last day I actually worked before being terminated. This is what I understood the question to mean at the time.

162.    I never contacted the Social Security office to apply for disability benefits before I was terminated as I thought I would be returned to the workplace after taking my stress leave.

163.    I never thought about contacting the Social Security office until I was terminated, and my PTSD symptoms got much worse to the point I could no longer work.

164.    I was ready and willing to return to work as I informed my employer via my doctor, Dr. Williamson.

165.    I filed a second request for SSD benefits on or about October 6, 2021 after my first application was denied. The date I put for the start of my disability in this second SSD application was June 23, 2020, the day after my termination when my PTSD condition got much worse.

166. I was finally granted my SSD benefits in 2023.

167. When I received my SSD benefits in 2023 I discarded any documents related to my filing as I received the benefits and didn't need them any longer.

168. I have not worked a day since being terminated as I am unable to function at a level that I could be employed.

169. I searched my email accounts and found no emails from the SS office related to my applications for Social Security Disability benefits.

Further Declarant Declares Naught

I, PRESTON LEE, do declare under penalty of perjury that the foregoing is true and correct.

DATED: Kaua'i, Hawai'i, August 7, 2024.

PRESTON LEE